1    JOSEPH M. GABRIEL (SB #123716)
     ROSENFELD, MEYER & SUSMAN, LLP
2    9601 Wilshire Boulevard
     Fourth Floor
3    Beverly Hills, California 90210-5288
     Telephone: (310) 858-7700
4

5    Attorneys for Defendants,
     FM ENTERTAINMENT, INC.,
     erroneously sued as
6    FM ENTERTAINMENT CO. and
     FM ENTERTAINMENT INTERNATIONAL
7    (II), N.V.

8

                 UNITED STATES DISTRICT COURT
9

                 CENTRAL DISTRICT OF CALIFORNIA
10

11   FRANK DUX                  )   Case No. CV 97-8409 JSL(VAPx)
                               )
12               Plaintiff,    )   (Honorable J. Spencer Letts)
                               )
13      vs.                      )   NOTICE OF MOTION AND MOTION FOR
                               )   SUMMARY JUDGMENT, OR IN THE
14   ALAN MEHREZ, FM ENTERTAINMENT    )   ALTERNATIVE, SUMMARY
     CO., DIANE MEHREZ            )   ADJUDICATION; MEMORANDUM OF
15                                )   POINTS AND AUTHORITIES AND
              Defendants.    )   DECLARATIONS OF ALAN MEHREZ,
16                                )   MARK DISALLE AND JOSEPH M.
                               )   GABRIEL IN SUPPORT THEREOF
17   _____ )
                                    DATE:      November 16, 1998
18                                     TIME:      1:00 p.m.
                                    CTRM:     Hon. J. Spencer Letts
19

20

21   TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

22       PLEASE TAKE NOTICE that on November 16, 1998 at 1:00 p.m. or

23   as soon thereafter as counsel may be heard, in the courtroom of the

24   Honorable J. Spencer Letts, District Judge of the United States

25   District Court for the Central District of California, located at

26   312 North Spring Street, Los Angeles, California 90012, Defendants

27   FM ENTERTAINMENT, INC. and FM ENTERTAINMENT INTERNATIONAL (II)

28

LAW OFFICES
**ROSENFELD,**
**MEYER, &**
**SUSMAN, LLP**

1   N.V.[1] (collectively, "Defendants") will move the Court, and hereby

2   do move the Court, for summary judgment, or in the alternative for

3   summary adjudication, of each of the remaining causes of action[2]

4   asserted in the First Amended Complaint ("FAC") of Plaintiff FRANK

5   DUX ("Plaintiff"), pursuant to Fed. R. Civ. P. 56(b) (or, if

6   appropriate, Fed. R. Civ. P. 56(d)), on the ground that there is no

7   genuine issue as to any material fact as to each remaining claim

8   and that Defendants are entitled to judgment as a matter of law.

9   Specifically:

10      Defendants move for summary judgment or alternatively for

11   summary adjudication on "Count" Four for Breach of Contract

12   (Defendants' alleged failure to pay Plaintiff a consulting fee on

13   later "Bloodsport" titled films).

14      Defendants move for summary judgment or alternatively for

15   summary adjudication on "Count" Seven for Breach of Contract

16   (Defendants' alleged failure to provide Plaintiff with a written

17   agreement regarding certain purported life rights).

18      This Motion will be based upon this Notice of Motion and

19   Motion; the attached Memorandum of Points and Authorities,

20   Declarations and Exhibits, the accompanying Separate Statement of

21   Uncontroverted Facts and Conclusions of Law which is filed

22

23   [1] Counsel have discussed a stipulation adding FM Entertainment
    International (II), N.V. as a defendant.  Although Plaintiff
24   prepared a draft of that stipulation (which Defendants approved
    with minor revisions), the stipulation has not yet been filed.
25   Defendants bring this motion on behalf of FM Entertainment
    International (II), N.V. in order to eliminate the need to bring a
26   largely duplicative motion later.
27   [2] The Court has already dismissed with prejudice all claims in
    Plaintiff's First Amended Complaint except Count Four and Count
28   Seven which both purport to state separate and independent claims
    for breach of contract.

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP

1    concurrently herewith; Plaintiff's First Amended Complaint; the

2    Court's files; and any other matter presented at or before the

3    hearing on this Motion.

4

5    DATED: October 26, 1998          JOSEPH M. GABRIEL
                                      ROSENFELD, MEYER & SUSMAN, LLP

6

7                                     By: _____

8                                         JOSEPH M. GABRIEL
                                          Attorneys for Defendant FM
9                                         ENTERTAINMENT, INC. and
                                          FM ENTERTAINMENT INTERNATIONAL
10                                        (II), N.V.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP

1

# TABLE OF CONTENTS

2

PAGE

3

I.    INTRODUCTION...........................................1

4

II.   SUMMARY OF FACTS.......................................1

5

      A. THE ORIGINAL ACQUISITION OF LIFE STORY RIGHTS.......1

6

      B. QUESTIONS CONCERNING PLAINTIFF'S VERACITY

7
         ARISE...............................................2

8

      C. DEVELOPMENT OF SUBSEQUENT "BLOODSPORT" FILMS

9
         COMMENCES...........................................3

      D. PLAINTIFF TALKS TO DISNEY ABOUT SELLING HIS

10
         LIFE RIGHTS.........................................3

11

      E. DISALLE'S ASSIGNMENT TO FM ENTERTAINMENT

12
         INTERNATIONAL.......................................4

13

      F. DISNEY DIRECTS FRANKEL'S NEGOTIATIONS WITH

         ABRAMS..............................................5

14

      G. PLAINTIFF DISCUSSES THE SALE OF HIS LIFE

15
         RIGHTS TO DISNEY....................................6

16

III.  ARGUMENT...............................................8

17

      A. COUNT FOUR: PLAINTIFF CANNOT PROVE THAT

         DEFENDANTS HAD A CONTRACTUAL DUTY TO USE AND

18
         PAY HIM AS A CONSULTANT.............................9

19

         1. The Consulting Obligation Only Applies to

            Films Which Depict True Incidents From

20
            Plaintiff's Life................................9

21

         2. The Consulting Obligation Was Never

            Delegated to Defendants........................10

22

      B. COUNT FOUR: PLAINTIFF'S CLAIM IS BARRED BY

23
         THE STATUTE OF LIMITATIONS ON WRITTEN CONTRACT

         CLAIMS BECAUSE PLAINTIFF MADE A DEMAND FOR

24
         COMPENSATION ON "BLOODSPORT II" ON MARCH 17,

25
         1993..............................................13

26

      C. COUNT SEVEN: PLAINTIFF CANNOT PROVE THAT

         DEFENDANTS FAILED TO PERFORM A CONTRACTUAL

27
         OBLIGATION TO PROVIDE PLAINTIFF WITH A WRITTEN

         GRANT BACK AGREEMENT..............................14

28

LAW OFFICES
**ROSENFELD,**
**MEYER, &**
**SUSMAN, LLP**    319300.1

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1. Plaintiff Cannot Prove That He Suffered
Damage As A Result Of The Alleged Breach...........14

2. Plaintiff Cannot Prove That The Purported
Promise To Return The Life Story Rights Was
Supported By Consideration........................16

D. COUNTS FOUR AND SEVEN:  PLAINTIFF CANNOT PROVE
THAT DEFENDANT FMEI IS A PARTY TO ANY CONTRACT
ALLEGED IN THE FIRST AMENDED COMPLAINT................17

IV.    CONCLUSION...............................................18

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP    319300.1

ii

TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

Celotex Corp. v. Catrett,
        477 U.S. 317 (1986) ........................................... 8

May v. Watt,
        822 F.2d 896 (9th Cir. 1987) ................................ 14

Mayes v. Sturdy Northern Sales, Inc.,
        91 Cal. App. 3d 69, 154 Cal. Rptr. 43 (1979) ............... 18

Rickards v. Sleasman,
        704 F.2d 1449 (9th Cir. 1983) .............................. 14

Walker v. Phillips,
        205 Cal.App.2d 26, 22 Cal.Rptr. 727 (1962) ................ 11


STATUTES

California Civil Code §1550 ...................................... 16
California Civil Code §1605 ...................................... 16
California Code of Civil Procedure §337 ......................... 13


OTHER MATERIAL

1 Witkin Summary of California Law (9th ed.)
        "Contracts" §943, p. 841 ................................... 10
2 Corbin on Contracts, (Revised Ed. )
        "Enforcement of Contracts," §5.4, p. 21 ................... 17

1                    MEMORANDUM OF POINTS AND AUTHORITIES

2    I.   INTRODUCTION

3         Plaintiff's two breach of contract claims are based on the

4    erroneous premise that Defendants owe contractual obligations to

5    him.  Defendants are not responsible for either of the purported

6    obligations that Plaintiff contends were breached.  Plaintiff's

7    claim that Defendants failed to pay him as a consultant must fail

8    because it is inconsistent with the plain language of the contracts

9    both as to when the obligation would accrue and as to who would

10   have to pay it.  Moreover, Plaintiff discovered the facts

11   underlying this claim more than four years prior to the filing of

12   this action -- outside of the statutory limitations period.

13        Plaintiff's claim that Defendants breached a purported oral

14   promise to provide him with a written contract granting back

15   certain rights is meritless since the promise was merely a

16   gratuitous favor that Plaintiff now attempts to convert into an

17   enforceable contract.  In any event, Plaintiff cannot prove that he

18   suffered damage as a result of the alleged breach of that promise.

19   The Court should grant summary judgment to Defendants.

20   II.  SUMMARY OF FACTS

21        A.   THE ORIGINAL ACQUISITION OF LIFE STORY RIGHTS

22        In June 1985, Plaintiff entered into an agreement with Mark

23   DiSalle ("DiSalle"), a film producer, under which Plaintiff

24   transferred film and related rights to certain incidents in his

25   life which he claimed were true (particularly with respect to

26   Plaintiff's purported participation in a 1975 sporting event) (the

27   "1985 Agreement").  Exh. 1, p. 1, ¶1.  Under the 1985 Agreement,

28   DiSalle also agreed to engage and pay Plaintiff as a consultant on

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP    319300.1                          1

1    the film project (which was named "Bloodsport") and "on any

2    subsequent Film under this agreement or based upon [Plaintiff's]

3    true-life experiences".  Exh. 1, p. 4, ¶15.[1]  Since Plaintiff

4    claimed that he had additional true life experiences which could

5    possibly serve as a basis for a sequel to "Bloodsport", Plaintiff

6    and DiSalle further agreed that DiSalle could later purchase

7    additional life story rights from Plaintiff for such a potential

8    project.  DiSalle Decl. ¶3.

9        A year later, Plaintiff and DiSalle entered into another

10   agreement (the "1986 Agreement") which was necessary for DiSalle to

11   transfer certain of his rights under the 1985 Agreement to Cannon

12   Films ("Cannon") so that Cannon could finance and distribute

13   "Bloodsport".  DiSalle Decl. ¶4.  Under DiSalle's agreement with

14   Cannon, DiSalle retained all rights and obligations with respect to

15   "Bloodsport" sequels; Cannon received only a right of "first

16   negotiation, first refusal" with regard to negotiating a deal for

17   the acquisition of sequel rights.  Exh. 3, p. 2, ¶ and p. 8, ¶22.

18       B.   QUESTIONS CONCERNING PLAINTIFF'S VERACITY ARISE

19       In 1988, "Bloodsport" was released.  FAC, ¶5.  Soon after,

20   articles appeared in the Los Angeles Times[2] and martial arts

21

22   [1] Under the 1985 Agreement, "Film" was defined to mean a motion
     picture "based upon those certain true incidents, events,
23   experiences and involvements of [Plaintiff] which [were previously
     identified] as a portion of the story of [Plaintiff's] life
24   generally consisting of [Plaintiff's] training as a Ninja beginning
     as a child and culminating with [Plaintiff's] victory at the 1975
25   Kumite Championship and [Plaintiff's] military experiences . . . ."
     Exh. 1, p. 1, ¶1.
26   [2] "Ninja:  Hero or Master Fake?  Others Kick Holes In Fabled Past
     Of Woodland Hills Martial Arts Teacher," Los Angeles Times, May 1,
27   1998.  ("Dux . . . has told the story [in "Bloodsport"] over the
     years to students and martial arts magazines.  It's splendid stuff,
28   obviously the stuff that movies are made of -- and critics say it

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP   319300.1

                                    2

1   magazines asserting that Plaintiff's purported exploits, as

2   depicted in part in "Bloodsport", were false and that Plaintiff was

3   neither a Ninja nor an operative of the Central Intelligence

4   Agency.  DiSalle Decl. ¶5.  DiSalle received numerous telephone

5   calls and letters from investigative reporters and martial arts

6   fans who advised him that Plaintiff's stories were not true.  Id.

7        C.   DEVELOPMENT OF SUBSEQUENT "BLOODSPORT" FILMS COMMENCES

8        Having discovered that Plaintiff's alleged true life stories

9   were fabricated, DiSalle decided that he would not rely on any

10  information from Plaintiff in producing any subsequent "Bloodsport"

11  films.  DiSalle Decl. ¶5.  In 1993, along with a professional

12  writer, Jeff Schecter, DiSalle developed the screenplay for

13  "Bloodsport II".  DiSalle Decl. ¶5.  On March 17, 1993, Plaintiff's

14  agent, Karen Pine, sent a letter to Odyssey Pictures, which was

15  then developing the "Bloodsport II" film project, asserting that

16  Plaintiff was entitled to compensation under the 1985 Agreement for

17  the "sequel" to "Bloodsport".  Exh 11.  No compensation was ever

18  paid to Plaintiff in connection with "Bloodsport II".  FAC, ¶32b.

19       D.   PLAINTIFF TALKS TO DISNEY ABOUT SELLING HIS LIFE RIGHTS

20       In late 1993, Lucas Foster, an executive with Simpson-

21  Bruckheimer Productions ("SBP") expressed interest in acquiring

22  certain life story rights from Plaintiff.  Exh. 14, Foster Depo.,

23  p. 35, ln. 3 to p. 37, ln. 21.  Plaintiff's representatives

24  provided information regarding Plaintiff's involvement in

25  "Bloodsport" to SBP and The Walt Disney Company ("Disney") (with

26  which SBP had a "development deal").  Exh. 14, Foster Depo., p. 45,

27

28  is about as real as the average macho fantasy.").  See Request for
    Judicial Notice, Exh. 1.

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP     319300.1

                                3

1    ls. 5-23.  After its review of that information, Disney became

2    concerned that a portion of Plaintiff's life story rights could be

3    owned by DiSalle or a successor.  Exh. 14, Foster Depo., p. 39, ln.

4    13 to p. 40, ln. 17.  Disney asked Plaintiff to secure a writing

5    clarifying the status of Plaintiff's life story rights so that

6    Disney could approve of Plaintiff's "chain of title" to the rights.

7    Exh. 14, Foster Depo., p. 40, ln. 20 to p. 41, ln. 17.

8          Plaintiff's counsel, Michael Frankel, contacted DiSalle's

9    attorney to see what DiSalle's position was with respect to

10   Plaintiff's life story rights.  Given DiSalle's decision not to

11   make any other films based on information that Plaintiff provided,

12   DiSalle agreed to return any rights that he or his producing entity

13   owned with respect to any subsequent film or television project

14   based on Plaintiff's true life stories (the "Alleged Oral

15   Agreement").  DiSalle Decl., ¶7.

16        E.   DISALLE'S ASSIGNMENT TO FM ENTERTAINMENT INTERNATIONAL.

17        In 1994, coinciding with his discussions with Plaintiff's

18   attorney regarding the return of Plaintiff's unexploited life story

19   rights, DiSalle's producing entity assigned its rights in

20   "Bloodsport" to Defendant FM Entertainment International (II), N.V.

21   ("FMNV").  Mehrez Decl. ¶2; Exh. 9.  FMNV was interested in

22   acquiring the "Bloodsport" rights primarily because of the value

23   that it saw in marketing films which contained "Bloodsport" in the

24   title -- FMNV had no interest in producing motion pictures which

25   involved Plaintiff's life story.  Mehrez Decl. ¶2.

26        In late 1994, DiSalle's representatives advised Frankel that

27   he would have to deal with FMNV with respect to memorializing the

28   Alleged Oral Agreement in light of the transfer to FMNV.  Exh. 11,

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP        319300.1                                4

1    Frankel Depo., p. 67, ls. 3-19.  Since FMNV had no interest in

2    Plaintiff's life story rights, FMNV's attorney, Alan Abrams, began

3    to work with Frankel in putting together a writing that reflected

4    the Alleged Oral Agreement.  Exh. 12, Frankel Depo., p. 56, ln. 12

5    to p. 57, ln. 4.  Frankel and Abrams negotiated several drafts of

6    that writing (collectively, the "Draft Agreements").  Exh. 8.

7         F.   <u>DISNEY DIRECTS FRANKEL'S NEGOTIATIONS WITH ABRAMS</u>

8         Since Disney and SBP requested the Draft Agreement, they

9    directly controlled Frankel's negotiations with Abrams -- a fact

10   which Frankel did not disclose to Abrams because he feared that

11   Abrams would demand payment for the conveyance of rights if he knew

12   that a major studio was interested in acquiring them.[1]  One of

13   SBP's attorneys prepared the first version of the Draft Agreement.

14   Exh. 12, Frankel Depo., p. 38, ls. 25.  In approximately August

15   1996, Frankel and Abrams encountered difficulties in finalizing the

16   Draft Agreement.  Among other disagreements, Abrams objected to

17   Frankel's insistence that FMNV indemnify Plaintiff for any "alleged

18   breaches" of FMNV's warranties regarding title to Plaintiff's life

19   story rights.  Exh. 12, Frankel Depo. p. 150, ls. 1-14.  Abrams

20   reasoned that the "alleged breach" language that Plaintiff demanded

21   for the indemnity provision would unfairly require FMNV to defend

22   Plaintiff and/or the ultimate purchaser of Plaintiff's life story

23   rights in a frivolous lawsuit even though FMNV received nothing of

24   value for the return of the rights.  Behind the scenes, Disney

25   _____

26   [1] In fact, when Abrams directly asked Frankel if Plaintiff had
     found someone interested in purchasing his life rights, Frankel
27   replied that there was no purchaser, but that Plaintiff was relying
     on "advisors" who provided insight as to what a "hypothetical major
28   studio" would want to see in the Draft Agreement to approve
     Plaintiffs' chain of title.

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP

319300.1

5

1    provided Plaintiff with alternate language for the objectionable

2    "alleged breach" provision, but Abrams found that language

3    unacceptable as well.  Throughout this process, Frankel kept making

4    changes to the Draft Agreements, other than solely with respect to

5    the "alleged breach" language which prevented Abrams from

6    recommending that FMNV sign any version of the Draft Agreements.

7         G.   PLAINTIFF DISCUSSES THE SALE OF HIS LIFE RIGHTS TO DISNEY

8         At the same time that Frankel was negotiating Draft Agreements

9    with Abrams, he received a first draft of a contract from Disney

10   outlining the terms under which Disney offered to acquire certain

11   life rights from Plaintiff including the film rights to Plaintiff's

12   purported nonfiction work "The Secret Man" (the "Draft Disney

13   Agreement").  Exh. 4.  The Draft Disney Agreement contained several

14   express conditions precedent, including the requirement that

15   Plaintiff provide Disney with any writings that were necessary to

16   satisfy Disney's "chain of title" concerns regarding Plaintiff's

17   life story rights and the prerequisite that Jerry Bruckheimer sign

18   an agreement to produce the film.  Exh. 4, ¶1(a).

19        Frankel, Karin Pine, and Joel Gotler, Plaintiff's literary

20   agent, provided Disney with extensive written revisions to the

21   Draft Disney Agreement including many points that directly effected

22   the economic terms of the deal.  For example, Disney offered to pay

23   Plaintiff a $125,000.00 option fee to purchase certain of

24   Plaintiff's life story rights which would be *deducted from* a

25   $500,000 purchase price if Disney exercised the option.  Exh. 4,

26   ¶4(a) and ¶5(a).  Plaintiff's representatives took issue with

27   Disney's attempt to secure a full credit for the option fee when

28   Disney paid the purchase price and argued that the $500,000

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP    319300.1

6

1    purchase price should be *in addition to* the option fee.  Exh. 7, p.

2    7.  Plaintiff also proposed a reduction in Disney's merchandising

3    rights so as to allow Plaintiff to market his own products and he

4    sought to limit the publication rights that Disney would receive.

5    Exh 7, p. 2.

6        At around the time that Plaintiff gave Disney his written

7    revisions to the Draft Disney Agreement, articles questioning the

8    credibility of the "true" stories that Plaintiff recounted in "The

9    Secret Man" appeared in the press.[1]  Larry W. Simmons, a renowned

10   former Navy SEAL Commander and the author of the foreword to "The

11   Secret Man" wrote the following in a letter to the book's

12   publisher:  "It has come to my attention that much of the

13   information in [Plaintiff's] book is a fabrication and that I have

14   been deceived into lending credibility to this fraudulent book."

15   General Norman Schwarzkopf also issued a public statement about

16   "The Secret Man", asserting that Plaintiff's alleged participation

17   in a highly sensitive mission during the Gulf War was false.[2]

18   Request for Judicial Notice, Exh. 3.

19

20   _____

21   [1] "CIA Calls Dux 'Quack': Spy Agency Says 'Secret Man' Exploits
     Just A Work Of Fiction" <u>Cleveland Plain Dealer</u>, June 16, 1996 ("The
22   CIA, former military officers and Soldier of Fortune magazine say
     Dux is a quack . . . .  Retired Maj. Gen. John Singlaub, named in
23   ["The Secret Man"] as someone Dux dealt with, called the book
     'virtually a complete fabrication.'").  <u>See</u> Request for Judicial
     Notice, Exh. 2.  "Soldier of Fortune Magazine Exposes
24   HarperCollins' 'Secret Man' Autobiography as Hoax" <u>U.S. Newswire,
     Inc.</u>, June 26, 1996.  <u>See</u> Request for Judicial Notice, Exh. 3.
25

26   [2] "Full Mental Jacket" <u>Soldier of Fortune</u>, Aug. 1996 ("<u>Soldier of
     Fortune</u> has thoroughly examined the book written by this former
27   low-ranking commo technician in a Marine Reserve artillery unit.
     Conclusion:  *The Secret Man* is a hoax.")  Request for Judicial
28   Notice, Exh. 3.

1    Disney never responded to Plaintiff's written comments to the

2    Draft Disney Agreement.  Exh. 12, Frankel Depo., p. 118, ln. 17 to

3    p. 119, ln. 14.  In September 1996, after the controversy over the

4    credibility of Plaintiff's stories in "The Secret Man" had

5    surfaced, Disney withdrew from further discussions with Plaintiff.

6    Exh. 10.  Disney asserted that Plaintiff had failed to fulfill the

7    condition precedent which required Plaintiff to provide Disney with

8    the documents necessary to approve chain of title to the life story

9    rights.  Exh. 11.  However, the condition precedent which required

10   that Jerry Bruckheimer sign an agreement to produce the film based

11   on Plaintiff's life story also had not been fulfilled.  Exh. 12,

12   Frankel Depo., p. 97, ls. 9-12; p. 122, ls. 3-13; Exh. 13, Gotler[1]

13   Depo., p. 48, ls. 8-25; Exh 14, Foster Depo. p. 63, ls. 2-15.

14   III. ARGUMENT

15       A defendant is entitled to summary judgment where, as here,

16   the Plaintiff cannot produce admissible evidence in support of an

17   essential allegation of his claim.  Celotex Corp. v. Catrett, 477

18   U.S. 317 (1986).  Since Plaintiff will bear the burden of proving

19   the essential elements of his two breach of contract claims, if

20   Plaintiff fails to come forward with admissible evidence satisfying

21   his burden, Defendants are entitled to summary judgment.

22

23

24

25

26

27

---

28   [1] Joel Gotler, Plaintiff's literary agent, also represented
Plaintiff in the negotiations with Disney.

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP    319300.1

8

1    A.   COUNT FOUR: PLAINTIFF CANNOT PROVE THAT DEFENDANTS HAD A

2         CONTRACTUAL DUTY TO USE AND PAY HIM AS A CONSULTANT.

3         1.   The Consulting Obligation Only Applies to Films

4              Which Depict True Incidents From Plaintiff's Life.

5    Plaintiff contends that Defendants breached the obligation in

6    the 1985 Agreement which required DiSalle to use and compensate him

7    for consulting services on "Bloodsport II", "Bloodsport III", and

8    "Bloodsport IV" (the "Consulting Obligation").   Defendants did not

9    breach the Consulting Obligation since the subsequent "Bloodsport"

10   titled films did not depict true incidents from Plaintiff's life as

11   required under the 1985 Agreement:

12             "During production of the Film, or any subsequent

13             Film under this agreement or based upon your

14             (i.e., Plaintiff's) true-life experiences, you

15             shall be engaged as a consultant for the duration

16             of principal photography and you shall be paid

17             therefor a consultants [sic] fee to be negotiate

18             in good faith."

19   Thus, the Consulting Obligation applies only to "subsequent

20   Films" and to those based upon Plaintiff's true life experiences.

21   The 1985 Agreement defines "Film" to include only those works which

22   are:

23             "based upon those certain true incidents, events,

24             experiences and involvements of [Plaintiff] . . .

25             [which were] previously identified as a portion of

26             the story of [Plaintiff's] life generally

27             consisting of [his] training as a Ninja beginning

28             as a child and culminating with [his] victory at

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP   319300.1

9

1           the 1975 Kumite Championship and [his] military

2           experiences . . . ."

3    Exh. 1, ¶1.

4          Therefore, Plaintiff and DiSalle expressly agreed that the

5    Consulting Obligation would apply only to films that depicted true

6    incidents from Plaintiff's life.  This is the only reasonable

7    interpretation of Paragraph 15 of the 1985 Agreement since

8    Plaintiff's consulting services were plainly more valuable on a

9    film that was about Plaintiff's life than one that did not portray

10   any part of Plaintiff's life, but was merely titled "Bloodsport".

11   Since Plaintiff cannot show that the subsequent "Bloodsport" titled

12   films depicted his true-life experiences (Mehrez Decl. ¶4), he

13   cannot prevail on his claim that Defendants breached the Consulting

14   Obligation.

15          2.   The Consulting Obligation Was Never Delegated to

16               Defendants.

17          Since DiSalle originally held the Consulting Obligation,

18   Plaintiff must demonstrate that DiSalle delegated that obligation

19   to subsequent holders of rights in "Bloodsport".  Plaintiff cannot

20   produce evidence that the Consulting Obligation was transferred by

21   DiSalle to Defendants, directly or indirectly.  Uncontroverted

22   facts demonstrate that the Consulting Obligation would only apply

23   to a film produced by DiSalle.

24          Even though Defendant FMNV secured the right to produce and

25   exploit subsequent "Bloodsport" titled films, it never received the

26   Consulting Obligation from DiSalle or any of his successors. An

27   assignment of rights under a contract does not allow the assignor

28   to escape its burdens.  1 Witkin Summary of California Law (9th

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP      319300.1                          10

1    ed.) "Contracts" §943, p. 841 ("[T]he assignor may transfer the

2    benefits, i.e., he may divest himself of his rights; but he cannot

3    escape the burden of his obligation by a mere assignment)"

4    (emphasis added).  See also, Walker v. Phillips, 205 Cal.App.2d 26,

5    32; 22 Cal.Rptr. 727 (1962).  Therefore, it does not necessarily

6    follow, as Plaintiff asserts, that involvement in the production of

7    the later "Bloodsport" titled films automatically imposed on

8    Defendants obligations owed to Plaintiff under the 1985 Agreement -

9    - Plaintiff must produce evidence that DiSalle actually transferred

10   the Consulting Obligation to Defendants.

11         The evidence indicates that DiSalle retained the Consulting

12   Obligation.  The 1986 Agreement makes clear that DiSalle kept the

13   Consulting Obligation when he transferred the film rights to

14   Cannon, the first transferee of those rights:

15              In the event of the production of a sequel or

16              remake of the Picture, I (i.e., DiSalle) agree to

17              negotiate in good faith with Mr. Dux for his

18              compensation for rights and/or services granted

19              and/or performed by him in connection therewith,

20              which shall be reasonable taking into

21              consideration the results of my "GOOD FAITH"

22              negotiations with others for the production of the

23              sequel or remake . . . .

24   Exh. 2, p. 1-2.

25         That the Consulting Obligation remained with DiSalle is also

26   evident from the plain language of the Cannon Agreement:

27              4.   Assumption of Obligations:  It is expressly

28              acknowledged and agreed by Owner (DiSalle) and

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP    319300.1                          11

1              Purchaser (Cannon) that although the rights

2              granted herein to Purchaser are controlled by

3              Owner by virtue of the Underlying Property

4              Agreements, Purchaser is _not_ assuming any

5              obligations pursuant to the Underlying Property

6              Agreements, except only (a) the obligation to

7              accord writing credit to Lettich if so determined

8              by the WGA, and (b) the merchandising payment

9              obligations pursuant to Paragraphs 12, 13, and 14

10            of the (1985 Agreement) (emphasis in original).

11 Exh. 4, p. 2, ¶4.

12    Conspicuously missing from the list of obligations transferred

13 to Cannon is any mention of the Consulting Obligations which

14 DiSalle owed to Plaintiff. The "Remakes, Sequels" provision in the

15 Cannon Agreement further confirms that DiSalle retained the

16 Consulting Obligation and that Plaintiff was entitled to

17 compensation only if DiSalle himself produced the sequel. Under

18 the Cannon Agreement, Cannon received only "first negotiation,

19 first refusal" rights with respect to sequels.[1] Exh. 3, p. 8, ¶22.

20 Had DiSalle and Cannon intended a wholesale transfer of sequel

21 rights and the Consulting Obligation to Cannon, language specifying

22 such a conveyance would be somewhere in the Cannon Agreement.

23 DiSalle's grant of only "first negotiation. first refusal" rights

24 [1] According to the "Remakes, Sequel" provision of the Cannon
25 Agreement, if DiSalle intended to produce a "Bloodsport" sequel, he
was required to give Cannon an exclusive opportunity for thirty
26 (30) days to negotiate a deal to acquire the rights to the sequel
("first negotiation"). If DiSalle and Cannon did not reach an
27 agreement and DiSalle subsequently secured an offer from a third
party for the sequel rights, Cannon had the right to purchase the
28 rights under the terms offered by the third party ("first
refusal"). Exh. 3, p. 8, ¶22.

1    with respect to sequels demonstrates the understanding of the
2    parties that DiSalle would retain the right to make sequels and the
3    Consulting Obligation.

4        Plaintiff cannot produce evidence establishing that the
5    Consulting Obligation was conveyed to Defendants.  The
6    uncontroverted facts demonstrate that the Consulting Obligation
7    remained with DiSalle and would be triggered only if DiSalle
8    produced a sequel to "Bloodsport".  While DiSalle may have
9    transferred "Bloodsport" rights, through intermediate transferees,
10   to Defendants, duties owed to Plaintiff, including the Consulting
11   Obligation, remained with DiSalle.  Therefore, Plaintiff cannot
12   prove the most fundamental element of Count Four -- the existence
13   of a contractual obligation which Defendants owed to him.  The
14   Court should summarily adjudicate Count Four in Defendants' favor.

15   B.   COUNT FOUR:  PLAINTIFF'S CLAIM IS BARRED BY THE STATUTE
16        OF LIMITATIONS ON WRITTEN CONTRACT CLAIMS BECAUSE
17        PLAINTIFF MADE A DEMAND FOR COMPENSATION ON "BLOODSPORT
18        II" ON MARCH 17, 1993.

19       Even were Defendants responsible for a breach of the
20   Consulting Obligation, which they are not, Plaintiff cannot prevail
21   since his claim is barred by the four year limitations period for
22   written contract claims.  California Code of Civil Procedure §337.
23   On March 17, 1993, Plaintiff's agent, Karen Pine, sent a letter to
24   the entity which was then developing "Bloodsport II" asserting that
25   Plaintiff was entitled to compensation under the 1985 Agreement for
26   the production of "Bloodsport II".  Exh. 11.  Thus, indisputably,
27   Plaintiff was aware of his alleged claim for "sequel" compensation
28   as of the date of that letter.  Since Plaintiff did not file the

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP    319300.1                        13

1   original Complaint until September 24, 1997, his claim for breach
2   of the Consulting Obligation is untimely and must be dismissed.
3      C.   COUNT SEVEN:  PLAINTIFF CANNOT PROVE THAT DEFENDANTS
4           FAILED TO PERFORM A CONTRACTUAL OBLIGATION TO PROVIDE
5           PLAINTIFF WITH A WRITTEN GRANT BACK AGREEMENT.
6           1.   Plaintiff Cannot Prove That He Suffered Damage As A
7                Result Of The Alleged Breach.
8      Proof of damages is an essential element of a breach of
9   contract claim.  However, "damages for breach of contract are not
10  available when speculative."  May v. Watt, 822 F.2d 896, 900, fn. 2
11  (9th Cir. 1987).  See also, Rickards v. Sleasman, 704 F.2d 1449,
12  1457 (9th Cir. 1983).
13     In this case, Plaintiff cannot prove that he suffered damage
14  as a result of Defendants' alleged failure to provide a written
15  grant back agreement because the evidence demonstrates that
16  Plaintiff was far from concluding a sale of his life story rights
17  to Disney.  In fact, the discussions with Disney did not even get
18  past the initial draft of a proposed agreement.  Moreover,
19  Plaintiff cannot prove that all of the conditions precedent to the
20  agreement would have been fulfilled.
21     Plaintiff and Disney were still in the early stages of
22  negotiations when Disney withdrew from further discussions.
23  Plaintiff's representatives provided Disney with extensive written
24  revisions to that initial draft -- clearly indicating Plaintiff's
25  belief that the material terms of the agreement were still open to
26  negotiation.  Exhs. 5-7.  Plaintiff's proposed revisions were not
27  restricted to the "boilerplate" of the contract -- Plaintiff took
28  issue with significant economic terms and attempted to limit

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP   319300.1

14

1 severely the scope of rights transferred to Disney.  Among the
2 revisions that Plaintiff demanded are the following:
3 • Plaintiff objected to Disney's attempt to secure a full credit
4   for the payment of the $125,000 option fee when Disney paid the
5   $500,000 purchase price and argued that the $500,000 purchase
6   price should be *in addition to* the option fee -- significantly
7   increasing Disney's financial obligations.  Exh. 7, p. 7.
8 • Plaintiff objected to the provision that allowed Disney to
9   allocate a portion of the purchase price as a credit against
10   "best seller bonuses".  Exh. 7, p. 7.
11 • Plaintiff demanded that Disney limit its merchandising rights so
12   that Plaintiff could continue to market his own products -- which
13   could potentially compete against Disney's products.  Exh. 7, p.
14   2.
15 • Plaintiff demanded that he retain certain ancillary rights such
16   as "novelization" and "books-on-tape" rights, as well as the
17   right to exploit his character in literary works.  Exh. 7, p. 9.
18 • Plaintiff demanded substantial changes in the definition of "net
19   profits", including the deletion of provisions which allowed
20   Disney to deduct overhead expenses and interest in calculating
21   Plaintiff's share of net profits.  Exh. 7, p. 9.
22    Significantly, Disney never responded to Plaintiff's written
23 revisions before withdrawing from further discussions with
24 Plaintiff.[1]  Frankel Depo. p. 118, ln. 24 to p. 119, ln. 14.

[1] It appears more than coincidental that Disney's decision to
terminate discussions with Plaintiff with regard to the acquisition
of film rights to Plaintiff's life story and his "nonfiction" book
"The Secret Man" occurred after articles appeared in the press
which questioned the veracity of "The Secret Man" and after it
became clear that the sales of Plaintiff's book would be
disappointing.  Request for Judicial Notice, Exhs. 2-4.

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP
319300.1

15

1    Therefore, Plaintiff cannot prove which of its proposed revisions

2    would have been acceptable to Disney or which would have been

3    compromised during further negotiations and what the compromise

4    would have been.

5         Plaintiff's contention that it would have entered into a

6    contract with Disney is speculative for the additional reason that

7    the Draft Disney Agreement contained certain conditions precedent

8    to Disney's obligation to option Plaintiff's life rights.  One of

9    those conditions required that Jerry Bruckheimer sign an agreement

10   to produce the film project in a form that was acceptable to

11   Disney.  Exh. 4, ¶1(a).  Plaintiff cannot produce evidence that

12   Bruckheimer either signed or would have signed a producers

13   agreement that was acceptable to Disney.  Exh. 12, Frankel Depo.,

14   p. 97, ls. 9-12; p. 122, ls. 3-13; Exh. 13, Gotler Depo., p. 48,

15   ls. 8-25; Exh 14, Foster Depo. p. 63, ls. 2-15.  Therefore,

16   Plaintiff cannot prove that this condition precedent would have

17   been satisfied and that Disney would have proceeded with the

18   acquisition.

19              2.   Plaintiff Cannot Prove That The Purported Promise To

20                   Return The Life Story Rights Was Supported By

21                   Consideration.

22        Every executory contract requires consideration.  California

23   Civil Code §1550.  Consideration may be either a benefit conferred

24   or agreed to be conferred upon the promisor or a detriment suffered

25   or agreed to be suffered by the promisee.  California Civil Code

26   §1605.

27              An informal promise without consideration that

28              stands utterly alone creates no legal duty and is

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP    319300.1                          16

1         not enforceable.  To be enforceable, there must be

2         a bargained for exchange or some accompanying

3         factor of the past . . . , or there must be some

4         subsequent changes of position in reliance on the

5         promise.  Without a bargain or any other such

6         accompanying factor, an informal promise to make a

7         gift is not binding.

8     2 Corbin on Contracts, (Revised Ed.) "Enforcement of

9 Contracts", §5.4, p. 21.

10     In 1994, neither DiSalle nor FMNV had any interest in

11 producing a film that was based on any incidents from Plaintiff's

12 life story.  DiSalle Decl. ¶7; Mehrez Decl. ¶3.  DiSalle -- and

13 later FMNV -- therefore gratuitously agreed to return to Plaintiff

14 any rights in Plaintiff's life story solely as an accommodation to

15 Plaintiff.  Id.  FMNV received nothing in exchange for the promise

16 to grant back the life story rights.  Accordingly, the Alleged Oral

17 Agreement is unenforceable.  The Court should summarily adjudicate

18 Count Seven in favor of Defendant.

19     D.  COUNTS FOUR AND SEVEN:  PLAINTIFF CANNOT PROVE THAT

20         DEFENDANT FMEI IS A PARTY TO ANY CONTRACT ALLEGED IN THE

21         FIRST AMENDED COMPLAINT.

22     Summary judgment in favor of FMEI is proper for the separate

23 and independent reason that Plaintiff cannot prove that he ever had

24 a contract with FMEI.  The Draft Agreements that Frankel negotiated

25 with Abrams plainly made FMNV, a separate entity, the contracting

26 party.  Exh. 8.  Moreover, Plaintiff cannot produce evidence

27 supporting his claim that the Consulting Obligation was transferred

28 to FMEI.  Exh. 9, p. 1, ¶D.  Since FMEI was never a party to a

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP
319300.1

17

1  contract with Plaintiff, directly or as a successor to another

2  party, it cannot be liable for any alleged breaches of contract.

3  See Mayes v. Sturdy Northern Sales, Inc. 91 Cal. App. 3d 69, 76-77,

4  154 Cal. Rptr. 43 (1979) disapproved on other grounds, Applied

5  Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 521,

6  n. 10, 28 Cal. Rptr. 2d 475 (1994).  Therefore, the Court should

7  grant summary judgment in favor of Defendant FMEI.

8  IV.   CONCLUSION

9       Based on the foregoing, Defendants request that this Court

10  grant summary judgment or, alternatively, summary adjudication of

11  the remaining claims in Plaintiff's First Amended Complaint (the

12  Fourth and/or Seventh Counts).

13                         Respectfully submitted,

14

   DATED: October 26 1998      JOSEPH M. GABRIEL
15                              ROSENFELD, MEYER & SUSMAN, LLP

16

17                         By: _____
                               JOSEPH M. GABRIEL
18                             Attorneys for Defendants FM
                               ENTERTAINMENT, INC. and
19                             FM ENTERTAINMENT INTERNATIONAL
                               (II), N.V.
20

21

22

23

24

25

26

27

28

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP

18

DiSalle Decl.

# DECLARATION OF ALAN MEHREZ

I, ALAN MEHREZ, declare:

1.    I am an officer of FM Entertainment, Inc. ("FMEI") and an officer of FM Entertainment International (II) N.V. ("FMNV").  I produced and directed the motion pictures "Bloodsport II", "Bloodsport III" and I produced "Bloodsport IV" (which has not been released).

2.    In 1994, I participated in discussions with Mark DiSalle and his representatives regarding the acquisition of the rights to the original "Bloodsport" film that Mr. DiSalle's producing entity held.  Those discussions culminated in the conveyance of certain rights in "Bloodsport" to FMNV.  Although I generally knew that "Bloodsport" was based on certain incidents that Frank Dux alleged were true, I had no interest in producing a motion picture based on any incidents from Mr. Dux's life story because, among other reasons, I understood that Mr. Dux's credibility was called into question after the release of "Bloodsport".  Our primary interest in acquiring the "Bloodsport" rights was to use "Bloodsport" in the title of other motion pictures and other projects.

3.    At around the time that FMNV acquired the "Bloodsport" rights, I learned that Mr. DiSalle -- solely as a favor to Mr. Dux -- had agreed to grant back to Mr. Dux any rights in Mr. Dux's life story that Mr. DiSalle held.  Since FMNV acquired certain "Bloodsport" rights, Mr. DiSalle, through his representatives, asked FMNV if it would also return to Mr. Dux any rights in Mr. Dux's life story that FMNV held.  Recognizing that FMNV never had any interest in portraying any true incidents from Mr. Dux's life

1  in a subsequent "Bloodsport" titled production, FMNV agreed to

2  grant back to Mr. Dux any rights which it had acquired in Mr. Dux's

3  life story by virtue of FMNV's recent transaction with Mr.

4  DiSalle's producing entity.  This was strictly a gratuitous act on

5  FMNV's part since FMNV did not receive anything of value in

6  exchange for the promise to grant back the rights.  Therefore, I

7  understood that Mr. Dux had requested a "quitclaim" agreement from

8  FMNV under which FMNV would convey any rights that it had in Mr.

9  Dux's life story back to Mr. Dux.  At this time, I did not know

10  that Mr. Dux would later demand that FMNV provide him with

11  warranties and a corresponding indemnity regarding the condition of

12  his life rights.

13      4.   In my capacity as the producer and director of

14  "Bloodsport II" and "Bloodsport III" and the producer of

15  "Bloodsport IV", I was intimately involved in the development of

16  the screenplays and stories upon which each of these films were

17  based.  I had control over the direction of the stories for the

18  subsequent "Bloodsport" titled films.  I reviewed the various

19  screenplay revisions, made comments to them, and participated in

20  numerous meetings with writers and other creative personnel where

21  the stories portrayed in these films were developed and refined.

22  "Bloodsport II", "Bloodsport III" and "Bloodsport IV" were not

23  based on any true incidents, events, experiences or involvements of

24  Mr. Dux.  We did not portray any true incidents, events,

25  experiences or involvements of Mr. Dux, nor did we rely on any

26  information from or about Mr. Dux, in producing these films.

27

28

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN

1    I declare under penalty of perjury under the laws of the

2    United States of America that the foregoing is true and correct.

3    Executed on October 19, 1998 at Los Angeles, California.

4

5    _____
                    Alan Mehrez

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN

## DECLARATION OF MARK DISALLE

I, MARK DISALLE, declare:

1.   I am a film producer and the principal of DiSalle Productions.  I produced the original "Bloodsport" motion picture which starred Jean Claude Van Damme.

2.   In 1985, I became interested in producing a motion picture based on certain events that I was lead to believe actually occurred in the life of Frank Dux.  Mr. Dux and I entered into a contract, dated as of June 15, 1985, under which Mr. Dux gave me an option to acquire certain of his life rights for film production purposes and certain related rights (the "1985 Agreement").  I subsequently exercised the option and acquired those rights.

3.   At around the time of the 1985 Agreement, Mr. Dux told me and Sheldon Lettich, the writer who I hired to write the screenplay for "Bloodsport", that there were other true events in his life that could be the basis for a motion picture.  Not having any reason to doubt Mr. Dux's credibility at this time, I made sure that the 1985 Agreement gave me an opportunity to make a sequel to "Bloodsport" based on Mr. Dux's other true life experiences for additional compensation to Mr. Dux.  At all times, I understood that I would be obligated to pay Mr. Dux compensation for a subsequent "Bloodsport" titled film only if that subsequent film depicted true events from Mr. Dux's life.

4.   In 1986, I entered into an agreement with Cannon Films with respect to the production of the "Bloodsport" film.  Prior to entering into that agreement, it was necessary for me to enter into a letter agreement (dated July 10, 1996) with Mr. Dux and Mr.

1    Lettich since they had both agreed to concede certain rights which
2    they had under my contracts with them in order to accommodate the
3    involvement of Cannon Films (the "1986 Agreement"). The film was
4    thereafter produced.

5        5.    After "Bloodsport" was released in 1988, I became aware
6    of articles which appeared in the <u>Los Angeles Times</u> and in various
7    martial arts magazines claiming that Mr. Dux's true-life
8    experiences were totally false and that he was neither a ninja nor
9    a secret operative of the Central Intelligence Agency as Mr. Dux
10   had claimed. I also received numerous calls and letters from
11   investigative reporters and other martial artists attesting that
12   Mr. Dux's claims were not true. At this point, I decided not to
13   use any more stories from Mr. Dux. I thus never utilized, and had
14   no intention of ever utilizing, any rights that I had with respect
15   to a sequel to "Bloodsport" under the 1985 Agreement.

16       6.    In 1991, I began developing an original story for the
17   "Bloodsport II" screenplay with writer Jeff Schechter. This story
18   was fictitious -- it was not based on any events from the life of
19   Mr. Dux, it had a different plot than "Bloodsport", and did not
20   portray any principal characters from "Bloodsport". (Mr. Van Damme
21   did not even appear in it.) Therefore, "Bloodsport II" was not a
22   "sequel" to "Bloodsport".

23       7.    During the development of "Bloodsport II", Mr. Dux
24   contacted me through one of my representatives to request that I
25   reconvey whatever rights that I then held in his life story. Since
26   I had no interest in ever using those rights, I agreed. I did not
27   understand that I would receive anything of value in exchange for

28

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN

                                    23

                                    2
                              302407.1/RMS

1   my promise to reconvey the rights.  My promise was strictly a favor

2   to Mr. Dux since I had no intention of ever using the rights.

3       8.   Around the time that I decided to reconvey Mr. Dux's life

4   story rights, I was involved in discussions regarding the sale of

5   my "Bloodsport" rights to FM Entertainment International (II) N.V.

6   Those discussions concluded in 1994.  After this sale, all further

7   discussions regarding the reconveyance of Mr. Dux's life story

8   rights took place between representatives of Mr. Dux and FM

9   Entertainment International (II) N.V.

10      I declare under penalty of perjury under the laws of the

11  United States of America that the foregoing is true and correct.

12      Executed on October 25, 1998 at Bellevue, Washington.

                                        _____
14                                            Mark DiSalle

24

LAW OFFICES
ROSENFELD,
MEYER &
SUSMAN

Professional Indexes & Files, Inc. 800-422-9191   Recycled Paper

1          DECLARATION OF JOSEPH M. GABRIEL

2      I, JOSEPH M. GABRIEL, declare:

3      1.   I am a partner in the law firm of Rosenfeld, Meyer &

4  Susman, LLP, attorneys of record for Defendants FM Entertainment,

5  Inc. and FM Entertainment International (II) N.V.

6      2.   Attached as Exhibit 1 is a true and correct copy of the

7  agreement dated as of June 15, 1985 between Mark DiSalle and Frank

8  Dux.  Plaintiff authenticated this document both in his First

9  Amended Complaint and in his responses to requests for admissions.

10     3.   Attached as Exhibit 2 is a true and correct copy of the

11  letter agreement dated July 10, 1986 between Mark DiSalle, on the

12  one hand, and Frank Dux and Sheldon Lettich, on the other.

13  Plaintiff authenticated this document both in his First Amended

14  Complaint and in his responses to requests for admissions.

15     4.   Attached as Exhibit 3 is a true and correct copy of the

16  agreement dated as of March 25, 1986 between Mark DiSalle, on the

17  one hand, and Cannon Films, Inc., on the other.  Plaintiff

18  authenticated this document both in his First Amended Complaint and

19  in his responses to requests for admissions.

20     5.   Attached as Exhibit 4 is a true and correct copy of a

21  letter dated January 30, 1996 from Tamara Woolfork of Walt Disney

22  Company and Michael Frankel, Plaintiff's attorney and the enclosed

23  draft agreement dated as of January 3, 1996 between Frank Dux, on

24  the one hand, and Hollywood Pictures Company, on the other.  Mr.

25  Frankel authenticated these documents at this deposition after it

26  was marked as Deposition Exhibit 28.  (As set forth below, true and

27  correct copies of the relevant pages from the transcript of the

28  deposition of Mr. Frankel are attached as Exhibit 12.)

LAW OFFICES
ROSENFELD,
MEYER, &
SUSMAN, LLP

25

6. Attached as Exhibit 5 is a true and correct copy of the draft agreement dated as of January 3, 1996 between Frank Dux, on the one hand, and Hollywood Pictures Company, on the other which contains certain handwritten interlineations of an employee of Michael Frankel, plaintiff's attorney. Mr. Frankel authenticated these documents at this deposition after it was marked as Deposition Exhibit 29.

7. Attached as Exhibit 6 is a true and correct copy of a letter dated February 28, 1996 from Joel Gotler, Plaintiff's literary agent, to Michael Frankel. Mr. Frankel authenticated these documents at this deposition after it was marked as Deposition Exhibit 35.

8. Attached as Exhibit 7 is a true and correct copy of a letter (with attachments) dated May 28, 1996 from Michael Frankel to Tamara Woolfork of Walt Disney Company. Mr. Frankel authenticated these documents at this deposition after it was marked as Deposition Exhibit 40.

9. Attached collectively as Exhibit 8 are true and correct copies of Redline Draft Agreements 3, 4, and 5 which were authenticated by Mr. Frankel and/or Mr. Abrams at their respective depositions.

10. Attached as Exhibit 9 is a true and correct copy of the Assignment of All Rights which Plaintiff admitted is authentic in his Reply re Motion for Partial Summary Judgment filed on January 29, 1998.

11. Attached as Exhibit 10 is a true and correct copy of a letter from Paige Wright of Walt Disney Company to Michael Frankel

1   dated September 11, 1996.  Mr. Frankel authenticated this document

2   at this deposition after it was marked as deposition exhibit 52.

3       12.  Attached as Exhibit 11 is a true and correct copy of a

4   letter from Karin Pine to Peter Elson dated March 17, 1993.  This

5   letter was produced by Plaintiff in response to Defendants' Request

6   for Production of Documents.

7       13.  Attached as Exhibit 12 is a true and correct copy of

8   several pages from the transcript of the deposition of Michael

9   Frankel.  I was present at the deposition and these pages

10  accurately reflect my questions and Mr. Frankel's responses to

11  those questions.

12      14.  Attached as Exhibit 13 is a true and correct copy of

13  several pages from the transcript of the deposition of Joel Gotler.

14  I was present at the deposition and these pages accurately reflect

15  my questions and Mr. Gotler's responses to those questions.

16      15.  Attached as Exhibit 14 is a true and correct copy of

17  several pages from the transcript of the deposition of Lucas

18  Foster.  I was present at the deposition and these pages accurately

19  reflect my questions and Mr. Foster's responses to those questions.

20      I declare under penalty of perjury under the laws of the

21  United States of America that the foregoing is true and correct.

22      Executed on October 26, 1998 at Los Angeles, California.

23

24                                   _____
                                         Joseph M. Gabriel
25

26

27

28

Professional Indexes & Files, Inc. 800-422-9191 Recycled Paper

EXHIBIT 1

Mark DiSalle
10100 Santa Monica Boulevard
Suite 2600
Los Angeles, California
90067

As of June 15, 1985

Mr. Frank Dux
12504 Magnolia Boulevard
North Hollywood, California   91364

> Re:   Life Story of Frank Dux
>        Dramatization Option Agreement

Dear Mr. Dux:

The following when signed by you shall constitute our agreement regarding your true-life story as the basis of a feature length theatrical motion pictures tentatively entitled "BLOODSPORT".

## OPTION

1.      For good and valuable consideration, receipt of which you hereby acknowledge, you nereby grant to me, or my designee, an irrevocable, exclusive option to acquire the right to produce, distribute and commercially exploit one feature length motion picture (or television film, as provided hereunder, collectively, the "Film") based upon those certain true incidents, events, experiences and involvements of yours which we have previously identified as a portion of the story of your life generally consisting of your training as a Ninja beginning as a child and culminating with your victory at the 1975 Kumite Championship and your military experiences (collectively the "Story").

2.      Notwithstanding the foregoing, you may freely continue to write or have written, stories, screenplays or similar adaptations based upon other of your life experiences which may include your Ninja training as a child and/or your military experiences but **may not** include your victory at the 1975 Kumite Championship PROVIDED that during the Option Period (as it may be extended), the production of the Film and nine months following release of the Film you shall not grant to others any right in or to such other stories or experiences without my prior written permission in each instance.

Exhibit 1

28

Frank Dux
Story Option and Agreement
Page 2.

3.    I shall have the right to acquire the Story and all rights incident thereto, upon the terms and conditions set forth hereinafter for a period of two (2) years following the date hereof ("Option Period").  I shall be entitled to extend the Option Period for an additional period of one year by the additional payment to you of $1000.00, and/or, if prior to the expiration of the Option Period I shall have commenced negotiations in respect of the Film which are incomplete upon expiration of the Option Period, the Option Period shall be automatically extended, without additional payment, for a period reasonably necessary for the completion of such negotiations.

4.    I may exercise my option and acquire the rights to the Story as provided hereunder by giving written notice thereof to you within the Option Period, as the same may be extended, and paying to you the sum of $15,000.00.

## TERMS OF AGREEMENT

Upon exercise of the option, our agreement shall be as follows:

### Grant of Rights

5.    Upon exercise of the option you shall grant to me, and I shall acquire all right, title and interest in and to the Story as provided herein and I shall have the right to add to, subtract from, and otherwise to dramatize and portray all aspects of the Story in a manner suitable for entertainment purposes but not in any way which would not be flattering to you or which would degrade you or cause you to be ridiculed.

6.    I shall have the right to engage writer(s) who shall be entitled to create original literary works based upon the Story for purposes of producing the Film hereunder which I shall be entitled to own and exploit in perpetuity throughout the world by all and every means now known or hereafter devised.

7.    I shall be entitled to produce, distribute and commercially exploit by any and all means now known or hereafter devised one (1) feature length theatrical motion picture, or, in my sole and exclusive discretion, one motion picture made for television, based upon the Story and/or any literary property based upon the Story, except literary properties created by or for you for purposes of publishing, the rights to which are reserved to you.

29

Frank Dux
Story Option and Agreement
3.

8.    I shall not be entitled to novelize any literary property, including teleplays or screenplays, created for the production of the Film without your prior written consent in each instance.

### Remakes, Sequels and Series

9.    Provided that I shall actually produce and release the Film, then I shall thereafter have the right, in perpetuity, in my sole and exclusive discretion, to remake the Film or to produce one (1) sequel to the Film.  In addition, you hereby grant to me the irrevocable, perpetual right of first negotiation and first refusal for the rights to: produce television programs based upon the Film or the Story; produce a second or subsequent sequel or remake of the Film; and/or, produce any other film or program based upon your true-life experience other than the Story.

### Literary Rights Reserved

10.    I shall not be entitled, and you shall retain all rights to novelize the Story and publish the same in book form provided that you shall not grant to others or make any use of the publishing rights reserved to you hereunder which diminish or abridge the rights granted to me hereunder.

### Materials

11.    You agree to provide me you with the details of your personal experiences and in connection therewith to give me reasonable access to all recorded materials (written works, memos, letters, books, articles, reviews and audio or audio-visual recordings) relating, describing or portraying any aspect of the Story.

### Merchandising

12.    You grant to me all merchandising rights in or in connection with the Film and in connection therewith I shall have the right to use your name, likeness, voice and biographical information.

13.    As full and complete compensation for the merchandising rights granted hereunder, I agree to pay to you, and you agree to accept, in addition to any other payment hereunder, a sum equal to five percent (5%) of my gross receipts from direct merchandising and/or a sum equal to twenty-five percent (25%) of my gross receipts

30

Mr. Frank Dux
Life Story Option and Agreement
Page 4.

from merchandising licensed by me and conducted by others hereunder. Merchandising proceeds shall not be considered as gross receipts derived from the Film.

14. I acknowledge that you have previously granted merchandising or similar rights to third parties pursuant to presently valid written agreements. Therefore, I agree that, even if depicted in the Film, I shall not have the right to exploit merchandizing rights in connection with your studio logo, your personal logo, the "Ninja knife" designed by you or the book written by you on the history of the Ninja. Merchandizing hereunder must be associated with the Film and shall not include any direct endorsement by you.

## Consultants Services

15. During production of the Film, or any subsequent Film under this agreement or based upon your true-life experiences, you shall be engaged as a consultant for the duration of principal photography and you shall be paid therefor a consultants fee to be negotiated in good faith.

## Courtesy Screenplay Consultation

16. I shall not be required to obtain your approval of any screenplay or teleplay in connection with the Film but I agree to consult with you and consider your suggestions in connection with the preparation of any screenplay or teleplay.

## Releases and Authorizations

17. You will use your best efforts to obtain and deliver to me all releases or authorizations reasonably necessary to use the actual names and portray on the screen real people and actual locations in the Story. You have advised me, and I acknowledge that in some instances national security or similar governmental interests may prevent you from obtaining some releases or authorizations.

## Profit Participation

18. If I actually produce the Film and complete production thereof, then, in addition to other payments hereunder, I shall pay you a sum equal to two and one-half percent (2 1/2%) of the producer's net profits, as that term is defined herein.

31

Mr. Frank Dux
Life Story Option and Agreement
Page 5.

19.    As used herein, the term producer's net profits shall mean all sums or items of value received from all sources and means of exploitation of the Film or other rights granted herein, but not revenues from merchandising, less all costs and expenses thereof, including, without limitation, third-party fixed dollar deferments and actual expenses of any type paid or incurred in the production or distribution of the Film. The profit participation payable to you hereunder shall be computed, accounted for and paid in the same manner as for all other profit participants in producer's net profits.

20.    You shall have the right to inspect my books and records relating to the Film, upon reasonable notice and during normal business hours at your offices in Los Angeles, California, but in no event more often than once every six months.

### Ownership; Reversion

21.    I shall own, solely and exclusively, all of the rights in and to all literary material created hereunder, and all of the elements of the Film, including the copyright in and to the same and all renewals and extensions thereof, throughout the world.

22.    Notwithstanding my continuing right to own all literary materials created hereunder and based upon the Story, if I have not commenced principal photography of the Film within six (6) years following the date hereof, or if I have not actually completed and released the Film within seven (7) years following the date hereof, upon your written request I shall reconvey to you all rights granted hereunder.

### Use of Name

23.    I and each entity commercializing or exploiting the Film, and the entity's advertising agency, and each network station over which the same may be broadcast, shall have the right to reproduce, print and disseminate in any medium, your name, likeness, voice and biographical information for purposes of advertising and promoting such picture, program or series, and in connection therewith, the product or services of any sponsor, provided that no direct or indirect endorsement of any such product of service by you shall be used without you's prior written consent.

32

Mr. Frank Dux
Life Story Option and Agreement
Page 6.

## Publicity

24.   I shall have the sole and exclusive right to issue publicity concerning the Film and concerning your services with respect thereto.  You shall not, directly or indirectly, issue or permit the issuance of any publicity, grant any interviews, or make any statements concerning your services hereunder without our prior written consent in each instance.

## Promotional Services

25.   You agree to render reasonable services and to make personal appearances in all media to the extent permitted by your other activities for the purpose of promoting and advertising the Film.  You shall not be entitled to any compensation therefor provided no other personality in or in connection with the Film receives any compensation for similar appearances.

## Notices

26.   Notices desired or required to be given hereunder shall be in writing and may be given by personal delivery or by United States mail, postage prepaid, and addressed to the respective addresses indicated for each party herein, unless and until either of us gives the other written notice of a different address.

## Warranties

27.   You represent and warrant that you have not and you shall not enter into any agreement which abridges or diminishes any right granted to me hereunder nor granted similar rights to any other person nor authorized any other person to create an audio-visual work based on the Story.  You shall indemnify me and hold me harmless from any claim, loss, action, damage, judgment, cost or expense paid or incurred in connection therewith.

28.   At your request, the Film shall contain a disclaimer announcing the fact that it is based upon a true story but that no particular person or event is portrayed therein.

33

Mr. Frank Dux
Life Story Option and Agreement
Page 7.

## Miscellaneous Provisions

29.   This agreement sets forth the entire understanding between the parties relative to the subject matter hereof, and any and all prior or contemporaneous negotiations, understandings, agreements, representations, warranties, inducements or similar communications are superceded and replaced by and/or incorporated into this agreement.

30.   This agreement shall inure to the benefit of, and be binding upon all of the parties hereto and each of their respective successors, permitted assigns, heirs, executors, administrators and/or legal representatives.

31.   The parties hereto agree to promptly execute and deliver to the other such other and further documents as are reasonably necessary to effectuate or carry out the provisions of this agreement.

32.   No modification, amendment, waiver, termination, discharge or replacement of this agreement or any of its terms or provisions shall be effective for any purpose unless and until confirmed in a writing executed by the duly authorized representative of the parties hereto.

33.   No waiver by any party hereto of any term or provision of this agreement shall abridge such parties right thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

34.   In the event of an action at law or in equity, or before any adjudicatory body having jurisdiction thereover, to enforce or construe any provision hereof or any right or obligation directly or indirectly created hereunder, the prevailing party shall be entitled to receive, as an element of damages, all costs and expenses paid or incurred in connection therewith, including reasonable attorney fees.

35.   This agreement is entered into in the State of California and shall be enforced and construed in accordance with the laws of said state applicable to agreements entered into and to be wholly performed therein.

34

Mr. Frank Dux
Life Story Option and Agreement
Page 8.

If the foregoing accurately reflects our understanding, please so indicate by signing below and this shall become a binding agreement between us.

Very truly yours,

Mark DiSalle

AGREED AND ACCEPTED:

Frank Dux

(3.104/c/bsrights)

35

Mark DiSalle
10100 Santa Monica Boulevard
Suite 2600
Los Angeles, California
90067
(213) 553-3888

July 10, 1986

Frank Dux and Sheldon Lettich
c/o Mike Frankel, Esq.
4444 Riverside Drive
Suite 105
Toluca Lake, California 91505

Re:   "Bloodsport"

Dear Mr. Dux and Mr. Lettich:

The following, when mutually executed, shall memorialize our representations and
warranties and the modifications to the terms of those two separate written
agreements each dated June 15, 1985, (the "Agreements"), regarding the rights to
certain aspects of the life of Mr. Dux ("Rights") and a first draft screenplay based
thereupon ("Script") all of which we have identified by the working title "Bloodsport".

Notwithstanding the terms and conditions of the Agreements, I have advised each of
you that, in order to enter into an agreement with Cannon Films for the production
of a motion picture based upon the Rights and Script (the "Picture"), I have agreed to
receive no portion of net profits (as understood in the industry) derived from the
exploitation of the Picture.  You each acknowledge, therefore, you are receiving no
net profits from this production only.

In addition, to accommodate the agreement with Cannon Films, you each are making
certain concessions and are agreeing to reduce the sums which would otherwise be
payable to you under the Agreements.  Specifically. Mr. Lettich has agreed to accept
the sum of $37,500.00 as full compensation, of which $2,500.00 has been previously
paid by me.

We three agree to make such changes and concessions, and each of you authorizes me
to enter into said agreement with Cannon Films, subject to the terms and conditions
therein and in the exhibits attached thereto, in order to maximize the probability
that a motion picture based on the Rights and Script will actually be produced and
exploited.

Each of you understands that I will not have ultimate control over the production or
exploitation of the Picture and that such final control will remain with Cannon
Films.

In the event of the production of a sequel or remake of the Picture, I agree to
negotiate in good faith with Mr. Dux for his compensation for rights and/or services
granted and/or performed by him in connection therewith, which shall be reasonable

Exhibit 2                    36

Frank Dux and Sheldon Lettich
July 10, 1986
page 2.

taking into consideration the results of my 'GOOD FAITH' negotiations
with others for the production of the sequel or remake. Not withstanding
the above it is understood Mr. Dux shall receive no less protection on
the sequel or remake than given him on the original June 15, 1985
Agreement and the other agreements and exhibits referred herein.

Nothing in this agreement, or in the Agreements, is intended to or
shall in any way abridge or diminish my absolute rights in and to the
sequel and remake of the Picture and Mr. Dux and I specifically agree
that our negotiations shall be limited solely to the compensation therefor.
Under no circumstances shall Mr. Dux be entitled to deny my right to produce,
or permit others to produce such a sequel or remake (subject to the
June 15, 1985 Agreement).

In the event Mr. Dux and I are unable to agree upon such resonable compen-
sation, upon demand by either of us the matter shall be resolved through
binding arbitration before the American Arbitration Association in Los
Angeles, California pursuant to the then existing rules and procedures
established by the American Arbitration Association for arbitrations of
this type.

In the event that Mr. Lettich is engaged to render writing services in
connection with a remake or sequel of the Picture, his compensation shall
be negotiated in good faith with his agent as per the WGA basic agreement.

Except as specifically set forth herein, the Agreements continue in full
force and effect.

If the foregoing accurately reflects our understanding, please so indicate
by signing below.

Very truly yours,

Mark DiSalle

AGREED AND ACCEPTED:

Frank Dux

Sheldon Lettich

(3.125.c.mdsalle)

## ACQUISITION AGREEMENT

This Agreement dated as of March 25, 1986 shall consti-
tute the basic terms and conditions of the agreement between MARK
DISALLE ("Owner") and CANNON FILMS, INC. ("Purchaser") relating
to the life story of Frank Dux ("Dux").

1.   The Property:  Reference is made herein to (a) that
certain executed letter agreement dated As of June 15, 1985 (the
"Dux Agreement") between Owner and Dux regarding certain rights
to Dux's life story (that portion of Dux's life story generally
consisting of Dux's training as a Ninja beginning as a child and
cluminating with Dux's victory of the 1975 Kumite Championship
and Dux's military experiences)(the "Life Story"), and (b) that
certain executed letter agreement dated June 15, 1985 (the "Let-
tich Agreement") between Owner and Sheldon Lettich ("Lettich")
wherein Owner employed Lettich to write a screenplay (the "Screen-
play") based upon the Life Story.  The Dux Agreement and the
Lettich Agreement are the "Underlying Rights Agreements".  The
Life Story and the Screenplay are the "Property".

2.   Grant of Rights.  Owner hereby irrevocably sells,
grants and assigns to Purchaser, absolutely and outright, in per-
petuity and throughout the universe, a license to produce one mo-
tion picture based upon the Property or any part thereof (the
"Picture") and customary ancillary, subsidary and incidental
rights related thereto.  With respect to the Picture, and without
limiting the generality of the foregoing, the rights herein
granted include:

(a)  all silent and sound (including all musical)
motion picture rights, televised motion picture rights, televi-
sion rights (whether free, pay, cable, subscription, pay-per-view,
live or otherwise), and audio-visual rights (including, without
limitation, videocassette and videodisc rights in all formats),
in all languages in any and all media and by any means whatsoever
(whether now known or hereafter developed), for the entire univ-
erse, and all ancillary and subsidiary rights therein (including,
without limitation, merchandising, commercial tie-up, by-product
and music publishing and recording rights);

(b)  the right to freely change, adapt, translate
and add to or subtract from the Property, and to engage writers
to render writing services in connection with the Property;

(c)  the right to distribute, exhibit, advertise,
publicize, exploit and otherwise turn to account the Picture by
any and all manner and media (whether now known or later de-
vised).

1.

Exhibit 3

3.   <u>Reserved Rights</u>.  Notwithstanding the foregoing, Owner hereby reserves only (a) certain remake, sequel and television program rights in the Life Story (subject to the terms of Paragraph 22 below), and (b) the right to publish the Life Story in printed form; provided, however, that Purchaser may publish or reproduce up to 5000 words from the Life Story for the purpose of advertising, publicizing and promoting the Picture.

4.   <u>Assumption of Obligations</u>:  It is expressly acknowledged and agreed by Owner and Purchaser that although the rights granted herein to Purchaser are controlled by Owner by virtue of the Underlying Property Agreements, Purchaser is <u>not</u> assuming any obligations pursuant to the Underlying Property Agreements, except only (a) the obligation to accord writing credit to Lettich if so determined by the WGA, and (b) the merchandising payment obligations pursuant to Paragraphs 12, 13 and 14 of the Dux Agreement.

5.   <u>Consideration</u>.

(a)   In consideration for all the rights granted to Purchaser by Owner hereunder and all of Owner's representations and warranties and agreements made herein, and subject to Paragraph 23 hereinbelow, Purchaser shall pay to Owner the sum of $75,000.00, payable upon execution hereof by the parties and execution and delivery of releases in the form of Exhibits "A", "B" and "C" attached hereto.

(b)   Additionally, with respect to merchandising for the Picture (other than on the cover of publications, home video device jackets and/or soundtrack albums and the like, which shall not be considered merchandising for purposes of this Paragraph and for which there will be no royalty), then Purchaser shall be entitled to a royalty of 5% of Purchaser's "net receipts" actually received (gross receipts less all costs of manufacture and distribution, a 25% distribution fee/ sales commission and all third party agent fees, if any) directly derived from such merchandising, prorated among all parties entitled to a royalty in connection with such merchandising but in no event less than 2-1/2% of such net receipts.  Merchandising royalties payable hereunder shall be accounted for and paid in accordance with generally accepted motion picture industry practice.

6.   <u>Warranties and Indemnities</u>.  Owner hereby represents, warrants and agrees that:

(a)   Lettich is the sole author of the Screenplay and Owner is the sole and exclusive owner of all rights in the Screenplay and such rights in and to the Life Story as are required to convey to Purchaser the rights herein granted to Purchaser.

2.

(b)   Owner has the full and sole right and author-
ity to enter into this Agreement and to convey the all the rights
herein conveyed to Purchaser as herein set forth.

(c)   The Screenplay is wholly original with Lettich
in all respects (except with respect to public domain material
relating to the Life Story).

(d)   Owner has exercised his option respecting the
Life Story pursuant to the Dux Agreement.

(e)   No part of the rights herein conveyed to Purch-
aser has in any way been encumbered, conveyed, granted or other-
wise disposed of and the same are free of any liens or claims
whatsoever and to the best of Owner's knowledge there are no
claims or litigation pending, outstanding or threatened which
might in any way prejudice, interrupt or interfere with
Purchaser's use of said rights.

(f)   The exercise or use by Purchaser of any of
said rights will not in any way infringe upon or violate the copy-
right, common law right or literary, dramatic or motion picture
rights or constitute a libel, defamation or invasion of the
rights of privacy or publicity of any person, firm or corporation
whomsoever.

(g)   Owner has not consented to allow Dux to author-
ize the production of a film based upon portions of Dux's life
story which are not exclusive to Owner as set forth in Paragraph
2 of the Dux Agreement, and Owner agrees that he will not in the
future so consent during the period of time in which his consent
is required pursuant to said Paragraph 2.

Additionally, Owner hereby assignes to Purchaser the
benefit of any representations, warranties and indemnities of Dux
and Lettich made pursuant to the Underlying Property Agreements.

The foregoing warranties and representations are made by
Owner to induce Purchaser to execute this Agreement and Owner ack-
nowledges that Purchaser has executed this Agreement in reliance
thereon.  Owner hereby agrees to indemnify, defend and hold Purch-
aser and his successors, licensees and assigns, harmless from and
against any claim, demand, loss, obligation, liability, cost or
expense (including reasonable attorney's fees, whether or not lit-
igation is actually commenced) arising out of a breach or alleged
breach by Owner of any warranties, representations or agreements
contained in this Agreement.  In the event that Owner's aforesaid
indemnity shall be required by Purchaser, Purchaser may offset
and/or deduct the amount covered by Owner's indemnity from monies
due to Owner pursuant to this agreement or any other agreement of
the parties.

3.

Purchaser's request, ny and all additional do ents of instru-
ments, including a short-form Assignment for recording in the
Copyright Office (a copy of which is attached hereto for signa-
ture by Owner), and to do any and all things deemed reasonably
necessary or desirable by Purchaser to effectuate the purpose of
this Agreement (including, without limitation, the purposes set
forth in Paragraphs 14 and 19 below).  If Owner fails to do any-
thing deemed reasonably necessary or desirable by Purchaser to
effectuate this Agreement including, without limitation, renewing
copyrights and instituting and maintaining actions for infringe-
ment of the Rights, Owner hereby irrevocably appoints Purchaser
Owner's attorney-in-fact with the right, but not the obligation,
to do any such things and maintain any such actions in the name
of Owner and on Owner's behalf, which appointment shall be irre-
vocable and coupled with an interest, and shall be unlimited with
regard to substitution and delegation.

8.  __Breach by Purchaser__.  In the event of any breach of
this Agreement by Purchaser, Owner's remedy shall be limited to
an action at law for damages, if any, and in no event shall Owner
have the right to terminate or rescind this Agreement or in any
way interfere with the development, production, distribution,
exhibition, advertising or exploitation of the Picture.

9.  __Failure to Make or Release Picture__.  Purchaser
shall have no obligation to utilize all or any part of the Prop-
erty or to make, produce, release, distribute, advertise, or
exploit the Picture; provided, that nothing in this paragraph
shall relieve Purchaser of the obligation to pay the sums
required pursuant to Paragraph 5, unless payment of same is
expressly conditioned upon an event which does not occur.  .

10.  __Name and Likeness__.  Owner hereby grants to Pur-
chaser the right to use the name, likeness and/or biography of
Dux and/or Lettich in connection with the development, produc-
tion, exhibition, advertising and other exploitation of the Pic-
ture and all ancillary and subsidiary rights therein, including
without limitation soundtrack albums, publications, merchandising
and commercial tie-ups; provided, that in no event shall Dux or
Lettich be depicted as using or endorsing any product or service
without their prior consent.

11.  __Assignment__.  Purchaser shall have the right to as-
sign this Agreement, or any of Purchaser's rights hereunder, in
whole or in part, at any time, to any person, firm or corpora-
tion; provided that, no such assignment shall relieve Purchaser
of its obligations hereunder unless such assignement is to a
motion picture production and/or distribution company of substan-
tially equivalent financial ability as Purchaser and such
assignee assumes same in writing.

12.  __Credit__.  Credit for the Picture shall be as
determined by the WGA.

4.

13.  Notices.  All notices to either party hereunder shall be given by personal delivery, telegram, telecopier or telex (toll prepaid) or by regular mail (postage prepaid) and shall be deemed given on the date of personal delivery, telegraphing or telexing or on a date twenty-four (24) hours after the date of mailing.  Until further written notice, the addresses of the parties shall be as follows:

Owner
Mark DiSalle
10100 Santa Monica Blvd.
Suite 2600
Los Angeles, CA 90067

Purchaser
Cannon Films, Inc.
640 San Vicente Blvd.
Los Angeles, CA 90048

With A Copy To:
Jack Dwosh, Esq.
Covey & Covey
10000 Santa Monica Blvd.
3rd Floor
Los Angeles, CA 90067

With A Copy To:
Law Offices of Sam Perlmutter
5757 Wilshire Blvd., Suite 636
Los Angeles, CA  90036

14.  Renewal of Copyright.  Owner agrees to cause renewals of all copyrights in the Property, and each and every party thereof, duly to be obtained, and all rights herein sold and assigned to Purchaser are sold and assigned for the renewal term or terms and during all extensions of such copyrights, as well as for the original term of such copyrights.  Owner hereby appoints Purchaser irrevocably the attorney-in-fact of Owner to apply for such renewals in the name and stead of Owner and duly to execute and deliver to Purchaser on behalf of Owner such assignments as Purchaser may deem necessary, proper or expedient to vest or confirm the vesting in Purchaser of all of the rights herein granted and agreed to be granted for and during the term of the renewal copyright(s) or the period of extension of copyright.

15.  Effect of Agreement.  This Agreement shall bind and inure to the benefit of Purchaser and Owner and their respective heirs, legal representatives, successors and assigns, and all or any part of Purchaser's rights hereunder may be licensed or assigned by Purchaser.  The term "Purchaser" as used herein means and includes Purchaser herein named, and its successors and assigns.  If more than one Owner is mentioned herein or executes this Agreement, this Agreement shall be binding jointly and severally upon each such person, and the word "Owner" as used herein shall then have a plural meaning.

16.  No Ownership/No Reissue Payment.  Nothing herein contained shall be deemed to grant or vest in Owner any right, title or interest whatsoever in or to the Picture and/or in and to any literary, musical or any other material created by Purchaser in connection with the Picture.  Under no circumstances shall Purchaser be obligated to pay Owner any sum, whether under the provisions of this Paragraph or otherwise, with respect to the reissue of the Picture.

5.

17. _Trailers/Stock Footage_. Neither the production or exhibition of trailers or other promotional films for the purpose of advertising and/or exploiting the Picture, nor the use of stock shot footage from the Picture for any purpose shall be prevented or precluded by any of the provisions of this Agreement, and in no event shall such trailers, promotional films or stock shot footage be construed to be a motion picture.

18. _Rights As Member Of Public_. Nothing contained in this Agreement shall be construed to be prejudicial to, or operate in derogation of, any rights, licenses, privileges or property which Purchaser may enjoy or be entitled to as a member of the public, as though this Agreement were not in existence. Purchaser may exercise such rights, licenses, privileges or property which it may enjoy or be entitled to as a member of the public as though this Agreement were not in existence. The rights granted hereunder by Owner to Purchaser, and the representations, warranties, undertakings and agreements made hereunder by Owner, shall endure in perpetuity and shall be in addition to any rights, licenses, privileges and property of Purchaser referred to in the first sentence of this Paragraph.

19. _Recapture_. If, pursuant to any copyright or similar law, Owner becomes entitled to exercise any right of reversion, recapture or termination (the "Termination Right") in or to all or part of the rights granted hereunder and Owner exercises the Termination Right, then from and after the date that Owner has the right pursuant to such copyright or similar law to transfer all or part of such rights (the "Recaptured Rights") to a third party, Purchaser shall have the first right to purchase the Recaptured Rights. If Owner decides to accept a bona fide offer with respect to all or part of the Recaptured Rights, then in each such instance, Owner shall, promptly after deciding to accept such offer, make a written offer to Purchaser specifying such terms and conditions which Owner is prepared to accept and the name of the third party offeror who made the offer to Owner to enter into an agreement with Purchaser with respect to the Recaptured Rights on the same such terms and conditions. At any time within thirty (30) days after receipt of such written offer from Owner, Purchaser may notify Owner of its accpetance of such offer and, in such event, the rights referred to in such offer shall be assigned to Purchaser, subject to Purchaser's compliance with the terms and conditions of the offer so accepted; provided, however, that Purchaser shall not be required to meet such terms and conditions which cannot be so easily met by one transferee as another, including without limitation, the use of talent. If Purchaser shall acquire from Owner all or part of the Recaptured Rights, then Owner agrees to enter into appropriate written agreements with respect thereto. If Purchaser shall elect not to purchase said rights, then Owner may dispose of said rights but only to the offeror and upon the terms and conditions specified in such notice to Purchaser, it being understood and agreed that

6.

43

owner may not dispose of such rights to any other party or upon terms and conditions more favorable to the transferee than those offered to Purchaser hereunder without again offering such more favorable terms and conditions to Purchaser as herein provided. With respect to such Recaptured Rights, it is agreed by Owner that such Recaptured Rights shall include only those exclusive rights comprised in the copyright. It is further agreed by Owner that if Owner becomes entitled to such Termination Rights and elects to exercise such rights, the requisite notice thereof shall be served upon Purchaser as well as upon any other persons upon whom it is required by law that it be served. Should any provision of this Paragraph be held unenforceable, such provision shall be either deemed amended to the extent necessary to achieve enforceability or, if no such amendment is possible, deleted herefrom without rendering unenforceable or otherwise modifying the remaining provisions hereof.

20. <u>Miscellaneous</u>.

(a) <u>Governing Law</u>: This Agreement shall be governed by the laws of the State of California and shall not be modified except by a written document executed by all parties hereto. The parties agree to the exclusive jurisdiction of the federal and state courts located in Los Angeles County, California in matters relating to this Agreement.

(b) <u>Entire Agreement</u>: This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements or understandings, written or oral, relating to the subject matter hereof. Owner acknowledges and agrees that in entering into this Agreement Owner has not relied upon or been induced by any promise or representation (express or implied, oral or written) of Purchaser not contained herein.

(c) <u>Paragraph Headings</u>: Paragraph headings are for the convenience of the parties only and shall have no legal effect whatsoever.

(d) <u>Waiver</u>: No waiver by any party hereto of any term or condition hereof shall be deemed or construed to be a waiver of such term or condition in the future, or of any preceding or subsequent breach of the same or any other term or condition of this or any other agreement.

(e) <u>Severability</u>: Except as expressly provided to the contrary herein, each provision of this Agreement shall be considered separate and divisible, and in the event that any such provision is held to be invalid, void or unenforceable by a court of competent jurisdiction, the remaining provisions shall continue to be in full force and effect without being impaired or invalidated in any way.

7.

44

(f) <u>Remedies Cumulative</u>:  Except as expressly provided to the contrary herein, the parties' various rights and remedies hereunder shall be cumulative and the exercise or en-forcement of any one or more of them shall not preclude the en-forcing party from exercising or enforcing any of the others or any right or remedy provided for by law.

(g) <u>Binding Effect</u>:  This Agreement, and all rights and obligations hereunder, shall be binding on and inure to the benefit of the parties hereto and their respective heirs, successors, licensees and assigns.

21.  <u>More Formal Agreement</u>.  It is contemplated that a more formal agreement shall be prepared containing the specific terms set forth herein, as well as such standard terms and con-ditions as are customary in the motion picture industry in Los Angeles, California in connection with agreements of this nature, which terms and conditions are incorporated herein by reference. Until such more formal agreement is prepared and executed, this Agreement shall constitute a valid and binding agreement between the parties.

22.  <u>Remakes, Sequels</u>:  If Owner desires to exercise any of the rights granted to Owner pursuant to Paragraph 9 of the Dux Agreement (the "Affected Rights"), Owner must first afford Pur-chaser the rights of "first negotiation" and "first refusal" with respect to Purchaser acquiring such Affected Rights.

Accordingly, if Owner desires to exercise said Affected Rights, Owner shall give Purchaser written notice thereof and shall first negotiate exclusively with Purchaser for a period of not less than 30 days with respect thereto.  If said negotiations do not result in a binding agreement, then Owner is free to nego-tiate with third parties with respect to said Affected Rights.

If at any time after said 30 days period of "first negotiation" Owner shall propose to make or accept a bona fide third party offer ("TPO") for said Affected Rights, Owner must give Purchaser written notice of said third party offer ("TPO Notice"), setting forth in detail the name of the offeror and all material terms of the TPO.  Purchaser shall have the exclusive right and option, during the 30 day period following receipt of the TPO Notice, to acquire the Affected Rights upon the same terms and conditions as contain in the TPO; provided that, Pur-chaser shall not be required to meet any terms or conditions of the TPO which may not be as easily met by Purchaser as by any other party or which relates to any person, matter or thing other than the purchase price and manner of payment thereof.  If Purchaser elects not to so accept, then Owner may accept said TPO; provided that, if the transaction contemplated by such TPO if not consummated for any reason whatsoever upon the terms and conditions contained in the TPO Notice, Purchaser's right and

8.

option shall apply to each and every further. If Purchaser elects to accept said offer, the Affected Rights. If Purchaser elects to accept said offer, then the parties will promptly thereafter negotiate a formal contract incorporating their said agreement, but in the absense of such contract the parties shall still have a binding agreement as of the date of Purchaser notice of acceptance of the terms contained in the TPO. If Owner does not exercise the Affected Rights within 3 years following release of the Picture in the USA, then Purchaser shall have the right to exercise same, and shall negotiate in good faith with Owner with respect to owner's rendering services in connection with any motion picture produced by Purchaser from said Affected Rights.

23. <u>Turnaround</u>: Purchaser shall have the option at any time to abandon production of the Picture by sending written notice thereof to Owner. Further, the Picture shall be deemed abandoned if principal photography thereof has not commenced by May 1, 1987 (subject to extension for delays caused by force majeure events). In the event of such an abandonment, the terms and conditions of Exhibit "D" hereto shall apply.

24. <u>Contingency</u>: All of Purchaser's obligations here-under are contingent upon: (a) receipt of executed copies of instruments in the form of Exhibits "A", "B", and "C" attached hereto, and (b) approval of the "chain-of-title" in the Property.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and date first written above.

Cannon Films, Inc.

By:_____

_____

Mark DiSalle                              Its:_____

9.

## SHORT-FORM ASSIGNMENT

For good and valuable consideration, receipt of which is hereby acknowledged, MARK DISALLE ("Owner") hereby grants, sells and assigns to CANNON FILMS, INC. ("Purchaser"):

1.  Certain rights to produce, distribute, advertise, exploit and otherwise turn to account one motion picture based upon (a) the life story of Frank Dux, and (b) that certain screenplay written by Sheldon Lettich based upon the life story of Frank Dux. The rights of Purchaser shall be as more fully set forth in that certain agreement (the "Agreement") between Owner and Purchaser dated as of March 25, 1986; and

2.  Any and all causes of action which Owner now has or hereafter may have for any past, present or future infringement or interference with any of said rights as granted to Purchaser.

Owner hereby appoints Purchaser (and its successors and assigns) Owner's irrevocable attorney-in-fact, with full power of substitution and delegation, in Owner's or in Purchaser's name: to enforce and protect all rights, licenses, privileges and/or property granted hereunder under any and all copyrights thereof; to prevent or terminate any infringement or violation or threatened infringement or violation of said copyrights as respects any of said rights, licenses, privileges or property; and to litigate, collect and receipt for all damages or injury arising from any such infringement or violation, and to join Owner as party plaintiff or defendant in any such suit or proceeding, in Purchaser's sole discretion.

_____
Mark DiSalle

STATE OF _____
COUNTY OF _____

On this _____ day of _____, 1986, before me, the undersigned, personally appeared _____, known to me to be the person whose name is subscribed in the within instrument, and acknowledged to me that s/he executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this instrument first written above.

_____
Notary Public

10.

47

**Ⓦ** 𝒲ALT 𝒟ISNEY Motion Pictures Group

FILE COPY

<u>VIA MESSENGER</u>

January 30, 1996

Mr. Mike Frankel
12501 Chandler Boulevard, #104
North Hollywood, CA  91607

Re:  "SPY PROJECT"

Dear Mike:

    Enclosed is a draft of the agreement ("Agreement") dated
as of January 3, 1996, between HOLLYWOOD PICTURES COMPANY
("HPC"), and Frank Dux ("Owner") for the acquisition of: (i)
exclusive motion picture, television and all allied rights of
every kind and nature throughout the universe in and to the
unpublished book written by Owner entitled "THE SECRET MAN"
(the "Book") in connection with a possible motion picture based
thereon currently known as "SPY PROJECT" (the "Picture"); and
(ii) all right title and interest in and to Owner's life story
(the "Life Story").

    Please give me a call at (818) 560-6071 once you have
reviewed the Agreement.

                              Sincerely,

                              Tamara Y. Woolfork

                              Tamara Y. Woolfork
                              Attorney for
                              Walt Disney Company

TYW:dc
encls.

cc:  Doug Carter
     Lary Simpson
     Joe Gotler

<u>DEF</u> EXHIBIT _28_ FOR IDENTIFICATION
COLLEEN M. McGOVERN C.S.R. NO. 10360
DEPONENT: _FRANKEL_
DATE _8-4-98_ PAGE _1_ OF _27_

SPYLTR-RTS.doc   500 South Buena Vista Street  Burbank  California 91521  818-560-1000

𝒲ALT 𝒟ISNEY Com

Exhibit 4

DNY 0044

CONFIDENTIAL

48

DATE:      As of January 3, 1996
SUBJECT:  "SPY PROJECT"
          FRANK DUX/RIGHTS


## MEMORANDUM OF AGREEMENT


The following are the terms of the agreement (the
"Agreement") dated as of January 3, 1996, between HOLLYWOOD
PICTURES COMPANY ("HPC") and Frank Dux ("Owner") for the
acquisition of (i) exclusive motion picture, television and all
allied rights of every kind and nature throughout the universe
(all as more fully set forth in Paragraph 6 below) in and to the
unpublished book written by Owner entitled "THE SECRET MAN" (the
"Book") in connection with a possible motion picture based
thereon currently known as "SPY PROJECT" (the "Picture"), and
(ii) all right title and interest in and to Owner's life story
(the "Life Story") (all as more fully set forth in Paragraph 6
below).  The Life Story and the Book and all versions and
adaptations of the Book previously or hereafter written are
collectively referred to herein as the "Property".

1.    CONDITIONS PRECEDENT:  HPC shall have no obligation
hereunder unless and until:

      a.    HPC receives a fully signed agreement (in form and
      substance acceptable to HPC) for the producing services of
      Jerry Bruckheimer in connection with the Picture;

      b.    HPC's receipt of a fully signed publisher's release
      (in form and substance acceptable to HPC) of all rights
      other than publication rights for the Book; and

      c.    HPC's receipt of a fully signed agreement between
      Hollywood Pictures Company ("HPC") and Frank Ninjitsu-Ninja
      Studios ("Lender") for the consulting services of Frank Dux
      ("Consultant") on an independent contractor basis in
      connection with the Picture.

      d.  HPC approves the chain of title with respect to the
      Picture, approves all agreements with respect thereto
      and receives all assignments and releases which HPC
      requires in connection therewith.

2.    OPTION/RIGHTS GRANTED:  Owner hereby grants to HPC the
exclusive and irrevocable option ("the Option") to acquire all
rights including without limitation the motion picture,
television and allied rights and rights of every kind and nature
now known and unknown in perpetuity throughout the universe in
and to the Property (collectively, the "Rights"), as more fully
defined in Paragraph 6 below.

3.    EXERCISE OF OPTION:  The Option may be exercised by written
notice thereof given at any time commencing as of the date of
this Agreement and ending two (2) years after the later to occur

CONFIDENTIAL

of: (i) the execution and delivery to HPC of this Agreement and (ii) satisfaction of the Conditions Precedent set forth in Paragraph 1 above (the "Initial Option Period"); provided, however, that the Initial Option Period may be extended for an additional period (the "First Extended Option Period") of one (1) year by written notice to Owner during the Initial Option Period and by payment as provided in Paragraph 4.b below; provided, further, that the Option shall be deemed exercised upon the commencement of principal photography of the Picture; and provided, further, that the Initial Option Period, and/or the First Extended Option Period may be further extended for any period during which a claim based upon, or for breach by the Owner of, any representation or warranty hereunder with respect to the Property has been asserted and remains unresolved, and for any period during which HPC's development and/or production activities based upon the Property are interrupted or postponed due to any occurrence of an event of force majeure, including, without limitation, any labor dispute (or threat thereof).  The Initial Option Period as extended by the First Extended Option Period is hereinafter referred to as the "Total Option Period".

4.  OPTION CONSIDERATION:

a.  Initial Option Period.  In consideration of Owner's grant to HPC of the Option, HPC shall pay Owner the sum of $125,000 upon the later to occur of the satisfaction of the conditions precedent set forth in Paragraph 1 above or the execution of this Agreement, which $125,000 sum shall be fully applicable against the Purchase Price set forth in Paragraph 5 below.

b.  Extended Option Period.  If HPC extends the Option Period as set forth in Paragraph 3 above for the Extended Option Period, then HPC shall pay Owner the additional sum of $50,000 upon the commencement of the Extended Option Period, which sum shall not be applicable against the Purchase Price set forth in Paragraph 5 below.

5.  PURCHASE PRICE:  If HPC exercises the Option, HPC will own all of the Rights, and as payment in full for Owner's grant of the Rights to HPC and for all of the promises, representations, warranties and agreements made by Owner hereunder, HPC will pay Owner as follows:

a.  Cash Consideration.  The sum ("Purchase Price") of $500,000, less any applicable sums set forth in Paragraph 4.a. above and 5.b. below, payable upon the earlier to occur of the exercise of the Option or the commencement of principal photography of the Picture; and

b.  If the Picture is produced as a theatrical motion picture, a bonus in the amount of:  (A) $10,000 for each week that the Book appears, if ever, on the New York Times Sunday Review of Books hard-cover fiction best seller list (the "Best Seller List") in position one (1) during the Book's initial release; (B) $5,000 for each week that the

Book appears, if ever, on the Best Seller List in positions two (2) through six (6) during the Book's initial release; (C) $3,500 for each week the Book appears, if ever, on the Best Seller List in positions seven (7) through eleven (11) during the Book's initial release; and (D) $2,000 for each week the Book appears, if ever, on the Best Seller List in positions twelve (12) through fifteen (15) during the Book's initial release; provided, however, that the aggregate of all bonuses (if any) payable to Owner pursuant to this Paragraph 5.b. shall not exceed $250,000. Notwithstanding anything to the contrary set forth herein, at such time, if ever, that Lender shall be entitled to receive the Purchase Price as set forth in Paragraph 5.a. above, Lender shall also be entitled to receive the amount of $150,000 as an advance against the bonus amounts (if any) which may become payable to Lender pursuant to this Paragraph 5.b.; provided that an amount up to $75,000 shall be fully applicable against the Purchase Price.

c.   Contingent Consideration.  Provided that the Picture is produced and released as a theatrical motion picture, an amount ("Participation") equal to 5% of 100% of the Net Profits, if any, derived from the Picture.  The term "Net Profits" shall be defined and computed, and the Participation shall be paid, pursuant to the terms of Exhibit "NP" (including a 15% overhead charge, plus charges for any HPC facilities used in accordance with HPC's then-current rate card) as modified solely by the Simpson/Bruckheimer Charge, copies of which are attached hereto and incorporated herein by this reference.

6.   RIGHTS GRANTED:  Subject only to the reserved rights set forth in Paragraph 7 below, Owner hereby irrevocably grants to HPC, solely, exclusively and in perpetuity throughout the universe, the following rights, and the Rights are defined to include:

a.   The right to develop, produce and exploit motion pictures (including without limitation theatrical motion pictures and television motion pictures and sequels and remakes thereof) based upon or adapted from all or any part of the Property throughout the universe, in perpetuity and in all languages and all elements therein for all now known and hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, videocassette and video or laser disc, any computer-assisted media (including, but not limited to CD-ROM, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised) and allied rights therein.

b.   The right to produce sound records of all or any part of the Property and any and all motion pictures (including without limitation theatrical motion pictures and

CONFIDENTIAL

DNY 0047

television motion pictures and sequels and remakes thereof) produced hereunder, specifically including the exclusive motion picture synchronization rights in the Property and each and every part thereof, and the exclusive right to use all or any part of the Property upon the parts of instruments serving to reproduce the same mechanically.

c.   The right to adapt, use, dramatize, arrange, change, vary, modify, alter, transpose, simulate and portray, factually or fictionally the Property, including but not limited to, Owner's name(s) or any variant thereof and Owner's picture(s), photograph(s), portrait(s) or representation(s) or any simulation(s) thereof, Owner's likeness(es), voice(s), personality(ies) and personal experience(s), episode(s), incident(s), situation(s) and event(s) which heretofore occurred (in whole or in part) and/or so-called mundane and/or everyday events, experiences, etc. which may occur in the future, in any manner and by any means either accurately or with such liberties as HPC, HPC's successors, assigns and licensees, may desire or deem necessary for the purposes of fictionalization or dramatization and by means of artist(s) who may or may not resemble Owner, and make musical or non-musical versions of the Property and any parts thereof; to add to, interpolate in and subtract or omit from the Property, characters, language, plot, theme, scenes, incidents, situations, action, titles, dialogue, songs, music and lyrics; to translate any of the foregoing into all languages; to include in motion pictures and other items provided for in this Paragraph 6 such language, speech, songs, music, lyrics, dancing, choreography, sound, sound effects, action, situations, scenes, plot, dialogue, incidents and characters, characterizations and other material (whether or not based upon, or taken from, the Property) as HPC, in its sole and uncontrolled discretion, may deem advisable, it being the intention hereof that HPC shall have the exclusive, absolute and unlimited right to use the Property, and each and every part thereof, for motion picture purposes (and all other purposes granted hereunder) in any manner it may, in its sole and uncontrolled discretion, deem advisable with the same force and effect as though HPC were the sole author of the Property, all without in any way being accountable or liable to Owner for any use that HPC may make thereof, excepting only the compensation and screen credit obligations to Owner contained herein.  Owner hereby waives the benefits of any provision of law known as "droit moral", or any similar laws, and agrees not to institute, support, maintain or authorize any action or lawsuit on the ground that any motion pictures or sound records, or other items produced hereunder in any way constitute an infringement of any of Owner's "droit moral" or a defamation or mutilation of any part thereof, or contain unauthorized variations, alterations, modifications, changes or translations.  Owner shall not have any right, title or interest whatsoever in or to any plot, story,

CONFIDENTIA

character, music, lyrics, dialogue, screenplay or other material of any kind created by or for HPC in the exercise of HPC's rights hereunder, or in any motion pictures produced hereunder or any material created by HPC in connection therewith.

d.    The right to broadcast all or any part of the Property and all or any part of any motion picture or sound record produced hereunder by radio and television, or otherwise, whether by electrical transcription, film, tape, or otherwise, in any language.

e.    The right, for the purpose of advertising and in connection with any exploitation hereunder of the Property, to produce and publish as serials or otherwise (with or without illustrations by photographs, drawings or cartoons) stories, synopses, excerpts, summaries, resumes, fictionalizations not to exceed a total of 7,500 words in length of and from the Property.

f.    The right to write and prepare screenplays, teleplays, treatments, storyboards and all other plans, specifications and designs for motion pictures and any sound records produced hereunder, and to cause musical compositions, including both words and music, utilizing or based upon or adapted from all or any part of the Property or any title or titles thereof to be written and composed, and to include such musical compositions in motion pictures and sound records produced hereunder.

g.    The right to manufacture, sell, furnish, supply and distribute products, by-products, services, facilities, merchandise and commodities of every nature and description, including, but not limited to, still photography, drawings, posters, artwork, toys, games, items of wearing apparel, foods, beverages and similar items, which make reference to or are based upon or adapted from the Property or any part thereof of any motion picture produced hereunder and the right to make trade deals and commercial tie-ups of all kinds involving the Property, or any part thereof.

h.    The right to copyright motion pictures and any version(s) thereof, sound records, musical compositions, screenplays, teleplays and all other items provided for in this Paragraph 6 and to secure copyright and/or trademark registration and protection thereof in all countries and territories where such protection is available, in HPC's own name or otherwise, together with the right to manufacture copies thereof, and to distribute, sell, vend, lease, license, exhibit, transmit, broadcast, project, reproduce, publish (subject to the terms of Paragraph 6.e above), use, perform, advertise, publicize, market, exploit, turn to account and derive revenue in any form or manner therefrom, without any territorial restriction whatsoever, by any and all media, methods, systems and

CONFIDENTIA

28-6

processes now or hereafter known, invented, used or contemplated, specifically including television and videocassettes, and the right to import or export such copies into or out of any territory without restriction. It is further expressly understood and agreed that motion pictures and all other items that may be produced hereunder shall constitute independent derivative works, and HPC and its successors, assigns and licensees shall have the perpetual right to exercise the rights granted in this Paragraph 6.h irrespective of the expiration, termination, transfer or renewal of any copyright owned or controlled by Owner, or any heirs, executors, widow, widower, children, successors or assigns of Owner.  HPC shall in no event have any less rights by reason of this Agreement than any member of the public may now or hereafter have.

i.    Insofar as Owner is concerned, the right to use a translation in any language of the title or titles by which the Property or any part thereof are now known or may hereafter be known as the title or titles of motion pictures (whether or not based upon or adapted from the Property), and the right to exploit, distribute and exhibit any motion picture produced hereunder under any other title or titles that HPC may deem proper in its uncontrolled discretion.

j.    Stage Rights (including musical Stage Play Rights): The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience.

k.    All other rights of every kind and character whatsoever now known and unknown in the Property including without limitation any and all theme park rights except only those rights as specifically reserved to Owner in Paragraph 7 below.

HPC shall have all rights herein granted to it in all existing and future versions, translations, dramatizations, arrangements, revisions, supplements and reissues of the Property written or published by or with the authority of Owner and Owner's successors, assigns and licensees, as well as all prior drafts, notes, research, source material and other works owned or controlled by Owner upon which the Property is based and from which the Property is adapted.

All rights granted HPC under this Agreement shall be cumulative, and HPC may exercise or refrain from exercising any one or more of said rights separately from, simultaneously, together or in connection with any other rights granted to HPC hereby or obtained by HPC from other sources, and regardless of whether said rights are granted in the disjunctive or conjunctive.

7.    RESERVED RIGHTS:  Only the following rights to the Property are reserved to Owner for Owner's use and disposition, subject, however, to the provisions of this Agreement:

DNY 0050

CONFIDENTIAL

spy02aa

-6-

54

25-7

a.   Publication Rights:  The right to publish and distribute printed versions of the Property and Author-Written Sequels owned or controlled by Owner in book form only, including translations and reissues, whether hardcover or softcover, and in magazine or other periodicals, whether in installments or otherwise, subject to Purchaser's rights provided for in Paragraph 6.e above. Such publications by Owner may be copyrighted in the name of Owner, subject to the provisions of Paragraph 11 below. Reserved publication rights do not include picture books, coloring books and other publications that do not contain the story line of the Property, which are all included in the rights granted to HPC.  All motion picture, television and allied rights with respect to said Author-Written Sequels shall be "frozen" (i.e., neither Owner nor HPC may exploit such rights without the express written consent of the other party), and if HPC elects to develop a motion picture based on said Author-Written Sequel(s), HPC and Owner will negotiate in good faith the financial terms of HPC's acquisition of such motion picture, television and allied rights.

b.   Electronic Publishing:  The right to mechanically produce, reproduce and license the reproduction of audio recorded cassettes of readings of the Property and Author-Written Sequels and/or excerpts from the Property and Author-Written Sequels (i.e., "books-on-tape"), as long as such form is solely a text-based product.

c.   Radio Rights:  The right to broadcast the Property by sound (as distinguished from visually) by radio, subject, however, to HPC's right at all times to:  (i) exercise its radio rights provided in Paragraph 7.d. above for advertising and exploitation purposes by living actors or otherwise; and (ii) in any event to broadcast any motion picture produced hereunder by radio.  Owner agrees not to exercise, or authorize any other person to exercise, Owner's radio rights earlier than five (5) years after the first general release in the United States of any theatrical motion picture produced hereunder or seven (7) years after the date of the exercise of the option granted HPC hereunder, whichever is earlier; provided, however, that such restriction on Owner's exercise of said radio rights shall be extended for any period during which there is in effect, in any particular country or territory, an initial network television broadcasting agreement for a television motion picture based upon the Property or based upon any motion picture produced in the exercise of rights assigned hereunder or using a character or characters of the Property, plus any contractual clearance period contained in such initial television broadcasting agreement, which period shall not exceed one year after the expiration of such agreement, and which period shall also be a restricted period in such

DNY 0051

55

CONFIDENTIAL

28-8

country or territory, whether or not such period occurs wholly or partly during or entirely after the 5/7 year period first referred to in this Paragraph 8.c. After the expiration of said restricted period, as extended, HPC shall have the right of first negotiation/last refusal with respect to said reserved rights, in accordance with the provisions of Paragraph 16 below.

d.    Live Television:  The right to telecast directly from the performance to the audience any adaptation of the Property (provided, however, that such adaptations do not infringe upon any motion picture produced hereunder), the performance not having been recorded on film, tape, wire or other substance or device whatsoever, subject, however, to HPC's right at all times to televise from living actors excerpts not to exceed 5 minutes in length from the condensations of the Property or any motion picture produced hereunder for advertising and exploitation purposes, provided nothing herein shall be deemed to nor shall anything contained herein limit HPC's unqualified right at all times to telecast HPC's motion picture produced hereunder.  Owner agrees not to exercise or authorize any other person to exercise Owner's live television rights earlier than five (5) years after the first general release in the United States of the first theatrical motion picture produced hereunder, or seven (7) years after the date of the exercise of the option granted HPC hereunder, whichever is earlier; provided, however, that such restriction on Owner's exercise of said live television rights shall be extended for any period during which there is in effect, in any particular country or territory, an initial network television broadcasting agreement for a television motion picture based upon the Property or based upon any motion picture produced in the exercise of rights assigned hereunder or using a character or characters of the Property, plus any contractual clearance period contained in such initial television broadcasting agreement, such period not to exceed one (1) year after the expiration of such agreement, which period shall also be a restricted period in such country or territory, whether or not such period occurs wholly or partly during or entirely after the 5/7 year period first referred to in this Paragraph 8.  After the expiration of said restricted period, as extended, HPC shall have the right to negotiate with respect to said reserved rights, and HPC shall have first refusal rights with respect thereto, in accordance with the provisions of Paragraph 16 below.

e.   It is expressly agreed that Owner's reserved rights under this Paragraph 7 relate only to material written or authorized by Owner, and not to any screenplay, characters, teleplay, music, lyrics, sequels or other material written and/or created by or for or authorized by HPC, even though

spy02aa

DNY 0052

CONFIDENTI

28-9

the same may contain characters or other elements contained in the Property and/or any Author-Written Sequels.

8. <u>WARRANTIES</u>: Owner represents, warrants and agrees as follows:

a. That Owner is the sole owner of all rights (including the Rights, as defined in Paragraph 6 above) herein granted and has full power and authority to grant said rights to HPC; that Owner has full power and authority to agree to the restrictions upon the exercise of the rights reserved to Owner, as more particularly set forth in Paragraph 7 above; that none of the rights granted to HPC hereunder has been granted, encumbered, or otherwise disposed of in any manner to any person, firm or other entity; that no motion picture based in whole or in part upon the Property has been produced or authorized by, or with the knowledge or consent of, Owner; that neither the Property nor any version thereof nor any play or dramatic adaptation based thereon in whole or in part has been published or presented or authorized on television, radio or on the spoken stage by or with the knowledge or consent of Owner; that Owner has not done or omitted to do and will not do or omit to do any act or thing by license, grant, or otherwise, which will or may impair or encumber any of the rights herein granted or interfere with the full enjoyment of said rights; and that there are no claims or litigation pending or threatened which will or might adversely affect any of the rights herein granted to HPC.

b. That Owner has not granted any other rights to the Property.

c. That the Property is original with Owner; that neither the Property nor any part thereof is taken from or based upon any other material except material wholly owned by Owner; and that neither the Property nor any part thereof, or the exercise by HPC of the rights herein granted, will violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, civil or property right, or any other right of any person, or invade the right of privacy or constitute a libel or slander of any person. Owner makes no warranty hereunder, however, with respect to any material added to the Property by HPC.

d. That the Property is not in the public domain, and enjoys, and will enjoy, either statutory or (to the extent that it may exist) common law protection in the United States and all countries adhering to the Berne and Universal Copyright Conventions; and that the rights granted to HPC hereunder are and will be exclusive.

e. Attached hereto, marked "Schedule II" and made a part of this Agreement by this reference, is a statement of all publications (if any), prior uses (if any), prior versions,

DNY 0053

CONFIDENTIAL

57

28-10

adaptations and translations (if any), and copyright status of the Property. Such statement shall also set forth the existence (if any) of any valid agreement with third parties for the publication or dramatic production of the Property.

9.   INDEMNITY: Owner will defend, indemnify, make good, save and hold harmless HPC, its parent and/or affiliated companies, the officers and directors of each, and its successors and assigns from and against any claims, losses, damages, costs, charges, reasonable attorney's fees, court costs, recoveries, actions, judgments, penalties, expenses and other loss whatsoever which may be obtained against, imposed upon or suffered by HPC, its parent and/or affiliated companies, the officers and directors of each and its successors and/or assigns, by reason of the breach or alleged breach of any warranty, covenant, agreement or representation herein made by Owner. HPC will defend, indemnify, make good, save and hold harmless Owner, its successors and assigns from and against any claims, losses, damages, costs, charges, reasonable attorney's fees, court costs, recoveries, actions, judgments, penalties, expenses and other loss whatsoever, which may be obtained against, imposed upon or suffered by Owner, its successors and/or assigns, by reason of the breach of any warranty, covenant, agreement or representation herein made by HPC.

10.   PRIOR INSTRUMENTS:

a.   Owner hereby grants to HPC all of Owner's right, title, and interest in and to any and all agreements, assignments, releases and other instruments or documents in writing (collectively, "Instruments") heretofore or hereafter executed in favor of Owner, or any predecessor of Owner, insofar as said Instruments grant or purport to grant to Owner, or any such predecessor, any of the rights, privileges and property herein granted to HPC, together with the full benefit of all representations, warranties and agreements made by any party in favor of Owner or any such predecessor, insofar as the same pertain to or affect any of the rights, privileges and property herein granted to HPC. Without limiting the foregoing, if Owner is not the sole author of the Property, then Owner shall deliver to HPC an assignment of all rights in and to the Property duly executed by any third-party author in favor of Owner, in a form satisfactory to HPC.

b.   Owner represents and warrants that said Instruments (if any exist) have not been amended, modified or cancelled in any way, and are in full force and effect as originally signed; that Owner has not granted or assigned any right, title or interest heretofore acquired by Owner in, to or under said Instruments in a manner inconsistent herewith; and that there has been paid to the party or parties entitled thereto all sums which have heretofore become payable under any of said Instruments, and, except as herein specifically provided, Owner will hereafter pay or

DNY 0054

CONFIDENTIAL

58

cause to be paid, to the party or parties entitled thereto, all sums which may hereafter accrue under said Instruments.

11.   <u>COPYRIGHTS</u>:

a.   Owner further grants and assigns to HPC all of Owner's right, title and interest in and to any and all copyrights in and to the Property and each and every part thereof contained therein, together with all benefits of said copyrights and all remedies held thereunder, and all actions and causes of action for infringement or violation of said copyrights, or any other rights in the Property or relating thereto, and all damages, profits, penalties and other recoveries and all other rights of every kind and character which Owner may now or hereafter have directly or indirectly as a result of any such infringement or violation, but only insofar as said copyrights pertain to or affect any of the rights, privileges and property herein granted to HPC.

b.   Owner agrees to:  prevent the Property from entering the public domain to the extent it is possible to do so; to cause to be affixed to each copy of the Property or any part thereof published or offered for sale by or with the authority of Owner notice of copyright complying in all respects with the U.S. Copyright law and with the Universal Copyright Convention; to register the Property wherever necessary for such protection; to contract henceforth for the benefit of HPC for the above protection in all grants concerning the Property hereunder made to others; not to cause or permit any publication of the Property or any arrangement, revision or reissue thereof in any form without duly copyrighting the same in the United States and every country where such publication may occur; and to specifically mention, except and reserve the rights herein granted when any grant is made to others of any rights or interest in the Property.

c.   Owner recognizes that a material part of the consideration moving HPC to enter into this agreement is that HPC shall enjoy the rights herein granted to HPC for the full term of any and all of said copyrights, including, to the full extent now or at any time hereafter permitted by law, any renewal term of all United States Copyrights involved.  Owner agrees to make application for, and secure a renewal of, each and every United States copyright involved, at least six (6) months prior to the expiration of each such copyright, or, if Owner is not entitled to renew any such copyright, then Owner will cause the person entitled so to do to make application for, and secure a renewal of, such copyright within said time; and in either event, Owner will promptly notify HPC in writing that such renewal copyright has been applied for and has been secured.  Promptly after each such copyright has been renewed, Owner shall, without payment of any further consideration by HPC, execute and deliver to HPC or cause

DNY 0055

CONFIDENTIAL

25-12

to be executed and delivered to HPC such further instrument or instruments as shall be necessary or proper to vest in HPC all of the rights herein granted for the full period of such renewal copyright, upon and subject to all of the identical terms, conditions, limitations, representations, covenants and warranties herein contained, except for the monetary consideration herein specified. Regardless of the execution and delivery of any such instrument, all such rights shall be deemed to have been acquired by HPC under such renewal copyright upon and subject to all of the terms, conditions, limitations, representations, covenants and warranties herein contained simultaneously with the effective date of renewal of such copyright.

d.   If, pursuant to any copyright or similar law, Owner becomes entitled to exercise any right of reversion, recapture or termination (the "Termination Right") in or to all or part of the rights granted hereunder and Owner exercises the Termination Right, then, from and after the date that Owner has the right, pursuant to such copyright or similar law, to transfer all or part of such rights (the "Recaptured Rights") to a third party, HPC shall have the first right to purchase from Owner the Recaptured Rights. If Owner decides to accept a bona fide offer with respect to all or part of the Recaptured Rights, then in each such instance, Owner shall, promptly after deciding to accept such offer, make a written offer to HPC, specifying such terms and conditions which Owner is prepared to accept and the name(s) of the third party who made the offer to Owner, to enter into an agreement with HPC with respect to the recaptured rights on the same such terms and conditions. At any time within thirty (30) days after receipt of such written offer from Owner, HPC may notify Owner of its acceptance of such offer and, in such event, the rights referred to in such offer shall be assigned to HPC, subject to HPC's compliance with the terms of the offer so accepted; provided, however, that HPC shall not be required to meet such terms which cannot be as easily met with one transferee as another, including, without limitation, the use of certain talent.  If HPC shall acquire from Owner all or part of the Recaptured Rights, then Owner agrees to enter into a written agreement with respect thereto.

e.   If HPC shall elect not to purchase the Recaptured Rights, then Owner may dispose of said Recaptured Rights but only to the offerer and upon the terms and conditions specified in such notice, it being understood and agreed that Owner may not dispose of such rights to any other party or upon terms and conditions any different from those offered to HPC hereunder without again offering such Recaptured Rights to HPC as herein provided. Should any provision of this Paragraph 12 be held unenforceable, said provision shall be either deemed amended to the extent necessary to achieve enforceability or, if such amendment is impossible, deleted herefrom without rendering

DNY 0056

CONFIDENTIAL

28-13

unenforceable or otherwise modifying the remaining provisions hereof.

f.    Owner hereby irrevocably appoints HPC, or its nominee, as Owner's attorney-in-fact (which power is acknowledged by Owner to be coupled with an interest), with the right but not the obligations, for the sole benefit of HPC, and at the HPC's expense, to bring, prosecute, defend and appear in suits, actions, and proceedings of any nature under or concerning all copyrights in and to the Property and all renewals thereof, or concerning any infringement of any such copyright or renewal copyright, or any interference with any of the rights herein granted to HPC; and to take such action as HPC may deem advisable to enforce, protect, and/or defend any of the rights, privileges and property herein granted to HPC under any and all such copyrights and renewals thereof, as well as any of the rights, licenses, privileges, warranties and agreements contained and/or set forth in any of the documents herein referred to, insofar as the same relate to the rights, privileges and property herein granted to HPC; and to litigate, collect and receipt for all damages arising from any infringement of any such rights.  Any such action may be taken by HPC in the name of Owner or otherwise, and HPC (at its sole discretion) may join Owner as a party plaintiff or defendant in any such suit, action or proceeding.  In the event of the failure of Owner to do or cause to be done any and all acts and things necessary to obtain the renewal of any United States copyright involved, or in the event of the failure of Owner to execute and deliver or cause to be executed and delivered to HPC all Instruments required in accordance with the provisions of this agreement, Owner hereby irrevocably appoints HPC, or its nominee, as Owner's attorney-in-fact (which power is acknowledged by Owner to be coupled with an interest) in Owner's name and on Owner's behalf, with the right, but not the obligation, to do any and all acts and things necessary for the obtaining of such renewal copyright, and to execute and deliver all such Instruments for the purposes aforesaid.

g.    Owner agrees to duly acknowledge, execute and deliver or to procure the due execution and delivery to HPC of any and all further assignments and other instruments that may be necessary or expedient to carry out and effectuate the purposes and intent of this agreement, including but not limited to, any and all copyright assignments which have been or are to be executed in connection herewith.  Owner hereby irrevocably appoints HPC or its nominee, as Owner's attorney-in-fact (which power is acknowledged by Owner to be coupled with an interest), with the right, but not the obligation, to complete any such copyright assignment, fill in any blanks which may be left therein (including dates, Copyright Office registration information, etc.), execute the same in Owner's name, or obtain execution thereof by others, as the case may be, and record the same in the

DNY 0057

CONFIDENTIAL

23-14

United States Copyright Office, or elsewhere, as HPC sees fit.

12.   ASSIGNMENT:  HPC may assign, transfer, license, delegate and/or grant all or any part of its rights, privileges and property hereunder to any person.  This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

13.   DEFINITIONS:

   a.   If more than one party is hereby referred to as "Owner", said term shall be deemed to designate each and all of such parties jointly and severally, and this agreement shall inure to the benefit of and be binding upon each and all of such parties jointly and severally.  Any one of such parties is hereby authorized to execute additional or supplemental documents to this agreement for and on behalf of all such parties and bind them jointly and severally.

As used herein:

   b.   "Author-Written Sequel" means a literary property (story, novel, drama or otherwise), whether written before or after the Property and whether written by Owner or by a successor in interest of Owner, using one or more of the characters appearing in the Property, participating in different events from those found in the Property, and whose plot is substantially different from that of the Property.

   c.   "Copies" with reference to a motion picture or sound record, means and includes any negative or positive print, dupe, negative, video or other electronic tape recording, disc or other physical article of any kind produced, re-produced or re-recorded by means of any photographic, electrical, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated on which such motion picture and/or sound record or any part thereof, is printed, imprinted, recorded, reproduced or duplicated, together with any package, cartridge, cassette or other container in which the same may be distributed or sold.

   d.   "Copies" with reference to a screenplay or teleplay, means any typewritten or printed copies thereof in substantially the form used in connection with production of the motion picture involved, whether or not accompanied by explanatory notes or comments, still photographs or other illustrations.

   e.   "Copies" with reference to a musical composition or the lyrics thereof, means any copies, arrangements,

DNY 0058

CONFIDENTIAL

orchestrations or versions thereof, whether or not in the form used in connection with the motion picture involved.

f.   "Motion picture" or its equivalent, means and includes a motion picture, cinematography film and/or photoplay of every kind and character whatsoever, including the sound records thereof, as well as trailers and clips thereof, produced by means of any photographic, electrical, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, pictures, drawings, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on film, tape or any other material of any description (whether translucent or not) for later projection or exhibition in such manner that the same are or appear to be in motion on a screen, mirror, tube or other medium or device, whether or not accompanied by sound records.

g.   "Theatrical motion picture" means a motion picture produced hereunder based upon the Property, other than a television motion picture.

h.   "Person" includes any association, organization, partnership, business trust, corporation or governmental agency, as well as natural persons.

i.   "Remake" means a motion picture utilizing the characters of the Property and depicting the same plot or story as that portrayed in the initial motion picture, which plot or story does not continue the original story or carry it forward or backward in time.

j.   "Sequel" means a motion picture utilizing the principal character or characters of the Property participating in entirely different events than those portrayed in the Property, whether prior to, concurrent with or subsequent to the events portrayed in the initial motion picture and whose plot is substantially new.

k.   "Sound Records" means and includes sound recordings and reproductions of every kind and character whatsoever produced by means of any electrical, electronic, mechanical or other processes or devices now known or hereafter known, invented, used or contemplated by which sound may be recorded for later transmission or playback, whether or not simultaneously, or in synchronization or times relation, with motion pictures.

l.   "Property" means the following: (i) the aforementioned literary property entitled "THE SECRET MAN" and includes all prior, present and future versions, adaptations and translations thereof (whether written by Owner or by others), its theme, story, plot, characters and their names, its title or titles and subtitles, if any, its music, lyrics, choreography, sets, costumes,

CONFIDENTIAL

orchestrations, arrangements, if any, and wherever throughout the world protectible thereby, its statutory and common law copyright or copyrights, all present or future renewals and extensions of such copyrights and all rights comprehended in such copyrights, and each and every part of all thereof; and (ii) all rights in and to the Life Story, which Life Story rights may be used in any manner and by any means, and either factually or with such fictionalization, portrayal, action, dialogue, impersonation, simulation and/or imitation, or other modification as HPC determines in HPC's sole discretion, including the fictionalization of events and experiences occurring subsequent to the date hereof.  Owner acknowledges that HPC and others are proceeding in reliance upon Owner's grant of rights to the Property to HPC hereunder.  Any or all of the rights shall be freely assignable by HPC.  "Property" does not include the material referred to in Paragraph 6.f above, written or prepared by HPC or under HPC's authority.

14.  CREDITS:  USE OF OWNER'S NAME, ETC:

a.   HPC shall have the right to publish, advertise, announce and use in any manner or medium the name, biography, and photographs or other likeness of Owner in connection with any exercise by HPC of its rights hereunder.

b.   Owner shall (subject to any applicable guild and/or union restrictions) receive a credit on screen, on a separate card, in the main titles if the screenplay writer's name appears in the main titles, on any feature-length theatrical motion picture produced hereunder which is based upon the Property to the effect that the motion picture is based upon or adapted from or suggested by the Property written by Owner, and, if HPC shall so elect, upon such other material as may be incorporated in any such motion picture photoplay, with or without the names of the authors of such other material.

Except as specifically provided above, Owner's credit shall be in such size and position, and shall have all other characteristics, as HPC may determine in its sole discretion. As used herein, "size" means height and width.

15.  THEATRICAL SEQUELS/REMAKES - TELEVISION SERIES/MOW:  If HPC produces and releases a theatrical motion picture based on the Property, and thereafter produces a Television Motion Picture, a Sequel or Remake thereto based on the Picture, then, provided Owner is not in default of any of Owner's obligations hereunder, and provided that Owner is not engaged to write the screenplay or teleplay for such production, Owner shall be entitled to the applicable royalty specified below.

a.   Theatrical Sequel.  One-half (1/2) of the Purchase Price paid to Owner pursuant to Paragraph 5.a above, plus, as contingent compensation, a percentage of Net Profits (if

DNY 0060

64

CONFIDENTIAL

any) of such Sequel, which percentage shall be equal to one-half of the percentage of Net Profits to which Owner was entitled for the Picture.

b.   <u>Theatrical Remake</u>.  One-third (1/3) of the Purchase Price paid to Owner pursuant to Paragraph 5.a above, plus, as contingent compensation, a percentage of Net Profits (if any) of such Remake, which percentage shall be equal to one-third of the percentage of Net Profits to which Owner was entitled for the Picture.

c.   <u>Network Television Series</u>.  The following royalties are payable for each episode of a primetime network television series based upon the Picture, as produced for a particular broadcast season:

| <u>Running Time</u> | <u>Payment</u> |
| --- | --- |
| 30 minutes | $1750 |
| 60 minutes | $2500 |
| 90 minutes (or more) | $3000 |

d.   <u>Movie-of-the-Week or Mini Series</u>.  $10,000 for each hour thereof, not to exceed a maximum of $100,000, regardless of running time.

e.   <u>Reruns and Royalties</u>.  Twenty percent (20%) of the applicable royalty set forth in subparagraph 15.c and d. shall be payable for each of the first five (5) reruns in the combined territory of the U.S. and Canada.  No further rerun payments shall be made thereafter.

g.   <u>Payment of Royalties</u>.  Unless specified otherwise, theatrical payments due under this paragraph 15 shall be payable on completion of principal photography and television payments shall be payable upon the initial U.S. broadcast.  Except as expressly set forth herein, HPC shall not be obligated to make any so-called residual, re-run, foreign use or theatrical use payments to Owner with respect to any television or other motion pictures produced by HPC based on the Property.  If any of the motion pictures referred to in subparagraphs C. and D. above shall be produced prior to the production of a feature-length motion picture intended for initial theatrical release, the payment of the Purchase Price shall be in lieu of the payments provided for in those subparagraphs.

h.   <u>Payments in Lieu of Any Other Royalties</u>.  The payments set forth in this Paragraph 15 are in lieu of any other sequel, remake or separation of rights payments, including, without limitation, any such payments, if any, that Owner would be entitled to receive pursuant to any applicable collective bargaining agreement.

16. <u>FIRST NEGOTIATION AND FIRST REFUSAL RIGHTS</u>:  HPC's right(s) to negotiate with respect to the reserved rights of Owner

CONFIDENTIAL

referred to in Paragraph 8. above (excluding publication rights and recital rights) and the right to meet outside offers received by Owner with respect to any of said reserved rights shall be exercised in accordance with and subject to the following procedures:

a.   Prior to contacting any third parties, if Owner (after the expiration of any restricted period provided for in Paragraph 8 above, as the same may be extended) proposes to sell or otherwise dispose of any of said rights to which this Paragraph 16 applies, Owner will so notify HPC in writing. Within seven (7) business days after the receipt of such notice from Owner, HPC will notify Owner in writing whether or not HPC desires to negotiate for the acquisition of any such rights, and if HPC does not give Owner notice in writing that HPC desires to negotiate for said rights, HPC shall be deemed to have elected not to negotiate therefor.

b.   In the event HPC elects, or is deemed to have elected, not to negotiate for said rights, or in the event HPC shall elect to negotiate for said rights, and such negotiations shall not result in a written agreement between Owner and HPC within a period of thirty (30) days from the commencement of such negotiations, then Owner may negotiate elsewhere for the sale or disposition of said rights, but HPC shall have the right to meet the financial terms of any bona fide offer received by Owner, that are equal to or less favorable to Owner than the last offer made by HPC to Owner with respect thereto. Owner shall give HPC written notice of each and every such offer received by Owner that Owner is willing to accept in respect of said rights, specifying the particulars thereof, including the name of the offeror, and HPC shall have a period of seven (7) business days from receipt of such notice from Owner within which to exercise its said right to meet said offer, provided HPC shall not be required to meet any terms which cannot be met as easily by one person as another, which right shall be exercised by HPC by giving Owner written notice of its election to do so.  In the event HPC exercises said right to meet such offer, then Owner and HPC shall promptly execute written agreements conveying to HPC the rights involved upon the terms and conditions of said offer.

c.   In the event HPC does not acquire the rights involved in accordance with the foregoing provisions, then Owner shall have the right to sell or otherwise dispose of such rights but only to the offeror and upon the terms and conditions specified in such notice to HPC pursuant to Paragraph 16.b. above; but if Owner is willing to accept any different terms and conditions or any offer from some other party which is equal to or less favorable to Owner than the last offer made by HPC to Owner, Owner shall again offer the same to HPC in accordance with the procedures set forth in Paragraph 16.b. hereof.

DNY 0062

CONFIDENTIAL

66

28-19

17.  MISCELLANEOUS

a.  No Obligation To Use.  HPC is not obligated to use the services of Owner or to develop, produce, distribute, or exploit the Picture, or, if commenced, to continue the development, production, distribution, or exploitation of any Picture in any territory.

b.  Notices.  Notices required to be given hereunder shall be in writing and shall be addressed:

To HPC:               HOLLYWOOD PICTURES COMPANY
                      500 South Buena Vista Street
                      Burbank, California 91521
                      Attention:   Senior Vice President
                                   Legal and Business
                                   Affairs

To Owner:             FRANK DUX
                      c/o Renaissance Agency
                      152 North LaPeer Drive
                      Los Angeles, California 90048
                      Attn:  Joel Gotler

or to such other address as the parties hereto may hereafter designate in writing, and shall be sufficiently given or submitted by personal delivery thereof to the other party at the aforesaid addresses, or by telegraphing or by mailing the same in a postpaid wrapper addressed to the other party as aforesaid, and the date of such delivery, telegraphing or mailing shall be the date of the giving of such notice.  If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this agreement or to perform any other act which parties are required or may desire to perform under or in connection with this agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

c.  Approvals and Controls.  HPC shall have all approvals and controls in connection with the Picture.

d.  Payments.  Owner does hereby irrevocably direct that all monies due Owner hereunder shall be payable to "Frank Dux, c/o Renaissance Agency, 152 North LaPeer Drive, Los Angeles, California 90048", payment for Owner, which agent is hereby authorized to receive and receipt therefor and whose receipt shall be deemed receipt by Owner and shall be a good and valuable discharge of HPC's obligation.  Owner shall look solely to said agent, and not to Purchaser for Owner's share of such payments so made to said agent.

DNY 0063

CONFIDENTIAL

28-20

e.   _Entire Understanding_.  This instrument and instruments executed pursuant hereto includes the entire understanding between the parties and replaces all former agreements and representations with respect to the subject matter hereof. No modification, alteration or amendment of this agreement shall be valid or binding unless in writing and signed by the party to be charged with such modification, alteration or amendment.

f.   _Breach_.  No waiver by HPC of any breach hereof shall be deemed a waiver of any preceding or succeeding breach hereof.  HPC shall not be liable for any breach of this Agreement unless HPC shall have received written notice from Owner of such breach and shall not have cured such breach within ten (10) business days after receipt of such notice.  In the event of any claim involving a breach or alleged breach of any of Owner's representations or warranties, or any claim that may impair or interfere with any of the rights granted hereunder: (i) any option period(s) provided for hereunder shall be extended automatically, without cost to HPC, until any such claim or litigation or alleged breach is resolved and the rights granted hereunder can be acquired free and clear of any claims, demands, liens or encumbrances of any kind whatsoever; and (ii), if HPC sustains a claim against Owner, then HPC may, in addition to all its other legal and equitable remedies, rescind this Agreement, and in such event, Owner shall pay HPC any monies received from HPC in connection with the Property.  Owner's representations, warranties and resultant obligation to indemnify HPC in the event of any breach thereof shall survive rescission of this Agreement.  Owner's sole and exclusive remedy for HPC's breach or termination of this Agreement or any term hereof (including any term pertaining to credit) shall be an action for damages and Owner irrevocably waives any right to seek and/or obtain equitable or injunctive relief.

g.   _Relationship of Parties_.  Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other.  Neither party shall hold itself out contrary to the terms of this Paragraph 16.g, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof.  This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any third party, whether referred to herein or not.

h.   _Legal Requirements_.  Nothing contained in this agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provisions of this Agreement so affected shall be curtailed

DNY 0064

68

CONFIDENTIA

2 8 - 2/

and limited only to the extent necessary to bring it within
the legal requirements; provided, however, that no other
provision of this Agreement shall be affected thereby and
such other provisions shall continue in full force and
effect.

i.   Publicity.  Owner hereby acknowledges and
agrees that Owner shall not directly or indirectly
issue or permit the issuance of any publicity or
disclose any information concerning the Agreement,
the Rights granted pursuant to the terms and
conditions of this Agreement, the Picture, HPC,
Simpson/Bruckheimer Productions (or its principals
or employees) or HPC's or Simpson/Bruckheimer
Productions' business or production methods;
provided, however, that Owner shall not be deemed in
breach of this Paragraph 17.i. if Owner makes
incidental and non-disparaging reference solely to
said matters during an interview concerned primarily
with Owner rather than any of said matters.  Owner
hereby acknowledges that unauthorized disclosure of
any information related to the above could cause
irreparable harm and significant injury which may be
difficult to ascertain.  Accordingly, Owner agrees
that HPC (without limiting its rights pursuant to
Paragraph 17.f. above) and Simpson/Bruckheimer
Productions shall have the right to obtain immediate
injunctive relief from any breach of this Paragraph
17.i, in addition to any other rights and remedies
they may have, including without limitation, HPC's
right to terminate this Agreement.

j.   Basic Agreement.  To the extent, if any, that this
agreement is subject to the Writers Guild of America
Theatrical and Television Basic Agreement (the "MBA"), it
is agreed that if there is any inconsistency between this
Agreement and the MBA, then the latter shall prevail but
only to the extent necessary to avoid inconsistency.  All
payments hereunder are not in addition to but are included
in, or include all applicable minimum scale payments
provided for in the MBA (if this Agreement is subject to
the MBA).  HPC shall be entitled to the full benefit of all
rights of offset permitted under the MBA (if this Agreement
is subject to the MBA).

18.   GENERAL

The terms and conditions of this Agreement are those set
forth hereinabove, and in the schedules attached hereto as
Schedule I (Short Form Assignment), Schedule II (Previous

DNY 0065

CONFIDENTIAL

History), and Schedule III (Publisher's Release) which by this reference are incorporated into and made a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this agreement as of the _____ day of ..., 1996.

HOLLYWOOD PICTURES COMPANY

By:_____

Its:_____

ACCEPTED AND AGREED:

FRANK DUX

_____

CONFIDENTIAL

25-23

"SCHEDULE I"

## SHORT FORM ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS:  That the undersigned, for value received, hereby sells, assigns, transfers and grants in perpetuity unto HOLLYWOOD PICTURES COMPANY and its successors and assigns (herein called "Assignee"), the sole and exclusive rights, including without limitation, motion picture rights, television motion picture and certain other television and other allied rights (the "Rights") throughout the world in perpetuity in and to the literary work entitled "THE SECRET MAN" (which, together with the title, themes, contents and characters and other versions thereof, is hereinafter called the "Property") written by Frank Dux with copyright in the name of Frank Dux and registered in the United States Copyright Office, No. _____, on _____ all as more particularly set forth and upon and subject to the terms and conditions in that certain Agreement between the undersigned and said Assignee dated as of _____.

The undersigned hereby agrees to obtain or cause to be obtained renewals of all United States copyrights in and to said Property, whether or not referred to herein, and hereby assigns said Rights under said renewal copyrights to Assignee; and should the undersigned fail to do any of the foregoing, the undersigned hereby irrevocably appoints Assignee as attorney-in-fact, with full and irrevocable power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record all such documents, in the name and on behalf of the undersigned, as Assignee may deem necessary or proper in the premises to accomplish the same.

Assignee is also hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to said Property and all renewals thereof, or concerning any infringement thereof, or interference with any of the Rights hereby granted under said copyrights or renewals thereof, in its own name or in the name of the copyright proprietor, but at the expense of Assignee, and, at its option, Assignee may join such copyright proprietor and/or the undersigned as a party plaintiff or defendant in any such suit, action or proceeding.

FRANK DUX

DATED:_____, 1996

By: _____

Its:_____

DNY 0067

71

CONFIDENTIAL

28-24

State of _____ )
                                    ) SS.
County of_____ )

On this the _____ day of _____ 1996, before me,
_____ (here insert name and title of the officer), personally
appeared _____, personally known to me (or proved to me on the
basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

_____                    (Seal)
Notary's Signature

CONFIDENTIAL

"SCHEDULE II"

PREVIOUS HISTORY

With respect to the provisions of Paragraph 8.e of the foregoing Agreement, Owner makes the following representations and warranties with respect to the Property:

CONFIDENTIAL

28-26

"SCHEDULE III"

PUBLISHER'S RELEASE

In consideration of the payment of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby acknowledges and agrees, for the express benefit of HOLLYWOOD PICTURES COMPANY and its representatives, successors and assigns forever, that the undersigned has no claim to or interest in the worldwide motion picture rights (silent, sound, talking), television rights, radio broadcasting rights or any other rights of any kind other than those certain publication rights heretofore granted to the undersigned, in or to that certain literary work published by the undersigned and described as follows:

Titled:    "THE SECRET MAN".

Author:    Frank Dux

Date and Place of Publication: _____, 19__

Copyright Registration: _____

The undersigned hereby consents to the publication and copyright by and/or in the name of said author, author's heirs, representatives, licensees and assigns, in any and all languages, in any and all countries of the world, and in any form or media, of synopses, excerpts and summaries, not exceeding 7,500 words in length each, of the said literary work based principally upon the said literary work, for the purpose of advertising, publicizing and/or exploiting any such motion picture, television or other version, but there shall be no limitation in length with respect to any motion picture, television or other version not based principally upon said work, including, but not limited to, sequel motion pictures and television series.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _____ day of _____, 1996.

_____ (publisher)

By:_____

Its:_____

DNY 0070

CONFIDENTIAL

74

2-8-27

*[handwritten: Biographies]*

DATE:       As of January 3, 1996
SUBJECT: "SPY PROJECT"
        FRANK DUX/RIGHTS

MEMORANDUM OF AGREEMENT

The following are the terms of the agreement (the
"Agreement") dated as of January 3, 1996, between HOLLYWOOD
PICTURES COMPANY ("HPC") and Frank Dux ("Owner") for the
acquisition of (i) exclusive motion picture, television and ~~certain~~ *[handwritten: CERTAIN]*
~~allied rights of every kind and nature~~ throughout the universe
~~(~~ as more fully set forth in Paragraph 6 below) in and to the
published book written by Owner entitled "THE SECRET MAN" (the
"Book") in connection with a possible motion picture based
thereon currently known as "SPY PROJECT" (the "Picture"), and
(ii) ~~the~~ right title and interest in and to Owner's life story *[handwritten: About]* ①
(the "Life Story") ~~(as~~ as more fully set forth in Paragraph 6
below).  The Life Story and the Book and all versions and
adaptations of the Book previously or hereafter written are
collectively referred to herein as the "Property" (3) *[handwritten: Except to the novel film which is Exclusive and bludgeon frankly content.]*

*[handwritten left margin: If this must be put in and enforceable staple Those]*

1.    CONDITIONS PRECEDENT:  HPC shall have no obligation
hereunder unless and until:

    a.    HPC receives a fully signed agreement (in form and
    substance acceptable to HPC) for the producing services of
    Jerry Bruckheimer in connection with the Picture;

    b.    HPC's receipt of a fully signed publisher's release
    (in form and substance acceptable to HPC) of all rights
    other than publication rights for the Book; and *[handwritten: and Audio Both into comic books?]*

    c.    HPC's receipt of a fully signed agreement between
    Hollywood Pictures Company ("HPC") and Frank Ninjitsu-Ninja
    ~~Studios~~ ("Lender") for the consulting services of Frank Dux
    ("Consultant") on an independent contractor basis in
    connection with the Picture.

    d.    HPC approves the chain of title with respect to the
    Picture, approves all agreements with respect thereto
    and receives all assignments and releases which HPC
    requires in connection therewith. *[handwritten annotations]*

2.    OPTION/RIGHTS GRANTED:  Owner hereby grants to HPC the
exclusive and irrevocable option ("the Option") to acquire ~~all~~
~~rights including without limitation~~ the motion picture,
television ~~and allied~~ rights and rights of every kind and nature
now known ~~and~~ unknown in perpetuity throughout the universe in
and to the Property (collectively, ~~the~~ "Rights"), as ~~more fully~~
~~defined~~ in Paragraph 6 below. *[handwritten: granted]*

3.    EXERCISE OF OPTION:  The Option may be exercised by written
notice thereof given at any time commencing as of the date of
this Agreement and ending two (2) years after the later to occur

*[handwritten: DEPS EXHIBIT 29 FOR IDENTIFICATION]*
COLLEEN M. McGOVERN C.S.R. NO. 10360     FD 00718
DEPONENT: FRANKEL
DATE 8-4-98 PAGE 1 OF 23                   75

of: (i) the execution and delivery to HPC of this Agreement and
(ii) satisfaction of the Conditions Precedent set forth in
Paragraph 1 above (the "Initial Option Period"); provided,
however, that the Initial Option Period may be extended for an
additional period (the "First Extended Option Period") of one
(1) year by written notice to Owner during the Initial Option
Period and by payment as provided in Paragraph 4.b below;
provided, further, that the Option shall be deemed exercised
upon the commencement of principal photography of the Picture;
and provided, further, that the Initial Option Period, and/or
the First Extended Option Period may be further extended for any
period during which a claim based upon, or for breach by the
Owner of, any representation or warranty hereunder with respect
to the Property has been asserted and remains unresolved, and
for any period during which HPC's development and/or production
activities based upon the Property are interrupted or postponed
due to any occurrence of an event of force majeure, including,
without limitation, any labor dispute (or threat thereof). The
Initial Option Period as extended by the First Extended Option
Period is hereinafter referred to as the "Total Option Period".

4.    OPTION CONSIDERATION:

    a.    Initial Option Period. In consideration of Owner's
grant to HPC of the Option, HPC shall pay Owner the sum of
$125,000 upon the later to occur of the satisfaction of the
conditions precedent set forth in Paragraph 1 above or the
execution of this Agreement, which $125,000 sum shall be
fully applicable against the Purchase Price set forth in
Paragraph 5 below.

    b.    Extended Option Period. If HPC extends the Option
Period as set forth in Paragraph 3 above for the Extended
Option Period, then HPC shall pay Owner the additional sum
of $50,000 upon the commencement of the Extended Option
Period, which sum shall not be applicable against the
Purchase Price set forth in Paragraph 5 below.

5.    PURCHASE PRICE: If HPC exercises the Option, HPC will
own all of the Rights, and as payment in full for Owner's grant
of the Rights to HPC and for all of the promises,
representations, warranties and agreements made by Owner
hereunder, HPC will pay Owner as follows:

    a.    Cash Consideration. The sum ("Purchase Price") of
$500,000, less any applicable sums set forth in Paragraph
4.a. above and 5.b. below, payable upon the earlier to
occur of the exercise of the Option or the commencement of
principal photography of the Picture; and

    b.    If the Picture is produced as a theatrical motion
picture, a bonus in the amount of: (A) $10,000 for each
week that the Book appears, if ever, on the New York Times
Sunday Review of Books hard-cover fiction best seller list
(the "Best Seller List") in position one (1) during the
Book's initial release; (B) $5,000 for each week that the

Book appears, if ever, on the Best Seller List in positions two (2) through six (6) during the Book's initial release; (C) $3,500 for each week the Book appears, if ever, on the Best Seller List in positions seven (7) through eleven (11) during the Book's initial release; and (D) $2,000 for each week the Book appears, if ever, on the Best Seller List in positions twelve (12) through fifteen (15) during the Book's initial release; provided, however, that the aggregate of all bonuses (if any) payable to Owner pursuant to this Paragraph 5.b. shall not exceed $250,000. Notwithstanding anything to the contrary set forth herein, at such time, if ever, that Lender shall be entitled to receive the Purchase Price as set forth in Paragraph 5.a. above, Lender shall also be entitled to receive the amount of $150,000 as an advance against the bonus amounts (if any) which may become payable to Lender pursuant to this Paragraph 5.b., provided that an amount up to $2,000 shall be fully applicable against the Purchase Price.

c.   Contingent Consideration.  Provided that the Picture is produced and released as a theatrical motion picture, an amount ("Participation") equal to 5% of 100% of the Net Profits, if any, derived from the Picture. The term "Net Profits" shall be defined and computed, and the Participation shall be paid, pursuant to the terms of Exhibit "NP" (including a 15% overhead charge, plus charges for any HPC facilities used in accordance with HPC's then-current rate card) as modified solely by the Simpson/Bruckheimer Charge, copies of which are attached hereto and incorporated herein by this reference.

6.   RIGHTS GRANTED:  Subject only to the reserved rights set forth in Paragraph 7 below, Owner hereby irrevocably grants to HPC, solely, exclusively and in perpetuity throughout the universe, the following rights, and the Rights are defined to include:

a.   The right to develop, produce and exploit motion pictures (including without limitation theatrical motion pictures and television motion pictures and sequels and remakes thereof) based upon or adapted from all or any part of the Property throughout the universe, in perpetuity and in all languages and all elements therein for all now known and hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, videocassette and video or laser disc, any computer-assisted media (including, but not limited to CD-ROM, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised) and allied rights therein.

b.   The right to produce sound records of all or any part of the Property and any and all motion pictures (including without limitation theatrical motion pictures and

SPY02AA

-3-

77

FD 00720

television motion pictures and sequels and remakes thereof)
produced hereunder, specifically including the exclusive
motion picture synchronization rights in the Property and
each and every part thereof, and the exclusive right to use
all or any part of the Property upon the parts of
instruments serving to reproduce the same mechanically. (15)

c.(u) The right to adapt, use, dramatize, arrange, change,
vary, modify, alter, transpose, simulate and portray,
factually or fictionally the Property, including but not
limited to, Owner's name(s) or any variant thereof and
Owner's picture(s), photograph(s), portrait(s) or
representation(s) or any simulation(s) thereof, Owner's
likeness(es), voice(s), personality(ies) and personal
experience(s), episode(s), incident(s), situation(s) and
event(s) which heretofore occurred (in whole or in part)
and/or so-called mundane and/or everyday events,
experiences, etc. (which may occur in the future), in any
manner and by any means either accurately or with such
liberties as HPC, HPC's successors, assigns and licensees,
may desire or deem necessary for the purposes of
fictionalization or dramatization and by means of artist(s)
who may or may not resemble Owner, and make musical or non-
musical versions of the Property and any parts thereof; to
add to, interpolate in and subtract or omit from the
Property, characters, language, plot, theme, scenes,
incidents, situations, action, titles, dialogue, songs,
music and lyrics; to translate any of the foregoing into
all languages; to include in motion pictures and other
items provided for in this Paragraph 6 such language,
speech, songs, music, lyrics, dancing, choreography, sound,
sound effects, action, situations, scenes, plot, dialogue,
incidents and characters, characterizations and other
material (whether or not based upon, or taken from, the
Property) as HPC, in its sole and uncontrolled discretion,
may deem advisable, it being the intention hereof that HPC
shall have the exclusive, absolute and unlimited right to
use the Property, and each and every part thereof, for
motion picture purposes (and all other purposes granted
hereunder) in any manner it may, in its sole and
uncontrolled discretion, deem advisable with the same force
and effect as though HPC were the sole author of the
Property, all without in any way being accountable or
liable to Owner for any use that HPC may make thereof,
excepting only the compensation and screen credit
obligations to Owner contained herein.  Owner hereby waives
the benefits of any provision of law known as "droit
moral", or any similar laws, and agrees not to institute,
support, maintain or authorize any action or lawsuit on the
ground that any motion pictures or sound records, or other
items produced hereunder in any way constitute an
infringement of any of Owner's "droit moral" or a
defamation or mutilation of any part thereof, or contain
unauthorized variations, alterations, modifications,
changes or translations.  Owner shall not have any right,
title or interest whatsoever in or to any plot, story,

spy02aa

FD 00721

29-4

character, music, lyrics, dialogue, screenplay or other
material of any kind created by or for HPC in the exercise
of HPC's rights hereunder, or in any motion pictures
produced hereunder or any material created by HPC in
connection therewith.

d.    The right to broadcast all or any part of the Property
and all or any part of any motion picture or sound record
produced hereunder by radio and television, or otherwise,
whether by electrical transcription, film, tape, or
otherwise, in any language. (18)

e.    The right, for the purpose of advertising and in
connection with any exploitation hereunder of the Property,
to produce and publish as serials or otherwise (with or
without illustrations by photographs, drawings or cartoons)
stories, synopses, excerpts, summaries, ~~resumes~~ (19)
fictionalizations not to exceed a total of 7,500 words in
length of and from the Property. (20)

f.    The right to write and prepare screenplays, teleplays,
treatments, storyboards and all other plans, specifications
and designs for motion pictures and any sound records
produced hereunder, and to cause musical compositions,
including both words and music, utilizing or based upon or
adapted from all or any part of the Property or any title
or titles thereof to be written and composed, and to
include such musical compositions in motion pictures and
sound records produced hereunder.

g.    The right to manufacture, sell, furnish, supply and
distribute products, by-products, services, facilities,
merchandise and commodities of every nature and
description, including, but not limited to, still
photography, drawings, posters, artwork, toys, games, items
of wearing apparel, foods, beverages and similar items,
which make reference to or are based upon or adapted from
the Property or any part thereof of any motion picture
produced hereunder and the right to make trade deals and
commercial tie-ups of all kinds involving the Property, or
any part thereof

h.    The right to copyright motion pictures and any
version(s) thereof, sound records, musical compositions,
screenplays, teleplays and all other items provided for in
this Paragraph 6 and to secure copyright and/or trademark
registration and protection thereof in all countries and
territories where such protection is available, in HPC's
own name or otherwise, together with the right to
manufacture copies thereof, and to distribute, sell, vend,
lease, license, exhibit, transmit, broadcast, project,
reproduce, publish (subject to the terms of Paragraph 6.e
above), use, perform, advertise, publicize, market,
exploit, turn to account and derive revenue in any form or
manner therefrom, without any territorial restriction
whatsoever, by any and all media, methods, systems and

SPY02AA

FD 00722

79

processes now or hereafter known, invented, used or
contemplated, specifically including television and
videocassettes, and the right to import or export such
copies into or out of any territory without restriction.
It is further expressly understood and agreed that motion
pictures and all other items that may be produced hereunder
shall constitute independent derivative works, and HPC and
its successors, assigns and licensees shall have the
perpetual right to exercise the rights granted in this
Paragraph 6.h irrespective of the expiration, termination,
transfer or renewal of any copyright owned or controlled by
Owner, or any heirs, executors, widow, widower, children,
successors or assigns of Owner.  HPC shall in no event have
any less rights by reason of this Agreement than any member
of the public may now or hereafter, have.

i.    Insofar as Owner is concerned, the right to use a
translation in any language of the title or titles by which
the Property or any part thereof are now known or may
hereafter be known as the title or titles of motion
pictures (whether or not based upon or adapted from the
Property), and the right to exploit, distribute and exhibit
any motion picture produced hereunder under any other title
or titles that HPC may deem proper in its uncontrolled
discretion.

j.    Stage Rights (including musical Stage Play Rights):
The right to perform the Property or adaptations thereof on
the spoken stage with actors appearing in person in the
immediate presence of the audience.

k.    All other rights of every kind and character
whatsoever now known and unknown in the Property including
without limitation any and all theme park rights except
only those rights as specifically reserved to Owner in
Paragraph 7 below.

HPC shall have all rights herein granted to it in all
existing and future versions, translations, dramatizations,
arrangements, revisions, supplements and reissues of the
Property written or published by or with the authority of Owner
and Owner's successors, assigns and licensees, as well as all
prior drafts, notes, research, source material and other works
owned or controlled by Owner upon which the Property is based
and from which the Property is adapted.

All rights granted HPC under this Agreement shall be
cumulative, and HPC may exercise or refrain from exercising any
one or more of said rights separately from, simultaneously,
together or in connection with any other rights granted to HPC
hereby or obtained by HPC from other sources, and regardless of
whether said rights are granted in the disjunctive or conjunctive.

7.    RESERVED RIGHTS:  the following rights to the Property
are reserved to Owner for Owner's use and disposition, subject,
however, to the provisions of this Agreement, and all other Rights not
specifically granted herein aue RESERVEd to Owner.

spy02aa

-6-        80        FD 00723

a.    Publication Rights:  The right to publish and
distribute printed versions of the Property and Author-
Written Sequels owned or controlled by Owner in book form
only, including translations and reissues, whether
hardcover or softcover, and in magazine or other
periodicals, whether in installments or otherwise, subject
to Purchaser's rights provided for in Paragraph 6.e above.
Such publications by Owner may be copyrighted in the name
of Owner, subject to the provisions of Paragraph 11 below.
Reserved publication rights shall that include picture books,
coloring books and other publications that do not contain
the story line of the Property, which are all included in
the rights granted to HPC.  All motion picture, television
and allied rights with respect to said Author-Written
Sequels shall be "frozen" (i.e., neither Owner nor HPC may
exploit such rights without the express written consent of
the other party), and if HPC elects to develop a motion
picture based on said Author-Written Sequel(s), HPC and
Owner will negotiate in good faith the financial terms of
HPC's acquisition of such motion picture, television and
allied rights.

b.    Electronic Publishing:  The right to mechanically
produce, reproduce and license the reproduction of audio
recorded cassettes of readings of the Property and Author-
Written Sequels and/or excerpts from the Property and
Author-Written Sequels (i.e., "books-on-tape"), as long as
such form is solely a text-based product.

c.    Radio Rights:  The right to broadcast the Property
by sound (as distinguished from visually) by radio,
subject, however, to HPC's right at all times to:  (i)
exercise its radio rights provided in Paragraph 7.d.
above for advertising and exploitation purposes by
living actors or otherwise; and (ii) in any event to
broadcast any motion picture produced hereunder by
radio.  Owner agrees not to exercise, or authorize any
other person to exercise, Owner's radio rights earlier
than five (5) years after the first general release in
the United States of any theatrical motion picture
produced hereunder or seven (7) years after the date of
the exercise of the option granted HPC hereunder,
whichever is earlier; provided, however, that such
restriction on Owner's exercise of said radio rights
shall be extended for any period during which there is
in effect, in any particular country or territory, an
initial network television broadcasting agreement for a
television motion picture based upon the Property or
based upon any motion picture produced in the exercise
of rights assigned hereunder or using a character or
characters of the Property, plus any contractual
clearance period contained in such initial television
broadcasting agreement, which period shall not exceed
one year after the expiration of such agreement, and
which period shall also be a restricted period in such

FD 00724

29-7

country or territory, whether or not such period occurs
wholly or partly during or entirely after the 5/7 year
period first referred to in this Paragraph 8.c.  After
the expiration of said restricted period, as extended,
HPC shall have the right of first negotiation/last
refusal with respect to said reserved rights, in
accordance with the provisions of Paragraph 16 below.

d.    Live Television:  The right to telecast directly
from the performance to the audience any adaptation of
the Property (provided, however, that such adaptations
do not infringe upon any motion picture produced
hereunder), the performance not having been recorded on
film, tape, wire or other substance or device
whatsoever, subject, however, to HPC's right at all
times to televise from living actors excerpts not to
exceed 5 minutes in length from the condensations of
the Property or any motion picture produced hereunder
for advertising and exploitation purposes, provided
nothing herein shall be deemed to nor shall anything
contained herein limit HPC's unqualified right at all
times to telecast HPC's motion picture produced
hereunder.  Owner agrees not to exercise or authorize
any other person to exercise Owner's live television
rights earlier than five (5) 3 years after the first
general release in the United States of the first
theatrical motion picture produced hereunder, or seven
(7) 5 years after the date of the exercise of the option
granted HPC hereunder, whichever is earlier; provided,
however, that such restriction on Owner's exercise of
said live television rights shall be extended for any
period during which there is in effect, in any
particular country or territory, an initial network
television broadcasting agreement for a television
motion picture based upon the Property or based upon
any motion picture produced in the exercise of rights
assigned hereunder or using a character or characters
of the Property, plus any contractual clearance period
contained in such initial television broadcasting
agreement, such period not to exceed one (1) year after
the expiration of such agreement, which period shall
also be a restricted period in such country or
territory, whether or not such period occurs wholly or
partly during or entirely after the 5/7 year period
first referred to in this Paragraph 8.  After the
expiration of said restricted period, as extended, HPC
shall have the right to negotiate with respect to said
reserved rights, and HPC shall have first refusal
rights with respect thereto, in accordance with the
provisions of Paragraph 16 below.

e.  It is expressly agreed that Owner's reserved rights
under this Paragraph 7 relate only to material written or
authorized by Owner, and not to any screenplay, characters,
teleplay, music, lyrics, sequels or other material written
and/or created by or for or authorized by HPC, even though

the same may contain characters or other elements contained in the Property and/or any Author-written Sequels.

8. WARRANTIES: Owner represents, warrants and agrees as follows:

a.    That Owner is the sole owner of all rights (including the Rights, as defined in Paragraph 6 above) herein granted and has full power and authority to grant said rights to HPC; that Owner has full power and authority to agree to the restrictions upon the exercise of the rights reserved to Owner, as more particularly set forth in Paragraph 7 above; that none of the rights granted to HPC hereunder has been granted, encumbered, or otherwise disposed of in any manner to any person, firm or other entity; that no motion picture based in whole or in part upon the Property has been produced or authorized by, or with the knowledge or consent of, Owner; that neither the Property nor any version thereof nor any play or dramatic adaptation based thereon in whole or in part has been published or presented or authorized on television, radio or on the spoken stage by or with the knowledge or consent of Owner; that Owner has not done or omitted to do and will not do or omit to do any act or thing by license, grant, or otherwise, which will or may impair or encumber any of the rights herein granted or interfere with the full enjoyment of said rights; and that there are no claims or litigation pending or threatened which will or might adversely affect any of the rights herein granted to HPC.

b.    That Owner has not granted any other rights to the Property except AS HPC legal regl her

c.    That the Property is original with Owner; that neither the Property nor any part thereof is taken from or based upon any other material except material wholly owned by Owner; and that neither the Property nor any part thereof, or the exercise by HPC of the rights herein granted, will violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, civil or property right, or any other right of any person, or invade the right of privacy or constitute a libel or slander of any person.  Owner makes no warranty hereunder, however, with respect to any material added to the Property by HPC.

d.    That the Property is not in the public domain, and enjoys, and will enjoy, either statutory or (to the extent that it may exist) common law protection in the United States and all countries adhering to the Berne and Universal Copyright Conventions; and that the rights granted to HPC hereunder are and will be exclusive.

e.    Attached hereto, marked "Schedule II" and made a part of this Agreement by this reference, is a statement of all publications (if any), prior uses (if any), prior versions,

adaptations and translations (if any), and copyright status of the Property. Such statement shall also set forth the existence (if any) of any valid agreement with third parties for the publication or dramatic production of the Property. (3)

9.   INDEMNITY: Owner will defend, indemnify, make good, save and hold harmless HPC, its parent and/or affiliated companies, the officers and directors of each, and its successors and assigns from and against any claims, losses, damages, costs, charges, reasonable attorney's fees, court costs, recoveries, actions, judgments, penalties, expenses and other loss whatsoever which may be obtained against, imposed upon or suffered by HPC, its parent and/or affiliated companies, the officers and directors of each and its successors and/or assigns, by reason of the breach or alleged breach of any warranty, covenant, agreement or representation herein made by Owner. HPC will defend, indemnify, make good, save and hold harmless Owner, its successors and assigns from and against any claims, losses, damages, costs, charges, reasonable attorney's fees, court costs, recoveries, actions, judgments, penalties, expenses and other loss whatsoever, which may be obtained against, imposed upon or suffered by Owner, its successors and/or assigns, by reason of the breach of any warranty, covenant, agreement or representation herein made by HPC.

10.   PRIOR INSTRUMENTS:

a.   Owner hereby grants to HPC all of Owner's right, title, and interest in and to any and all agreements, assignments, releases and other instruments or documents in writing (collectively, "Instruments") heretofore or hereafter executed in favor of Owner, or any predecessor of Owner, insofar as said Instruments grant or purport to grant to Owner, or any such predecessor, any of the rights, privileges and property herein granted to HPC, together with the full benefit of all representations, warranties and agreements made by any party in favor of Owner or any such predecessor, insofar as the same pertain to or affect any of the rights, privileges and property herein granted to HPC. Without limiting the foregoing, if Owner is not the sole author of the Property, then Owner shall deliver to HPC an assignment of all rights in and to the Property duly executed by any third-party author in favor of Owner, in a form satisfactory to HPC.

b.   Owner represents and warrants that said Instruments (if any exist) have not been amended, modified or cancelled in any way, and are in full force and effect as originally signed; that Owner has not granted or assigned any right, title or interest heretofore acquired by Owner in, to or under said Instruments in a manner inconsistent herewith; and that there has been paid to the party or parties entitled thereto all sums which have heretofore become payable under any of said Instruments, and, except as herein specifically provided, Owner will hereafter pay or

spy02aa

-10-

84

FD 00727

29-10

cause to be paid, to the party or parties entitled thereto, all sums which may hereafter accrue under said Instruments.

11.  COPYRIGHTS:

a.    Owner further grants and assigns to HPC all of Owner's right, title and interest in and to any and all copyrights in and to the Property and each and every part thereof contained therein, together with all benefits of said copyrights and all remedies held thereunder, and all actions and causes of action for infringement or violation of said copyrights, or any other rights in the Property or relating thereto, and all damages, profits, penalties and other recoveries and all other rights of every kind and character which Owner may now or hereafter have directly or indirectly as a result of any such infringement or violation, but only insofar as said copyrights pertain to or affect any of the rights, privileges and property herein granted to HPC. (34)

b.    Owner agrees to:  prevent the Property from entering the public domain to the extent it is possible to do so; to cause to be affixed to each copy of the Property or any part thereof published or offered for sale by or with the authority of Owner notice of copyright complying in all respects with the U.S. Copyright law and with the Universal Copyright Convention; to register the Property wherever necessary for such protection; to contract henceforth for the benefit of HPC for the above protection in all grants concerning the Property hereunder made to others; not to cause or permit any publication of the Property or any arrangement, revision or reissue thereof in any form without duly copyrighting the same in the United States and every country where such publication may occur; and to specifically mention, except and reserve the rights herein granted when any grant is made to others of any rights or interest in the Property.

c.    Owner recognizes that a material part of the consideration moving HPC to enter into this agreement is that HPC shall enjoy the rights herein granted to HPC for the full term of any and all of said copyrights, including, to the full extent now or at any time hereafter permitted by law, any renewal term of all United States Copyrights involved.  Owner agrees to make application for, and secure a renewal of, each and every United States copyright involved, at least six (6) months prior to the expiration of each such copyright, or, if Owner is not entitled to renew any such copyright, then Owner will cause the person entitled so to do to make application for, and secure a renewal of, such copyright within said time; and in either event, Owner will promptly notify HPC in writing that such renewal copyright has been applied for and has been secured.  Promptly after each such copyright has been renewed, Owner shall, without payment of any further consideration by HPC, execute and deliver to HPC or cause

SPY02AA

-11-

85

FD 00728

29-11

to be executed and delivered to HPC such further instrument
or instruments as shall be necessary or proper to vest in
HPC all of the rights herein granted for the full period of
such renewal copyright, upon and subject to all of the
identical terms, conditions, limitations, representations,
covenants and warranties herein contained, except for the
monetary consideration herein specified.  Regardless of the
execution and delivery of any such instrument, all such
rights shall be deemed to have been acquired by HPC under
such renewal copyright upon and subject to all of the
terms, conditions, limitations, representations, covenants
and warranties herein contained simultaneously with the
effective date of renewal of such copyright.

d.    If, pursuant to any copyright or similar law, Owner
becomes entitled to exercise any right of reversion,
recapture or termination (the "Termination Right") in or to
all or part of the rights granted hereunder and Owner
exercises the Termination Right, then, from and after the
date that Owner has the right, pursuant to such copyright
or similar law, to transfer all or part of such rights (the
"Recaptured Rights") to a third party, HPC shall have the
first right to purchase from Owner the Recaptured Rights.
If Owner decides to accept a bona fide offer with respect
to all or part of the Recaptured Rights, then in each such
instance, Owner shall, promptly after deciding to accept
such offer, make a written offer to HPC, specifying such
terms and conditions which Owner is prepared to accept and
the name(s) of the third party who made the offer to Owner,
to enter into an agreement with HPC with respect to the
recaptured rights on the same such terms and conditions.
At any time within thirty (30) days after receipt of such
written offer from Owner, HPC may notify Owner of its
acceptance of such offer and, in such event, the rights
referred to in such offer shall be assigned to HPC, subject
to HPC's compliance with the terms of the offer so
accepted; provided, however, that HPC shall not be required
to meet such terms which cannot be as easily met with one
transferee as another, including, without limitation, the
use of certain talent.  If HPC shall acquire from Owner all
or part of the Recaptured Rights, then Owner agrees to
enter into a written agreement with respect thereto.

e.    If HPC shall elect not to purchase the Recaptured
Rights, then Owner may dispose of said Recaptured Rights
but only to the offerer and upon the terms and conditions
specified in such notice, it being understood and agreed
that Owner may not dispose of such rights to any other
party or upon terms and conditions any different from those
offered to HPC hereunder without again offering such
Recaptured Rights to HPC as herein provided.  Should any
provision of this Paragraph 12 be held unenforceable, said
provision shall be either deemed amended to the extent
necessary to achieve enforceability or, if such amendment
is impossible, deleted herefrom without rendering

spy02aa

-12-

FD 00729

29-12

unenforceable or otherwise modifying the remaining
provisions hereof.

f.   Owner hereby irrevocably appoints HPC, or its nominee,
as Owner's attorney-in-fact (which power is acknowledged by
Owner to be coupled with an interest), with the right but
not the obligations, for the sole benefit of HPC, and at
the HPC's expense, to bring, prosecute, defend and appear
in suits, actions, and proceedings of any nature under or
concerning all copyrights in and to the Property and all
renewals thereof, or concerning any infringement of any
such copyright or renewal copyright, or any interference
with any of the rights herein granted to HPC; and to take
such action as HPC may deem advisable to enforce, protect,
and/or defend any of the rights, privileges and property
herein granted to HPC under any and all such copyrights and
renewals thereof, as well as any of the rights, licenses,
privileges, warranties and agreements contained and/or set
forth in any of the documents herein referred to, insofar
as the same relate to the rights, privileges and property
herein granted to HPC; and to litigate, collect and receipt
for all damages arising from any infringement of any such
rights.  Any such action may be taken by HPC in the name of
Owner or otherwise, and HPC (at its sole discretion) may
join Owner as a party plaintiff or defendant in any such
suit, action or proceeding.  In the event of the failure of
Owner to do or cause to be done any and all acts and things
necessary to obtain the renewal of any United States
copyright involved, or in the event of the failure of Owner
to execute and deliver or cause to be executed and
delivered to HPC all Instruments required in accordance
with the provisions of this agreement, Owner hereby
irrevocably appoints HPC, or its nominee, as Owner's
attorney-in-fact (which power is acknowledged by Owner to
be coupled with an interest) in Owner's name and on Owner's
behalf, with the right, but not the obligation, to do any
and all acts and things necessary for the obtaining of such
renewal copyright, and to execute and deliver all such
Instruments for the purposes aforesaid.

g.   Owner agrees to duly acknowledge, execute and deliver
or to procure the due execution and delivery to HPC of any
and all further assignments and other instruments that may
be necessary or expedient to carry out and effectuate the
purposes and intent of this agreement, including but not
limited to, any and all copyright assignments which have
been or are to be executed in connection herewith.  Owner
hereby irrevocably appoints HPC or its nominee, as Owner's
attorney-in-fact (which power is acknowledged by Owner to
be coupled with an interest), with the right, but not the
obligation, to complete any such copyright assignment, fill
in any blanks which may be left therein (including dates,
Copyright Office registration information, etc.), execute
the same in Owner's name, or obtain execution thereof by
others, as the case may be, and record the same in the

FD 00730

29-13

United States Copyright Office, or elsewhere, as HPC sees fit.

12. ASSIGNMENT: HPC may assign, transfer, license, delegate and/or grant all or any part of its rights, privileges and property hereunder to any person. This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Said Assigns shall have the same Fire and 13.4g to pay ~~expert~~ Owen his ~~expense~~ - 1

13. DEFINITIONS:

a.    If more than one party is hereby referred to as "Owner", said term shall be deemed to designate each and all of such parties jointly and severally, and this agreement shall inure to the benefit of and be binding upon each and all of such parties jointly and severally.  Any one of such parties is hereby authorized to execute additional or supplemental documents to this agreement for and on behalf of all such parties and bind them jointly and severally.

As used herein:

b.    "Author-Written Sequel" means a literary property (story, novel, drama or otherwise), whether written before or after the Property and whether written by Owner or by a successor in interest of Owner, using one or more of the characters appearing in the Property, participating in different events from those found in the Property, and whose plot is substantially different from that of the Property.

c.    "Copies" with reference to a motion picture or sound record, means and includes any negative or positive print, dupe, negative, video or other electronic tape recording, disc or other physical article of any kind produced, re-produced or re-recorded by means of any photographic, electrical, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated on which such motion picture and/or sound record or any part thereof, is printed, imprinted, recorded, reproduced or duplicated, together with any package, cartridge, cassette or other container in which the same may be distributed or sold.

d.    "Copies" with reference to a screenplay or teleplay, means any typewritten or printed copies thereof in substantially the form used in connection with production of the motion picture involved, whether or not accompanied by explanatory notes or comments, still photographs or other illustrations.

e.    "Copies" with reference to a musical composition or the lyrics thereof, means any copies, arrangements,

spy02aa

-14-

FD 00731

29-14

orchestratic    or versions thereof, whe    r or not in the
form used in connection with the motion picture involved.

f.    "Motion picture" or its equivalent, means and includes
a motion picture, cinematography film and/or photoplay of
every kind and character whatsoever, including the sound
records thereof, as well as trailers and clips thereof,
produced by means of any photographic, electrical,
electronic, mechanical or other processes or devices now or
hereafter known, invented, used or contemplated, by which
photographs, pictures, drawings, images or other visual
reproductions or representations are or may be printed,
imprinted, recorded or otherwise preserved on film, tape or
any other material of any description (whether translucent
or not) for later projection or exhibition in such manner
that the same are or appear to be in motion on a screen,
mirror, tube or other medium or device, whether or not
accompanied by sound records.

g.    "Theatrical motion picture" means a motion picture
produced hereunder based upon the Property, other than a
television motion picture.

h.    "Person" includes any association, organization,
partnership, business trust, corporation or governmental
agency, as well as natural persons.

i.    "Remake" means a motion picture utilizing the
characters of the Property and depicting the same plot or
story as that portrayed in the initial motion picture,
which plot or story does not continue the original story or
carry it forward or backward in time.

j.    "Sequel" means a motion picture utilizing the
principal character or characters of the Property
participating in entirely different events than those
portrayed in the Property, whether prior to, concurrent
with or subsequent to the events portrayed in the initial
motion picture and whose plot is substantially new.

k.    "Sound Records" means and includes sound recordings
and reproductions of every kind and character whatsoever
produced by means of any electrical, electronic, mechanical
or other processes or devices now known or hereafter known,
invented, used or contemplated by which sound may be
recorded for later transmission or playback, whether or not
simultaneously, or in synchronization or times relation,
with motion pictures.

l.    "Property" means the following: (i) the aforementioned
literary property entitled "THE SECRET MAN" and includes
all prior, present and future versions, adaptations and
translations thereof (whether written by Owner or by
others), its theme, story, plot, characters and their
names, its title or titles and subtitles, if any, its
music, lyrics, choreography, sets, costumes,

SPY02AA
                              -15-
                                             89

FD 00732

29-15.

orchestrations, arrangements, if any, and wherever throughout the world protectible thereby, its statutory and common law copyright or copyrights, all present or future renewals and extensions of such copyrights and all rights comprehended in such copyrights, and each and every part of all thereof; and (ii) all rights in and to the Life Story, which Life Story rights may be used in any manner and by any means, and either factually or with such fictionalization, portrayal, action, dialogue, impersonation, simulation and/or imitation, or other modification as HPC determines in HPC's ~~sole discretion, including the fictionalization of events and experiences occurring subsequent to the date hereof.~~ Owner acknowledges that HPC and others are proceeding in reliance upon Owner's grant of rights to the Property to HPC hereunder. Any or all of the rights shall be freely assignable by HPC. "Property" does not include the material referred to in Paragraph 6.f above, written or prepared by HPC or under HPC's authority.

*Except These Rights retain by Tom/Bloodsport remain rgt of Kunitz*

14. CREDITS: USE OF OWNER'S NAME, ETC:

   a.   HPC shall have the right to publish, advertise, announce and use in any manner or medium the name, biography, and photographs or other likeness of Owner in connection with any exercise by HPC of its rights hereunder.

*photo Approval*

   b.   Owner shall (subject to any applicable guild and/or union restrictions) receive a credit on screen, on a separate card, in the main titles ~~if the screenplay writer's name appears in the main titles~~, on any feature-length theatrical motion picture produced hereunder which is based upon the Property to the effect that the motion picture is based upon or adapted from or suggested by the Property written by Owner, and, if HPC shall so elect, upon such other material as may be incorporated in any such motion picture photoplay, with or without the names of the authors of such other material.

*can not use in pursuit of Approval*

   Except as specifically provided above, Owner's credit shall be in such size and position, and shall have all other characteristics, as HPC may determine in its sole discretion. As used herein, "size" means height and width.

15. THEATRICAL SEQUELS/REMAKES - TELEVISION SERIES/MOW: If HPC produces and releases a theatrical motion picture based on the Property, and thereafter produces a Television Motion Picture, a Sequel or Remake thereto based on the Picture, then, provided Owner is not in default of any of Owner's obligations hereunder, ~~and provided that Owner is not engaged to write the screenplay or teleplay for such production~~, Owner shall be entitled to the applicable royalty specified below.

*Separate deal*

   a.   Theatrical Sequel.  One-half (1/2) of the Purchase Price paid to Owner pursuant to Paragraph 5.a above, plus, as contingent compensation, a percentage of Net Profits (if

spy02aa

any) of such Sequel, which percentage shall be equal to one-half of the percentage of Net Profits to which Owner was entitled for the Picture.

b. <u>Theatrical Remake</u>. One-third (1/3) of the Purchase Price paid to Owner pursuant to Paragraph 5.a above, plus, as contingent compensation, a percentage of Net Profits (if any) of such Remake, which percentage shall be equal to one-third of the percentage of Net Profits to which Owner was entitled for the Picture.

c. <u>Network Television Series</u>. The following royalties are payable for each episode of a primetime network television series based upon the Picture, as produced for a particular broadcast season:

| Running Time | Payment |
|---|---|
| 30 minutes | $1750 |
| 60 minutes | $2500 |
| 90 minutes (or more) | $3000 |

*(handwritten annotations: "But NOT PRIOR TO Theatrical Film"; numbers "2650 5000 1500 80,000 new 35,000")*

d. <u>Movie-of-the-Week or Mini Series</u>. $10,000 for each hour thereof, not to exceed a maximum of $100,000, regardless of running time.

e. <u>Reruns and Royalties</u>. Twenty percent (20%) of the applicable royalty set forth in subparagraph 15 c and d. shall be payable for each of the first five (5) reruns in the combined territory of the U.S. and Canada. No further rerun payments shall be made thereafter.

*(handwritten: "57 mil")* *(handwritten margin: "to limit")*

g. <u>Payment of Royalties</u>. Unless specified otherwise, theatrical payments due under this paragraph 15 shall be payable on completion of principal photography and television payments shall be payable upon the initial U.S. broadcast. Except as expressly set forth herein, HPC shall not be obligated to make any so-called residual, re-run, foreign use or theatrical use payments to Owner with respect to any television or other motion pictures produced by HPC based on the Property. If any of the motion pictures referred to in subparagraphs C. and D. above shall be produced prior to the production of a feature-length motion picture intended for initial theatrical release, the payment of the Purchase Price shall be in lieu of the payments provided for in those subparagraphs.

*(handwritten margin: "But some payment shall be made to the P cued reps for the P R's")*

h. <u>Payments in Lieu of Any Other Royalties</u>. The payments set forth in this Paragraph 15 are in lieu of any other sequel, remake or separation of rights payments, including, without limitation, any such payments, if any, that Owner would be entitled to receive pursuant to any applicable collective bargaining agreement. *(handwritten: "(37)")*

16. <u>FIRST NEGOTIATION AND FIRST REFUSAL RIGHTS</u>: HPC's right(s) to negotiate with respect to the reserved rights of Owner

referred to in Paragraph 8. above (excluding publication rights and recital rights) and the right to meet outside offers received by Owner with respect to any of said reserved rights shall be exercised in accordance with and subject to the following procedures:

a.   Prior to contacting any third parties, if Owner (after the expiration of any restricted period provided for in Paragraph 8 above, as the same may be extended) proposes to sell or otherwise dispose of any of said rights to which this Paragraph 16 applies, Owner will so notify HPC in writing.  Within seven (7) business days after the receipt of such notice from Owner, HPC will notify Owner in writing whether or not HPC desires to negotiate for the acquisition of any such rights, and if HPC does not give Owner notice in writing that HPC desires to negotiate for said rights, HPC shall be deemed to have elected not to negotiate therefor.

b.   In the event HPC elects, or is deemed to have elected, not to negotiate for said rights, or in the event HPC shall elect to negotiate for said rights, and such negotiations shall not result in a written agreement between Owner and HPC within a period of thirty (30) days from the commencement of such negotiations, then Owner may negotiate elsewhere for the sale or disposition of said rights, but HPC shall have the right to meet the financial terms of any bona fide offer received by Owner, that are equal to or less favorable to Owner than the last offer made by HPC to Owner with respect thereto.  Owner shall give HPC written notice of each and every such offer received by Owner that Owner is willing to accept in respect of said rights, specifying the particulars thereof, including the name of the offeror, and HPC shall have a period of seven (7) business days from receipt of such notice from Owner within which to exercise its said right to meet said offer, provided HPC shall not be required to meet any terms which cannot be met as easily by one person as another, which right shall be exercised by HPC by giving Owner written notice of its election to do so.  In the event HPC exercises said right to meet such offer, then Owner and HPC shall promptly execute written agreements conveying to HPC the rights involved upon the terms and conditions of said offer.

c.   In the event HPC does not acquire the rights involved in accordance with the foregoing provisions, then Owner shall have the right to sell or otherwise dispose of such rights but only to the offeror and upon the terms and conditions specified in such notice to HPC pursuant to Paragraph 16.b. above; but if Owner is willing to accept any different terms and conditions or any offer from some other party which is equal to or less favorable to Owner than the last offer made by HPC to Owner, Owner shall again offer the same to HPC in accordance with the procedures set forth in Paragraph 16.b. hereof.

spy02aa

FD 00735

29-18

17.   MISCELLANEOUS

a.   No Obligation To Use.  HPC is not obligated to use the services of Owner or to develop, produce, distribute, or exploit the Picture, or, if commenced, to continue the development, production, distribution, or exploitation of any Picture in any territory. *[handwritten notation]*

b.   Notices.  Notices required to be given hereunder shall be in writing and shall be addressed:

To HPC:                  HOLLYWOOD PICTURES COMPANY
                         500 South Buena Vista Street
                         Burbank, California 91521
                         Attention:   Senior Vice President
                                      Legal and Business
                                      Affairs

To Owner:                FRANK DUX
                         c/o Renaissance Agency
                         152 North LaPeer Drive
                         Los Angeles, California 90048
                         Attn:  Joel Gotler

or to such other address as the parties hereto may hereafter designate in writing, and shall be sufficiently given or submitted by personal delivery thereof to the other party at the aforesaid addresses, or by telegraphing or by mailing the same in a postpaid wrapper addressed to the other party as aforesaid, and the date of such delivery, telegraphing or mailing shall be the date of the giving of such notice.  If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this agreement or to perform any other act which parties are required or may desire to perform under or in connection with this agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

c.   Approvals and Controls.  HPC shall have all approvals and controls in connection with the Picture.

d.   Payments.  Owner does hereby irrevocably direct that all monies due Owner hereunder shall be payable to "Frank Dux, c/o Renaissance Agency, 152 North LaPeer Drive, Los Angeles, California 90048", payment for Owner, which agent is hereby authorized to receive and receipt therefor and whose receipt shall be deemed receipt by Owner and shall be a good and valuable discharge of HPC's obligation.  Owner shall look solely to said agent, and not to Purchaser for Owner's share of such payments so made to said agent.

e.   Entire Understanding.   This instrument and instruments executed pursuant hereto includes the entire understanding between the parties and replaces all former agreements and representations with respect to the subject matter hereof. No modification, alteration or amendment of this agreement shall be valid or binding unless in writing and signed by the party to be charged with such modification, alteration or amendment.

f.   Breach.   No waiver by HPC of any breach hereof shall be deemed a waiver of any preceding or succeeding breach hereof.   HPC shall not be liable for any breach of this Agreement unless HPC shall have received written notice from Owner of such breach and shall not have cured such breach within ten (10) business days after receipt of such notice.   In the event of any claim involving a breach or alleged breach of any of Owner's representations or warranties, or any claim that may impair or interfere with any of the rights granted hereunder: (i) any option period(s) provided for hereunder shall be extended automatically, without cost to HPC, until any such claim or litigation or alleged breach is resolved and the rights granted hereunder can be acquired free and clear of any claims, demands, liens or encumbrances of any kind whatsoever; and (ii), if HPC sustains a claim against Owner, then HPC may, in addition to all its other legal and equitable remedies, rescind this Agreement, and in such event, Owner shall pay HPC any monies received from HPC in connection with the Property.   Owner's representations, warranties and resultant obligation to indemnify HPC in the event of any breach thereof shall survive rescission of this Agreement.   Owner's sole and exclusive remedy for HPC's breach or termination of this Agreement or any term hereof (including any term pertaining to credit) shall be an action for damages and Owner irrevocably waives any right to seek and/or obtain equitable or injunctive relief.

g.   Relationship of Parties.   Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other.   Neither party shall hold itself out contrary to the terms of this Paragraph 16.g, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof.   This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any third party, whether referred to herein or not.

h.   Legal Requirements.   Nothing contained in this agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provisions of this Agreement so affected shall be curtailed

FD 00737

29-20

and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this Agreement shall be affected thereby and such other provisions shall continue in full force and effect.

i.   Publicity.  Owner hereby acknowledges and agrees that Owner shall not directly or indirectly issue or permit the issuance of any publicity or disclose any information concerning the Agreement, the Rights granted pursuant to the terms and conditions of this Agreement, the Picture, HPC, Simpson/Bruckheimer Productions (or its principals or employees) or HPC's or Simpson/Bruckheimer Productions' business or production methods; provided, however, that Owner shall not be deemed in breach of this Paragraph 17.i. if Owner makes incidental and non-disparaging reference solely to said matters during an interview concerned primarily with Owner rather than any of said matters.  Owner hereby acknowledges that unauthorized disclosure of any information related to the above could cause irreparable harm and significant injury which may be difficult to ascertain.  Accordingly, Owner agrees that HPC (without limiting its rights pursuant to Paragraph 17.f. above) and Simpson/Bruckheimer Productions shall have the right to obtain immediate injunctive relief from any breach of this Paragraph 17.i, in addition to any other rights and remedies they may have, including without limitation, HPC's right to terminate this Agreement.

j.   Basic Agreement.  To the extent, if any, that this agreement is subject to the Writers Guild of America Theatrical and Television Basic Agreement (the "MBA"), it is agreed that if there is any inconsistency between this Agreement and the MBA, then the latter shall prevail but only to the extent necessary to avoid inconsistency.  All payments hereunder are not in addition to but are included in, or include all applicable minimum scale payments provided for in the MBA (if this Agreement is subject to the MBA).  HPC shall be entitled to the full benefit of all rights of offset permitted under the MBA (if this Agreement is subject to the MBA).

18.  GENERAL

The terms and conditions of this Agreement are those set forth hereinabove, and in the schedules attached hereto as Schedule I (Short Form Assignment), Schedule II (Previous

History), and Schedule III (Publisher's Release) which by this reference are incorporated into and made a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this agreement as of the _____ day of ..., 1996.

HOLLYWOOD PICTURES COMPANY

By:_____

Its:_____

ACCEPTED AND AGREED:

FRANK DUX

_____

FD 00739

$2\,9 - 2\,2$

"SCHEDULE I"

## SHORT FORM ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS:  That the undersigned, for value received, hereby sells, assigns, transfers and grants in perpetuity unto HOLLYWOOD PICTURES COMPANY and its successors and assigns (herein called "Assignee"), the sole and exclusive rights, including without limitation, motion picture rights, television motion picture and certain other television and other allied rights (the "Rights") throughout the world in perpetuity in and to the literary work entitled "THE SECRET MAN" (which, together with the title, themes, contents and characters and other versions thereof, is hereinafter called the "Property") written by Frank Dux with copyright in the name of Frank Dux and registered in the United States Copyright Office, No. _____, on _____ all as more particularly set forth and upon and subject to the terms and conditions in that certain Agreement between the undersigned and said Assignee dated as of _____.

The undersigned hereby agrees to obtain or cause to be obtained renewals of all United States copyrights in and to said Property, whether or not referred to herein, and hereby assigns said Rights under said renewal copyrights to Assignee; and should the undersigned fail to do any of the foregoing, the undersigned hereby irrevocably appoints Assignee as attorney-in-fact, with full and irrevocable power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record all such documents, in the name and on behalf of the undersigned, as Assignee may deem necessary or proper in the premises to accomplish the same.

Assignee is also hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to said Property and all renewals thereof, or concerning any infringement thereof, or interference with any of the Rights hereby granted under said copyrights or renewals thereof, in its own name or in the name of the copyright proprietor, but at the expense of Assignee, and, at its option, Assignee may join such copyright proprietor and/or the undersigned as a party plaintiff or defendant in any such suit, action or proceeding.

FRANK DUX

DATED:_____, 1996

By: _____

Its:_____

SPY02AA

-23-

97

FD 00740

29-23

RENAISSANC.
H. N. SWANSON. INC.
IRVING PAUL LAZAR AGENCY

A LITERARY TALENT AGENCY

<u>Via Facsimile</u>

February 28, 1996

Michael Frankel, Esq.
12501 Chandler Boulevard
#104
North Hollywood, CA  91607

     Re:   "SPY PROJECT" - Frank Dux/Rights & Consultant

Dear Michael:

I have received a copy of the rights agreement and the consultant agreement
for Frank and here are my comments:

<u>Rights</u>

Introductory Paragraph:  In the fourth line, "all" should be changed to
"certain" and in the fifth line "of every kind and nature" should be deleted.

2.  In the second line, "all" should be changed to "certain".

3.  In the second line "and payment" should be added after "notice".

Also, force majeure should be for up to one year only, and should be
suspended and extended only if all other similar development agreements
are similarly suspended and extended.

5.  b.  Frank should get half these numbers for paperback appearances.  These
bonuses should be payable on exercise or commencement of principal
photography, whichever is earlier.  If already exercised, and still on list,
payment is due on the Thursday after the listing.

5.  c.  Net Profits should be Net Proceeds (that is the word of choice these
days).  In the seventh line, "including a 15% overhead charge" must be
deleted.  Also, in the definition of net proceeds, there should be no cross-
collateralization or interest on overhead, and the definition should be no less
favorable than any other net proceeds participant providing materials or
services.

8523 Sunset Boulevard □ Los Angeles, California 90069 □ Telephone (310) 289-3636 □ Facsimile (310) 289-3637

DEFS EXHIBIT 35 FOR IDENTIFICATION
COLLEEN M. McGOVERN C.S.R. NO. 10360
DEPONENT: FRANKEL
DATE 8-4-98 PAGE 1 OF 3

FD 01610

Exhibit 6

98

Michael Frankel, Esq.
*THE SECRET MAN*
February 28, 1996
Page 2 of 3

6. b.  It must be clear, Frank must reserve rights to "books-on-tape".

6. c.  In the fifth through ninth lines, all these items must be approved by Frank before HPC can use them as they wish.

6. e.  In the third line, we should have "serials" deleted.  And we should also make clear that Frank must not be names as author of said synopses or summaries unless he actually writes such synopses or summaries.

6. j.  Reserved by Frank.

7. a.  We must make sure Frank reserves books-on-tape rights and novelization rights.

7. c.  The holdback periods for radio rights should be three and five years instead of five and seven years, respectively.  Also, in the third to last line, HPC should have first refusal, not last.

7. d.  The holdback periods for live television rights should be three and five years instead of five and seven years, respectively.

9.  Frank should be included on HPC's E & O policy.

12.  HPC may only assign HPC's rights to a financially responsible third party.

14. a.  Frank should have approval over his likeness and biography or any photographs of him used by HPC.

14. b.  Beginning in the third line, we should have "if the screenplay...main titles" deleted.  In the fifth line, "sequel, remake, or subsequent television production" should be added after "motion picture".  Frank should also receive credit in all paid ads where screenwriter(s) receive credit.

14. Last Paragraph.  Frank's credit should be no less favorable than credit assessed to the screenwriter(s).

15. c.  Royalties should be $3,000, $4,000, $5,000 for 30 minutes, 60 minutes and 90 minutes, respectively.  There should also be provisions for spin-offs.

15. h.  Should be deleted.

FD 01611

35-2

Michael Frankel, Esq.
*THE SECRET MAN*
February 28, 1996
Page 3 of 3

17. b. Please make sure our correct address is listed (8523 Sunset Blvd., Los
Angeles, CA 90069).

17. d. Again, please make sure our correct address is listed (8523 Sunset
Blvd., Los Angeles, CA 90069).

<u>Consultant</u>

1. c. In the third line, "all" should be changed to "certain" and "of every kind
and nature" should be deleted.

2.1 These services should be subject to professional availability.

2. 2 In the last line of the first page, there is a typo: 2.2 should be 3.2.

5. The weekly allowance should be $2,000 per week, Frank should get
business class if first class not available, and ground transportation should be
provided for him.

7.3 Frank should be included on HPC's E & O policy.

9. HPC may only assign HPC's rights to a financially responsible third party.

11. Frank should have approval over his likeness and biography.

15. Payments should be made to Renaissance.

When you have had a chance to review, please call to discuss.

Best regards,

Joel Gotler

JG/red

FD 01612

35-3

LAW OFFICE OF
MICHAEL B. FRANKEL
12501 Chandler Boulevard, Suite 104
North Hollywood, California 91607
(818) 761-4841

May 28, 1996

Tamara Woolfork, Esq.
HOLLYWOOD PICTURES COMPANY
500 South Buena Vista Street
Burbank, California 91521

RE: NOTES SPY PROJECT

Dear Tamara:

As we discussed over the last two months, the following are my general concerns on the current draft of the agreements. **The bottom line as I understand it from Joel is that Jerry wants to work with Frank and Frank wants to work with Jerry.** It is up to us to pull from that vast store of Disney boilerplate the language that will fairly protect my client and compensate him while following Disney policy and Jerry's needs in making these films.

Frank would like to do the first draft screenplay for the "Spy" project at minimal compensation forward, with any significant payment to be made if he gets sole or shared screenplay credit in the produced film. Frank would like to discuss this matter with Jerry given the success of "The Quest" and get his reactions on this point. As we discussed last week, it is my understanding that Frank's duties under the Technical Advisor agreement excludes services that would be covered under the WGA Minimum Basic Agreement.

I explained to you that Frank is already working on a project currently titled "Legacy", which encompasses the life of his father, his grandfather and himself as spies. Since there is some reference to his father and grandfather in "The Secret Man", we will need to add a paragraph to the reservation of rights stating that Frank has a right to do a novel about his father and grandfather using some incidents from his own life and that novel may be used as the basis for a feature, movie-of-the-week, miniseries, etc. We would, of course, be giving HPC a right of

DEFS EXHIBIT 40 FOR IDENTIFICATION   DNY 0228

COLLEEN M. McGOVERN C.S.R. NO. 10360

DEPONENT: _FRANKEL_

DATE _8-4-98_ PAGE _1_ OF _15_

Exhibit 7          101

CONFIDENTIAL

first refusal on such film rights and a window of non-competition after the release of the "Spy" project for two years. Further, Frank is doing a documentary in support of the book "SECRET MAN" for the purpose of book sales, etc. and some news shows. These should be excluded from the grant or at least addressed in the agreement.

Also, as we have discussed, Frank and I have talked about a game based on those chapters in "The Secret Man" wherein Frank's character is dropped off by a Navy Seal team in Iraq, walks across the country to Iran and gets big bonus points for eating the rat. I think Frank should have a right to submit game or interactive video concepts based upon his character to HPC, with HPC reasonably reviewing, and with Frank receiving a reasonable compensation for his concepts.

In addition, he may want to act in some type of home video games as Frank Dux, the person or actor. This should be addressed in the agreement. Frank now has an offer to play a character in another party's film, "THE PARIS EQUATION", as Frank Dux, a featured player, but this part is not based on anything Frank has lived, written or created. It is just using Frank and his name in an acting part as Frank.

It is essential that we make it clear that Frank retains all novelization rights to his character, Frank Dux, for all stories occurring prior to "The Secret Man" and after "The Secret Man" for expansions such as "Legacy". Further, it is necessary that Frank retains all books-on-tape rights along with all novelization rights as you have outlined in Paragraph 7.

I am including the following language (see attached example of Cannon Merchandising clauses 12, 13, and 14 with regard to merchandising, as an example of what Frank had on merchandising on the Cannon deal for two reasons. First, we need to address Frank as a spokesman, Persona, and celebrity separate and apart from the "SPY MAN" for the purpose of exploiting his martial arts skills, lecturing capabilities, and ability to play parts as himself on T.V. shows as Van Damme did on "Friends", separate and apart from Merchandising coming from Disney films.

Second, as you can see in paragraph 14 of the attached example, Frank has for years been selling shirts, knives and other signed merchandise. Also, please review Exhibit "A" page 2, 2(d),

DNY 0229      CONFIDENTIAL

40 - 2

of the Cannon Agreement, regarding clarifying those areas outside the grant in paragraphs 6 and 7 of this agreement.  On page 2 of the Cannon Films Agreement (Exhibit "C"), in the second full paragraph down, beginning with "It is also....", the protection of Frank's reputation is addressed, as it is in paragraph 5 of the June 15, 1985 "Bloodsport" agreement.  This is a major concern for Frank.

Since you are purchasing all of Frank Dux's life rights, Frank's 5% of 100% of net proceeds should flow through this contract to all subsequent exploitations of the Frank Dux character, including lunch-boxes, ninja suits etc., from any and all of the Disney giant's exploitation arms (e.g., in the event that a Dux television series was done ten years from now, separate and apart from the royalty paid per episode as passive payment, Frank should get a share of the merchandising income too).

These are my general concerns with regard to this draft as well as our numerous conversations on "dead", or as you put it, "frozen" projects, wherein Frank writes another novel and HPC chooses not to exploit it.  I believe we need a formal reversion or special turnaround clause so that Frank may at some time in the future exploit all possible sources of revenue on his works of art, at least the type of protection the "WGA MBA" affords.  There should be no dispute that Frank has a right to write a "BLOODSPORT" novel, but I would like it acknowledged in the formal agreement.

Lastly, as we discussed last Thursday, I think it necessary that HPC acknowledge,  that 1(d) of the conditions precedent has been fulfilled when the agreement between Frank and FM  is executed, since  HPC has review of chain of title as well as the language of the F.M. Agreement.  You have said  that HPC will take care of the Jerry Bruckheimer condition precedent (1(a)).  Frank, of course, will have to have the publishers sign off on their release.  I THINK IT NECESSARY THAT HPC CLARIFY WHAT WILL SATISFY ALL OF THEIR NEEDS IN 1(a) THROUGH 1(d), AND WHAT WOULD HAPPEN IN THE EVENT THAT WE SIGN THIS AGREEMENT PRIOR TO 1(d) BEING FULFILLED AND DUX WAS FORCED TO SUE TO ENFORCE HIS RIGHTS.  This becomes important with regard to the time factor in that all Dux fiction is outside of the "BLOODSPORT" Contract and the procedure for right of first refusal as per that contract has always been available.

CONFIDENTIAL

40-3

I am not sure whether we will be doing a Loan-out for Frank through Ninjitsu Studios.  That will be up to Frank's tax advisers.  I will inform you as soon as I know their recommendations.

I have attached addition notes on the agreements.

Sincerely:

Michael B. Frankel

cc:  Joel Gotler
     Frank Dux

DNY 0231

CONFIDENTIAL

40 -4

ATTACHMENT A.     .CHANDISING #:118UGE EXAMPLE

## Merchandising

12.   You grant to me all merchandising rights in or in connection with the Film and in connection therewith I shall have the right to use your name, likeness, voice and biographical information.

13.   As full and complete compensation for the merchandising rights granted hereunder, I agree to pay to you, and you agree to accept, in addition to any other payment hereunder, a sum equal to five percent (5%) of my gross receipts from direct merchandising and/or a sum equal to twenty-five percent (25%) of my gross receipts

from merchandising licensed by me and conducted by others hereunder. Merchandising proceeds shall not be considered as gross receipts derived from the Film.

14.   I acknowledge that you have previously granted merchandising or similar to rights to third parties pursuant to presently valid written agreements.  Therefore, I agree that, even if depicted in the Film, I shall not have the right to exploit merchandizing rights in connection with your studio logo, your personal logo, the "Ninja knife" designed by you or the book written by you on the history of the Ninja. Merchandizing hereunder must be associated with the Film and shall not include any direct endorsement by you.

DNY 0232

CONFIDENTIAL

105

40 -5

REDACTED

### ADDITION NOTES ON DUX LIFE RIGHTS AGREEMENT

Preamble:  The book is now published.  "all" on page one line 4 should be changed to "certain". Delete "every kind and nature" in line 5. "all" on line six should be changed to "certain". "All" after (ii) line 10 should be changed to " Those". On line 12 "all versions" should be changed to "all published versions and adaptions as of this date".  Add to the end of line 14 new sentence- "This clause specifically excludes rights previously granted and retained by third parties under the "BLOODSPORT AGREEMENTS" and modifications thereto.

Frank Dux still retains all novelization rights to the "Bloodsport Kumite" story as per the F.M. agreement which granted back to Dux his life rights.  He also retains an interest in participation and reputation protection in those rights retained by F.M. or other third parties.   HPC acknowledges that they have copies of all "Bloodsport" Agreements.


1.   a.   As we have discussed Disney is responsible for this condition precedent.  Will HPC have this condition fullfilled prior to my client executing these agreements?  Further, is the project attached to Jerry if he should go to some other production entity or HPC should put the project in Turnaround?

     d.   add
          (i)  HPC acknowledges that upon receipt of a grant back to Dux from FM on language already approved by Disney counsel that the requirements for 1(d) have been fulfilled.

2.   In the second line, "all" should be changed to "certain".
     In the third line, "all rights including without limitation" should be changed to "rights including but not limited to" the motion picture...
     line 6... "(collectively the rights)" should read, " "those certain rights as defined in Paragraph 6 below".

3.   Make the option exercisable on the earlier of commencement of principal photography or signing to a pay-or-play contract of either a director or a lead actor. N?

DNY 0233     CONFIDENTIAL

40 - 6

REDACTED

In the second line "and payment" should be added after notice.

Also force majeure should be for up to one year only, and should be suspended and extended only if all other similar development agreements are similarly suspended and extended. "provided, further, that the Initial Option Period, and/or the First Extended Option Period may be further extended for any period during which a claim .....has been asserted" <u>Define and limit "asserted."</u> "including, without limitation, any labor dispute (or threat thereof)." <u>Delete "(or threat thereof)."</u>

Page 2, line 8, insert after "option shall be deemed exercised upon", "PAYMENT OF THE PURCHASE PRICE AND"...

4.   a.   A condition precedent is a condition precedent, meaning the contract is inexecutable until the condition has been satisfied and therefore, the option payment should be made upon execution of the Agreement. I take issue with having the option price fully applicable against the Purchase Price. If the option is exercised within 12 months of execution, the full $125,000.00 could be reasonably applied to the full purchase price, but if it's in the second 12 month period, then only one-half should be applicable against the purchase price.

     b.   Why are the first 2 years worth $125,000 but the third only worth $50,000? Pro rata it should be $75,000 or more, since Dux would be damaging the timeliness of his property by tying the rights up for this extended amount of time. The longer the option without exercise, the more "damage" if the option is never exercised.

5.   B.   Delete the last two lines.
     b.   I have never heard of having Bestseller's list bonuses being made applicable against the purchase price. If they are applicable, they are not bonuses. BONUSES ARE NOT APPLICABLE AGAINST ANY OTHER COMPENSATION IN CONTRACT.

     This breakdown of different bonuses for each position on the list makes no sense. Gary Salt's contract on "Hunt for the Red October," an obscure book published by an even more obscure publisher set out a flat fee for each week on the list. Period.
     There is no reason to specify hard-cover best seller.


     The reason for Bestseller's list bonuses is notoriety and marketing support the book is, as a result, more valuable. FURTHER THE CORE DEMOGRAPHIC AUDIENCE FOR THIS BOOK IS MORE VALUABLE AT THE BOX OFFICE IN SOFT COVER THAN IN HARD THE BONUS SHOULD BE EVEN HIGHER ON SOFT COVER BEST SELLER LIST, THAT IS IF ART MUPPHY'S AUDIENCE ANALYSIS IS CORRECT.

DNY 0234

CONFIDENTIAL

40-7

REDACTED

Frank should get  the same numbers for paperback appearances.  These bonuses should be payable on exercise or commencement of principal photography, whichever is earlier.  If already exercised, and still on list, payment is due on the Thursday after listing.

    c.   Contingent Consideration.  Should be "equal to 5% of 100% of the Net Proceeds, if any, derived from the" **"RIGHTS GRANTED IN PARAGRAPH 6".**  By the way, under no circumstances should Frank  have to give up his rights to Videocassette rental and/or sales income.  The European Commonwealth standard should prevail.

    "Net Profits" should be "Net Proceeds" (that is the terme of choice these days.  In the seventh line, "including a 15% overhead charge" must be deleted.  Also, in the definition of net proceeds, there should be no cross-collateralization or interest on overhead, and the definition should be no less favorable than any other net proceeds participant providing materials or services.

    Delete everything after ..."participation shall be paid, pursuant to the terms of 'Exhibit NP'." **We don't have a copy of the** 'Exhibit NP.'

Insert at the end of 5(c),

    (i) In the event there are any gross participants in the project, Dux will receive a non-refundable advance against net proceeds, participation as follows:

    (a) if picture does box office of $100 million (U.S. and Canada), Dux shall receive a $500,000.00 advance

    (b) upon a U.S./Canadian box office of $150 million, Dux shall receive a $650,000.00 advance against net proceeds

    (c) upon a worldwide box office of $200 million, Dux shall receive a $500,000.00 advance against net proceeds

    (d) if the aggregaate income from all sources under paragraph 6 below including but not limited to box office and all merchandising tie-ins, specials or products generated for HPC or its subsequent licensee gross income in excess of $300 million, Dux shall be entitled to $500,000.00 advance against net proceeds

    (e) if income from all sources is in excess of $500 million, Dux shall be entitled to an advance of $1 million against proceeds.

The reasoning for the foregoing paragraph is twofold:

    (1) to make the 5% of 100% net proceeds real and not illusory under motion picture accounting principles, and

    (2) Dux presents a unique set of grants and assets in that he is currently a worldwide celebrity from "Bloodsport", his book, and promotions going on concurrently with the promotion of his book.

    Further, the grant Disney requires, and their ability to exploit same is so extensive that it is difficult to keep track of all the possible areas of revenue that could flow to Disney from the use of Dux and his life story.  Dux should be able to participate in the proceeds generated by the use his grant where

CONFIDENTIAL

40.8

REDACTED

such grant is to be purchased for a contingent compensation of a percentage of the proceeds. I would be remiss in my legal duties if I did not formulate in some manner a protection for Dux's ability to participate in the REAL proceeds flowing from the exploitation of the rights he is granting.

6.   a.   We want to include documentaries, news shows and biographies as well in our reserved rights such as " A&E's Biography".
For example, we could insert
       (i) see Paragraph 7 for exclusion of documentaries, biography use (e.g. A&E's Biography) made for the promotion of Frank Dux' celebrity and promotion of his book.
     b.    Add "the right to produce sound recordings of the property and any and all motion pictures excluding any and all "books-on-tape" which rights Dux reserves pursuant to Paragraph 7 below.
          Page 4, line 6...Insert "notwithstanding anything contained herein Dux reserves all rights to "books on tape" publication of the property or any other books-on-tape derivative of those rights reserved in Paragraph 7 below.
     c.    Dux's name and reputation must be protected and it must be clear that Frank still has the right to exploit his celebrity as Frank Dux in all stories prior and subsequent to "the Secret Man" for expansions such as "Legacy".
          In the original 1985 contract with Cannon (Exhibit "C"), Frank had the right to exploit without interference his name, martial arts reputation, and products. I do not believe it is Disney's intention to purchase with the book these preexisting business rights which depend on his reputation. Therefore, Frank's reputation/celebrity should be protected, for example by inserting into Paragraph 7 some of the reserve language from "Exhibit C" of the Cannon "Bloodsport" Agreement.
          HPC language here is unacceptable, for example...
"which may occur in the future"
"either accurately or with such liberties as HPC may desire"
"as HPC in its sole and uncontrolled discretion, may deem advisable"
"it being the intention hereof that HPC shall have the exclusive, absolute and unlimited right to use the Property ... in its sole and uncontrolled discretion". ("sole and uncontrolled discretion" should be changed to "in its discretion as limited by Paragraph 7 below").

"Owner shall not have any right, title or interest whatsoever in or to any plot, story, character, etc. or in any motion pictures produced hereunder ..." THERE MUST BE SOME PROTECTION OF DUX'S REPUTATION AND CHARACTER. Further, Frank retains an absolute right to novelization and exploitaition of the character in literatuure.
          In the fifth through ninth lines, all of these items must be approved by Frank before HPC can use them as they wish.
     d.    Add "Except those rights in the Property that are retained by Dux" to the end of(d), line 5.

CONFIDENTIAL

40 - 9

REDACTED

e.    This paragraph intrudes on the Publisher's rights.  Also, extracts are usually limited to 2,500 words

In the third line, we should have "serials" deleted.  And we should also make clear that Frank must not be named as author of said synopses or summaries unless he actually writes such synopses or summaries.

-omit "resumes" of Dux unless he has given written approval.
-We need to insert something like, "This paragraph shall not be construed to allow use of Dux's personal endorsement without prior written consent, and it is understood that all exploitation under this Paragraph shall be subject to Dux's participation as per Paragraph 5(c) above.

g.    Insert "Notwithstanding anything contained herein, this Paragraph shall not be construed to give HPC a right to use Dux's endorsement on any product or service not specifically allied with said film and those products allied with said film and its exploitation in which Dux has a specific net participation interest.

h.    The last section of this clause, "It is further expressly understood and agreed that motion pictures and all other items that may be produced hereunder <u>shall constitute independent derivative works</u> " makes me very nervous, although I do see that the purported intent is to separate the copyright of the motion pictures from the copyright of the book.  The Library of Congress might have another point of view on this....

Need to add "and it is further understood that Dux, his successors, assigns and heirs shall have the same perpetual right in the 5% of 100% participation in funds derived from the exploitation of these rights under Paragraph 6."

j.    Reserved by Frank.

Unnumbered paragraph directly following (k): **DISCARD** !
Rather, HPC shall have all rights herein granted to it in all existing published versions of the Property (The Secret Man).  The reason is that Frank retains all literary rights retained in Paragraph 7 and may use any other material not used in the published work for subsequent literary works which he has a right to submit to HPC for possible purchase.

With regard to the paragraph immediately preceding 7; there should be some way to allow Frank to exploit rights which HPC has refrained from exercising for five years or more, or at least to present HPC a plan for exploitation of rights which HPC has refrained from exploiting, or to repurchase rights from which HPC has refrained from exploiting , subject to HPC's participation and HPC's not unreasonably withholding permission to exploit said rights or a reversion of some type.

7.    in the first line, omit "Only"
7, Line 3, add after "...subject to the provisions of this agreement", "and all other rights not specifically granted herein are reserved to Owner."

DNY 0237                                    CONFIDENTIAL

40-10

7.   a.   "Reserved publication rights do not include picture books, coloring books and other publications ..." AGAIN, <u>IN ORDER FOR THIS DEAL TO BE WORTH DOING, FRANK MUST SHARE IN PROFITS FLOWING FROM THE RIGHTS GRANTED</u>. Do not include picture books, which shall be limited to HPC product. Dux retains rights to do books or collections of photos of himself in any of his retained novelization or book rights, or martial arts equipment, posters, etc.

This paragraph shall not be construed to limit Dux's retained literary rights; therefore, omit other publications that do not contain storyline or proerty which are all included in the rights granted to HPC.

—Also, in 7(a) line 6, after "subject", add, "and only limited by Paragraphs 6(a)-(k) above.

On line 10, need to change "do not include..." to "that include...".

on Line 13, after, "...the rights granted to HPC.", insert, "Frank specifically does reserve the right to publish any and all literary material including but not limited to picture-books showing his martial arts history relating to his life which were not specifically granted to HPC in their purchase of the book "The Secret Man"." NOTE— It is anticipated by all parties that Frank may write other books about his life and that although HPC limits his motion-picture exploitation rights, it is still contemplated that HPC may choose to buy subsequent literary works by Dux.

Line 15, after "sequels", insert "and prequels".

We must make sure Frank reserves books-on-tape rights and novelization rights.

"All motion picture, television and allied rights ... shall be 'frozen', and if HPC elects to develop, HPC and Owner will negotiate in good faith the terms ..." WE MUST HAVE A REVERSION IF NO EXPLOITATION TAKES PLACE OR A VERY LONG TURN AROUND PERIOD OR THE RIGHT TO REPURCHASE OR HAVE A THIRD PARTY PURCHASE UNEXPLOITED RIGHTS WHICH HAVE SAT ON THE SHELF FOR LONG PERIODS OF TIME.

b.   Including rights to use photographs of Dux on covers or packaging of audio products.

c.   Three (3) years, not five (5).

The holdback periods for radio rights should be three and five years instead of five and seven years, respectively. Also, in the third to last line, HPC should have first refusal, not last.

d.   The holdback periods for live television rights should be three and five years instead of five and seven years, respectively.

e.   Omit "and/or any Author-written sequels."

Need to add

f.   Dux retains all rights to protection compensation and exploitation to the reserved rights paragraph of that agreement referred to herein as the "Bloodsport Life Rights Agreement" between FM Entertainment and Frank Dux which includes but is not limited to rights to participate in merchandising, the right to

DNY 0238

CONFIDENTIAL

write a novel about "Bloodsport" and the right to protection of his reputation in the event of a remake.

8.   b.   Add "except as to "Bloodsport" agreements as noted herein.
     e.   Add "Nobody's Hero".   Tamara, I will have to talk to Dux when he returns regarding Schedule III.

9.   Frank should be included on HPC's E & O policy.

10.a.        NO.   10(a) should be redrafted to specifically reflect and include by reference the FM/Dux agreement, excluding those benefits of that agreement as outlined above which inure to Dux personally (e.g. Bloodsport novelization and merchandising rights).
     10 b. shall be subject to the redraft of 10(a).

 11. HPC SHALL be responsible for copyright renewals.

     d. Frank should NOT be required to "report the name of the third party who made the offer to Owner."   This is the same situation  we have with F.M.; we have not notified FM of Disney's interest in the property.

     f.   "for the sole benefit of HPC, and **entirely** at HPC's expense...."

12.   HPC may only assign HPC's rights to a financially responsible third party.

13.   l.   (ii)(page 16, line 11) change, "...in HPC's sole discretion..." to "in HPC's discretion, subject to Frank Dux's approval, including the fictionalization of events and experiences to date."
     l.   At the end of (l) we need to insert, "HPC acknowledges this Paragraph does not apply to the "Bloodsport" rights retained by FM, nor to Dux's Bloodsport novel."
14.   a.   Preapproved by Frank.
          Frank should have approval over his likeness and biography or any photographs of him used by HPC.
     b.   In the sentence beginning "Owner shall (subject to any applicable guild and/or union restrictions), _strike the phrase,_ _"if the screenplay writer's name appears in the main titles,"_

 If necessary we will agree to HPC to insert, "if any other person or entities' name appears in the main titles,"
Beginning in the third line, we should have "if the screenplay...main titles" deleted.
In the fifth line, "sequel, prequel, remake, or subsequent television production" should be added after "motion picture".
Frank should also receive credit in all paid ads where screenwriter(s) receive(s) credit.

DNY 0239

CONFIDENTIAL

40 -12

14. Last paragraph- Frank's credit should be no less favorable than credit assessed to the screenwriter(s).

15. "provided Owner is not in material default of any of Owner's **material** obligations."

   **Strike, "and provided that Owner is not engaged to write the screenplay or teleplay for such production."** He will have already earned these passive payments. New writing is a new job.
   a.(and b) Net proceeds in 15(a) and (b) shall be over and above any of the 5% of 100% net proceeds flowing to Dux from his grant to HPC in Paragraph 6 above.
   c.   These royalties are low. $3000, $5000, $7500 and $80,000 for an MOW or Mini, with any hour over __2 being worth $25,000 each.  Drop the ceiling of $100,000; it's unjustified.
         Royalties should be $3000, $4000, $5000 for 30 minutes, 60 minutes, and 90 minutes, respectively.  There should also be a provision for spin-offs.

   e.   I've often seen rerun royalties limited to the first five reruns but I've never seen them limited to U.S. and Canada. Change to "first 5 reruns in all territories wherein HPC (Disney) may be able to exploit said product.

   g.   **OMIT** "HPC shall not be obligated to make any so-called residual, re-run, foreign use or theatrical use payments to Owner with respect to ..."  Disney is a global giant.
   h.   Should be deleted.

16. a.   There is no restricted period provided for in Paragraph 8 above. Page 18, line three, after "..reserved rights.." add "should HPC have exercised this option and paid all fees due and owing without breach of said option agreement then said reserved right".....

   c.   With a courtesy copy to Michael B. Frankel, Esq., etc. Delete "only" on line 4 and add after "offeror.. or any better offer recieved by owner..."

   f.   Breach:  Again, limit right to option extensions for claims of "alleged" breaches.

   i.   Strike all of end of the paragraph starting with "Owner hereby acknowledges that unauthorized disclosure of any information related to the above ....".

17. a. If HPC has not exploited any rights after a reasonable period of time from their exercise of this option then Dux should have the right to exploit his life rights, by either reversion, turnaround or repurchase.
   c.   Dux shall have control of his likeness, resume, etc. as above and protection as to character and reputation as outlined above.
   b.   Please make sure RENAISSANCE AGENCY'S correct  address

DNY 0240

CONFIDENTIAL

40-13

REDACTED

is listed (8523 Sunset Blvd., Los Angeles CA 90069).
    d.   Again, please make sure  correct address is listed
(8523 Sunset Blvd., LA, CA  90069). HPC will cc copies to Frank
Dux's attorney at the time of such payments, Michael B. Frankel,
12501 Chandler Blvd., Suite 104, North Hollywood, CA 91607.
    F.  Delete "alleged breach".  Please clarify (ii) of this
paragraph.  What is HPC trying to protect with the rescission,
and at what point in the production of the product could this
take place?
    i.   Delete line 14 through 25. after "said matters..."

    j.  Frank is a member in good standing of the WGA and this
agreement is subject to the MBA.

CONSULTANT

    This agreement is also subject to the cover letter and notes
above as to conditions precedent.

1. c.    In the third line, "all" should be changed to "certain"
and "of every kind and nature" should be deleted.

2.1     These services should be subject to professional
availability.   THESE SERVICES SHALL NOT BE CONSTRUED TO COVER
THOSE TYPES OF DUTIES COVERED BY THE WGA MBA.

2.2     In the last line of the first page, there is a typo:
        2.2 should be 3.2.  FRANK'S RATE FOR THIS TYPE OF WORK
IS $3,500 A WEEK, THEREFORE 2.2 SHOULD ONLY COVER ONE WEEK OF
WORK HOURS EVEN IF THE WORK TAKES A NUMBER OF WEEKS TO COMPLETE.

3.  Frank should be pay and play on this agreement if a film
goes foward, and the compensation should work out to
approximately his rate for this type of work ($3,500 a week).

3.2  and 4     Dux should be exclusive if professionally
available at time of pre production.  The total compensation  is
at a weekly rate of $3,500, or, a minimum of $50,000, whichever
is greater.

5.      The weekly allowance should be $2000 per week, Frank
should get business class if first class not available, and
ground transportation should be provided for him.

6. Add at end of paragraph "subject to the rights retained in
Life Rights agreement executed concurrently with this agreement
and incoporated by reference in 1.c above."

7.3     Frank should be included on HPC's E&O policy.
8.      Frank should be pay and play if this film goes into
production.

9.      HPC may only assign HPC's rights to a financially
responsible third party.

                              DNY 0241          CONFIDENTIAL

                                                40-14

11.        Frank should have approval over his likeness and biography and "This paragraph shall not be construed to allow use of Dux's personal endorsement without prior written consent" of products other than the film.

14. Delete from line 12 after "...matters..." the remainder of paragraph.

15.  Payments should be made to Renaissance.

Finally, a general note:  A  probability  ALWAYS exists that HPC will exercise the option and either no film/tv show will be produced, or only one badly made one will ever be released.  The contract must address some way for Frank to reasonably  reacquire these Rights.

DNY 0242

CONFIDENTIAL

40 -/5

As of January 31, 1994          RED LINE DRAFT
                              **NUMBER THREE**

F.M. Entertainment International (II), NV
c/o CASSON BECKMAN
Chartered Accountants
HOBSON HOUSE
155 Gower Street
London WCIE 68J
Attn: Monda Popat


    Re: Frank W. Dux's Life Story Rights


Dear Sir or Madame:


    Reference is made to (i) the letter agreement ("Option Agreement") dated June 15, 1985 between Mark DiSalle ("DiSalle") and Frank W. Dux ("Dux"), (ii) the Production/Acquisition Agreement ("Production Agreement") dated June 16, 1986 between DiSalle and Cannon Picture Corporation (including Exhibits A and C thereof), and (iii) the letter agreement ("Letter Agreement") date as of July 10, 1986 between DiSalle and Dux in connection with the life story rights of Dux, and (iv) the assignment agreements ("Assignments") between DiSalle and F. M. Entertainment International (II), NV ("F.M."). The option Agreement, Production Agreement and Letter Agreement and Assignments are hereinafter collectively referred to as the "Agreements". (...omitted...)


    1. Granted Rights Subject only to Paragraph 2. below, this letter shall confirm that notwithstanding anything to the contrary contained in the Agreements, and for good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by F.M.), F.M. (as successor in interest to DiSalle) hereby grants, assigns and/or reconveys, as applicable, to Dux all of the motion picture, television and allied and ancillary rights of every kind and nature, known and unknown, in perpetuity, throughout the universe, in and to Dux's "Life Story" to the full extent of all rights granted by Dux to

Exhibit 8

D E F S EXHIBIT 36 FOR IDENTIFICATION
COLLEEN M. McGOVERN C.S.R. NO. 10360
DEPONENT: _FRANKEL_
DATE 8-4-98 PAGE _1_ OF _5_

116                                             FM 0411

Disalle and Subsequently granted to the predecessors in interest of F.M. As used herein, Dux's Life Story shall be deemed to mean the unconditional, irrevocable and exclusive right throughout the universe to use,simulate and portray, factually and/or fictionally: DUX'S name,likeness, voice, personality, personal identification and personal experiences, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) based upon or taken from Dux's life and otherwise.

2. Reserved Rights: (omitted)  It is hereby agreed that only the following rights (collectively"Reserved Rights") are reserved to F.M. for F.M.'s use and disposition:

(A)  The rights to distribute, broadcast license, exhibit and copyright the existing 1988 motion picture entitled "Bloodsport" ("Bloodsport") starring Jean-Claude Van Damme and directed by Mark Arnold (which rights are retained by F.M. predecessors-in-interest[1])

(B)  The remake rights to "Bloodsport", which remake rights shall include only that part of Dux's Life Story which was actually portrayed in "Bloodsport" (the "Bloodsport Remake Rights"), provided that the Bloodsport Remake Rights shall be subject to Dux's rights in connection therewith as set forth in the Agreements, (e.g. including but not limited to novelization rights, and merchandising rights).

(C)  The right to utilize the title "Bloodsport" for and to make references to (and/or incorporate excerpts from) "Bloodsport" in connection with any and all other motion pictures, including sequel motion pictures, for exhibition in any and all media, now known or hereafter devised, provided such other motion pictures do not utilize the character "Frank Dux" or any and all portions of his "Life Story" or otherwise infringe upon any of his published works which are listed in the attached schedule 1 to this agreement and any future books or publications about his life which occur prior to a "given" proposed "Bloodsport" sequel; provided, however, (i) any unintentional immaterial similarity between Dux's Life Story and any fictional character appearing in such other motion picture shall not be deemed to infringe upon the

_____

[1]Specify company holding right

36·2

rights granted to Dux hereunder (it being acknowledged that F.M. shall have no right to utilize Dux name in connection with any such fictional character); (ii) Dux acknowledges that Dux has no rights with respect to the "Kumite" full contact fighting contest portrayed in Bloodsport except the rights reserved in the June 1985 agreement (e.g. Novelization and merchandizing from the 1988 film) and that F.M. and its

successors and assigns may freely utilize such "Kumite" full contact fighting contest (and/or similar type contests) in any and all other motion pictures produced pursuant to this paragraph.

3.   F.M. hereby represents and warrants that F.M. is the sole owner of all rights herein granted to Dux to the full extent that such rights were granted to F.M. and its predecessors-in-interest by DiSalle and all entities affiliated with him and that F.M. has the full power and authority to grant said rights to Dux; that none of the rights granted to Dux hereunder (other than the Reserved Rights) have been granted, encumbered, or otherwise disposed of in any manner to any person, firm or other entity by F.M.; that F.M. has not done or omitted to do and will not do or omit to do any act or thing by license, grant or otherwise, which will or may impair or encumber any of the rights herein granted or interfere with the full enjoyment of said rights and that so far as F.M. is aware, in the exercise of reasonable prudence there are no claims or litigation pending or threatened which will or might adversely affect any of the rights herein granted to Dux.

a).   F.M. specifically represents and warrants that, (i) they have reviewed DiSalle's chain of title in the "Agreements" and, (ii) F.M. owns all rights granted to DiSalle by Dux.

4. F.M. will defend, indemnify, make good, save and hold harmless Dux and Dux's successors and assigns from and against any losses, damages, costs, charges, reasonable attorney's fees, recoveries, actions or judgments, penalties: expenses, and other loss, whatsoever, which may be obtained against, imposed upon or suffered by Dux and/or Dux's successors and/or assigns by reason of the breach and/or for alleged breach of any warranty, covenant, agreement or representation herein made by F.M. or wrongful act and /or tortious conduct or failure to act by F.M.

FM 0413

5. F.M. hereby grants to Dux all of F.M.'S right, title, and interest (to the full extent granted by DiSalle to F.M. or F.M.'s predecessors-in-interest) in and to any and all agreements, assignments, releases and other instruments in writing heretofore or hereafter executed in favor of DiSalle and F. M., or any predecessor of DiSalle and F. M., insofar as said documents grant or purport to grant to DiSalle and F. M., or any such predecessor, any of the rights, privileges and property herein granted to Dux, together with the full benefit of all representations, warranties and agreements made by any party in favor of DiSalle and F. M. or any such predecessor, insofar as the same pertain to or affect any of the rights, privileges and property herein granted to Dux.

6. Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of the this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof,

7. Nothing contained in this agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this agreement and any material statute, law, ordinance, order or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provisions of this agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this agreement shall be affected thereby and such other provisions shall continue in full force and effect.

8. Nothing in this letter agreement shall ever be construed to restrict, diminish or impair the rights of F.M., its predecessors and successors in interest as well as their respective assignees and licenses, or of Dux or Dux's assignees to utilize freely, in any work or media, any story idea, plot, theme, sequence, scene, episode, incident, name, characterization or dialogue which may be in the public domain, from whatever source derived.

FM 0414

3 6 - 4

9. FM. hereby acknowledges that F.M.'s sole and exclusive remedy for any breach by Dux ( or Dux's successors or assigns), termination and /or cancellation of this agreement or any term hereof shall be an action for damages and F.M. irrevocably waives any right to seek and/or obtain equitable or injunctive relief. This paragraph shall not be deemed to give Dux a license to breach this agreement or any of the warranties herein.

10. This letter agreement shall be governed by and construed in accordance with the laws of the State of California.

Please confirm the foregoing as accurately reflecting the Agreement and understanding of the parties by signing in the space provided below.

Very truly yours,

RED   LINE   DRAFT
**Number three**

Frank Dux

AGREED AND ACCEPTED:

F.M. Entertainment International (II), NV

120

FM 0415

36-5

03/18/96   15:52   ☎818 752 8006        BARRY E. POSNER                    ④ 003

_ _   As of January 31, 1994        RED LINE DRAFT
                                 NUMBER FOUR

F.M. Entertainment International (II), NV
c/o CASSON BECKMAN
Chartered Accountants
HOBSON HOUSE
155 Gower Street
London WCIE 68J
Attn: Monda Popat


        Re: Frank W. Dux's Life Story Rights


Dear Sir or Madame:


        Reference is made to (i) the letter agreement ("Option
Agreement") dated June 15, 1985 between Mark DiSalle ("DiSalle")
and Frank W. Dux ("Dux"), (ii) the Production/Acquisition
Agreement ("Production Agreement") dated June 16, 1986 between
DiSalle and Cannon Picture Corporation (including Exhibits A and
C thereof), and (iii) the letter agreement ("Letter Agreement") date
as of July 10, 1986 between DiSalle and Dux in connection with the
life story rights of Dux, and (iv) the assignment agreements
("Assignments") between DiSalle and F. M. Entertainment
International (II), NV ("F.M."). The option Agreement, Production
Agreement and Letter Agreement and Assignments are hereinafter
collectively referred to as the "Agreements".


        1. Granted Rights Subject only to Paragraph 2. below, this letter
shall confirm that notwithstanding anything to the contrary
contained in the Agreements, and for good and valuable
consideration (the receipt and sufficiency of which is hereby
acknowledged by F.M.), F.M. (as successor in interest to DiSalle)
hereby grants, assigns and/or reconveys, as applicable, to Dux all of
the motion picture, television and allied and ancillary rights of every
kind and nature, known and unknown, in perpetuity, throughout the
universe, in and to Dux's "Life Story" to the full extent of all rights
granted by Dux to

03/18/96   15:53   ☎818 752 8006       BARRY E. POSNER                    @004

*[handwritten margin note, top right:]* but nothing in it FM's rights to produce remake motion pictures in exploitation of such "Blood Sport" Remake rights without payment to Dux, except as required in respect of merchandising rights under the Agreement

- - Disalle and subsequently granted to the predecessors in interest of F.M. As used herein, Dux's Life Story shall be deemed to mean the unconditional, irrevocable and exclusive right throughout the universe to use, simulate and portray, factually and/or fictionally: DUX'S name, likeness, voice, personality, personal identification and personal experiences, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) based upon or taken from Dux's life and otherwise.

2. Reserved Rights: It is hereby agreed that only the following rights (collectively "Reserved Rights") are reserved to F.M. for use and disposition: 'S

(A)   The rights to distribute, broadcast license, exhibit and copyright the existing 1988 motion picture entitled "Bloodsport" ("Bloodsport") starring Jean-Claude Van Damme and directed by Newt Arnold (which rights are retained by F.M. predecessors-in-interest)

*[handwritten:]* without limitation

(B)   Remake rights to "Bloodsport", which remake rights shall include only that part of Dux's Life Story which was actually portrayed in "Bloodsport" (the "Bloodsport Remake Rights"), provided that the Bloodsport Remake Rights shall be subject to Dux's rights in connection therewith as set forth in the Agreements, (e.g. including but not limited to novelization rights, and merchandising rights)

*[handwritten:]* remakes, television series, interactive motion productions in interactive media and all new scanning and all other exploitation whatsoever

(C)   In sequels, F.M. reserves the right to utilize the title "Bloodsport" for and to make references to (and/or incorporate excerpts from) "Bloodsport" in connection with any and all other motion pictures, including sequel motion pictures, for exhibition in any and all media, now known or hereafter devised, provided such other motion pictures do not utilize the character "Frank Dux" or any and all portions of his "Life Story" or otherwise infringe upon any of his published works which are listed in the attached schedule 1 to this agreement and any future books or publications about his life which occur prior to a "given" proposed "Bloodsport" sequel; provided, however, (i) any unintentional immaterial similarity between Dux's Life Story and any fictional character appearing in such other motion picture shall not be deemed to infringe upon the rights granted to Dux hereunder (it being acknowledged that F.M. shall have no right to utilize Dux name in connection with any such fictional character); (ii) Dux acknowledges that Dux has no rights with respect to the "Kumite" full contact fighting contest portrayed

*[handwritten, right side:]* Exploitation of

*[handwritten, left margin bottom:]* Pretend exploitation in ...

*[handwritten, bottom left:]* new timing & TV series & KA clarified

*[handwritten, bottom center:]* (Collect. item as a part of exercise of in "Remake rights" above)

*inclusion of* [handwritten annotation]

*any novel exploitation whether by Dux in exercise of Dux' Reserved Literary Rights under clause 10 of such June 15, 1985 Agreement.* [handwritten annotation]

in Bloodsport except the rights reserved in the June 1985 agreement (e.g. or fictionization of the "Kumite" in the Bloodsport novel) and that F.M. and its successors and assigns may freely utilize such "Kumite" full contact fighting contest (and/or similar type contests) in any and all other motion pictures produced pursuant to this paragraph without obligation to Dux.

*all* [handwritten annotation]

3.   F.M. hereby represents and warrants that F.M. is the sole owner of all rights herein granted to Dux to the full extent that such rights were granted to F.M. and its predecessors-in-interest by DiSalle and all entities affiliated with him and that F.M. has the full power and authority to grant said rights to Dux; that none of the rights granted to Dux hereunder (other than the Reserved Rights) have been granted, encumbered, or otherwise disposed of in any manner to any person, firm or other entity by F.M.; that F.M. has not done or omitted to do and will not do or omit to do any act or thing by license, grant or otherwise, which will or may impair or encumber any of the rights herein granted or interfere with the full enjoyment of said rights and that so far as F.M. is aware, in the exercise of reasonable prudence there are no claims or litigation pending or threatened which will or might adversely affect any of the rights herein granted to Dux.

*Dux acknowledges that FM retains the exclusive right to the Title "Blood Sport"* [handwritten annotation]

(A).   F.M. specifically represents and warrants that, (i) Counsel for F.M. has reviewed DiSalle's chain of title in the "Agreements" and, (ii) insofar as F.M. is aware, in the exercise of reasonable prudence, F.M. owns all rights granted to DiSalle by Dux.

*for all purposes and uses and Dux shall not have any rights, title or interest in such title. The Term "motion picture" as used herein, includes, without limitation, motion pictures of every kind and nature,* [handwritten annotation]

4.   F.M. will defend, indemnify, make good, save and hold harmless Dux and Dux's successors and assigns from and against any losses, damages, costs, charges, reasonable attorney's fees, recoveries, actions or judgments, penalties; expenses, and other loss, whatsoever, which may be obtained against, imposed upon or suffered by Dux and/or Dux's successors and/or assigns by reason of the (i) the breach of and (ii) any claim alleging facts which if true would constitute such a breach, if and to the extent such claim is of a type not ordinarily covered by a so-called errors and omissions policy of any warranty, covenant, agreement or representation herein made by F.M.

*produced for exploitation in any and all media devised or hereafter devised now known or hereafter in existence without limitation including without limitation, TV movies, TV series and TV mini-series, interactive products and productions such as CD-Rom, CD-I and video games and such previous productions* [handwritten annotation]

5. F.M. hereby grants to Dux all of F.M.'S right, title, and interest (to the full extent granted by DiSalle to F.M. or F.M.'s predecessors-in-interest) in and to any and all agreements, assignments, releases and other instruments in writing heretofore or hereafter executed in favor of DiSalle and F. M., or any predecessor of DiSalle and F. M., insofar as said documents grant or purport to grant to DiSalle and F. M., or any such predecessor, any of the rights, privileges and property herein granted to Dux, together with the full benefit of all representations, warranties and agreements made by any party in favor of DiSalle and F. M. or any such predecessor, insofar as the same pertain to or affect any of the rights, privileges and property herein granted to Dux except for any rights expressly reserved to F.M. pursuant to paragraph 2 above only.

6. Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of the this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof,

7. Nothing contained in this agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this agreement and any material statute, law, ordinance, order or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provisions of this agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this agreement shall be affected thereby and such other provisions shall continue in full force and effect.

8. Nothing in this letter agreement shall ever be construed to restrict, diminish or impair the rights of F.M., its predecessors and successors in interest as well as their respective assignees and licenses, or of Dux or Dux's assignees to utilize freely, in any work or media, any story idea, plot, theme, sequence, scene, episode, incident, name, characterization or dialogue which may be in the public domain, from whatever source derived.

FM 0381

*All parties hereby agreed submit to binding arbitration in connection therewith*

03/18/96   15:55   ☎818 752 8006        BARRY E. POSNER                    ⓐ 007

*to be granted in such arbitration the prevailing party shall be entitled to attorney's fees and costs.*

9. FM. hereby acknowledges that F.M.'s sole and exclusive remedy for any breach by Dux ( or Dux's successors or assigns), termination and /or cancellation of this agreement or any term hereof shall be an action for damages and F.M. irrevocably waives any right to seek and/or obtain equitable or injunctive relief except (1) *for any use by Dux or his successors of the* as specifically stated in 9.a. below. This paragraph shall not be *title "Bloodsport" or* deemed to give Dux a license to breach this agreement or any of the *any derivation thereof, or* warranties herein. *(ii) otherwise, except as*

   (A).   Where F.M. claims an infringement on reserved rights; F.M.shall take such claim to binding AAA arbitration in Los Angeles, California and if successful in such arbitration shall have a *we* right to injunctive relief.
                                                                    *F.M.*

10. This letter agreement shall be governed by and construed in accordance with the laws of the State of California.


Please confirm the foregoing as accurately reflecting the Agreement and understanding of the parties by signing in the space provided below.

                                        Very truly yours,

RED     LINE     DRAFT
Number FOUR
                                        Frank Dux


AGREED AND ACCEPTED:

F.M. Entertainment International (II), NV

*in accordance with the Commercial arbitration rules of the American ~~Abor~~ arbitration association*

RED LINE

As of January 31, 1994

RED LINE DRAFT
**NUMBER FIVE**

F.M. Entertainment International (II), NV
c/o CASSON BECKMAN
Chartered Accountants
HOBSON HOUSE
155 Gower Street
London WCIE 68J
Attn: Monda Popat

Re:   Frank W. Dux's Life Story Rights

Dear Sir or Madame:

Reference is made to (i) the letter agreement ("Option Agreement")
dated June 15, 1985 between Mark DiSalle ("DiSalle") and Frank W. Dux
("Dux"), (ii) the Production/Acquisition Agreement ("Production
Agreement") dated June 16, 1986 between DiSalle and Cannon Picture
Corporation (including Exhibits A and C thereof), and (iii) the letter
agreement ("Letter Agreement") dated as of July 10, 1986 between DiSalle
and Dux in connection with the life story rights of Dux, and (iv) the
assignment agreements ("Assignments") between DiSalle and F. M.
Entertainment International (II), NV ("F.M."). The option Agreement,
Production Agreement and Letter Agreement and Assignments are hereinafter
collectively referred to as the                    "Agreements".

1.   Granted Rights.  Subject only to Paragraph 2. below, this letter
shall confirm that notwithstanding anything to the contrary contained in the
Agreements, and for good and valuable consideration (the receipt and
sufficiency of which is hereby acknowledged by F.M.), F.M. (as successor in
interest to DiSalle) hereby grants, assigns and/or reconveys, as applicable, to
Dux all of the motion picture, television and allied and ancillary rights of every
kind and nature, known and unknown, in perpetuity, throughout the universe,
in and to Dux's "Life Story" to the full extent of all rights granted by Dux to
Disalle and subsequently granted to the predecessors in interest of F.M.  As
used herein, Dux's Life Story shall be deemed to mean the unconditional,
irrevocable and exclusive right throughout the universe to use, simulate and
portray, factually and/or fictionally: DUX'S name, likeness, voice, personality,
personal identification and personal experiences, incidents, situations and
events which heretofore occurred or hereafter occur (in whole or in part)
based upon or taken from Dux's life and otherwise.

126                    **FM 0358**

2.    Reserved Rights:    It is hereby agreed that only the following rights (collectively "Reserved Rights") are reserved to F.M. for use and disposition:

(A)    The rights to distribute, broadcast license, exhibit and copyright the existing 1988 motion picture entitled "Bloodsport" ("Bloodsport") starring Jean-Claude Van Damme and directed by Newt Arnold (which rights are retained by F.M.'s predecessors-in-interest)

(B)    Remake rights to "Bloodsport", which remake rights shall include only the right to one remake of "Bloodsport" which one remake shall consist of only that part of Dux's Life Story which was actually portrayed in "Bloodsport" (the "Bloodsport Remake Rights"), provided that the Bloodsport Remake Rights shall be subject to Dux's rights in connection therewith as set forth in the Agreements, (e.g. including but not limited to novelization rights, and merchandising rights), and

(C)    Non-infringing sequels: (i) subject to paragraph (ii) below, F.M. reserves the right to utilize the title "Bloodsport" to make references to (and/or incorporate excerpts from) "Bloodsport" in connection with any and all feature motion pictures produced for exploitation in any and all media now known or hereafter devised, including without limitation of remakes of sequels, television series based on sequels, interactive media productions based on any sequels, merchandising based on any sequels and all other exploitation whatsoever in connection with any sequel (all of the foregoing collectively referred to as "SEQUEL RIGHTS"), for exhibition in any and all media, now known or hereafter devised.(ii) F.M.'s exercise of the Sequel Rights shall specifically exclude any and all use of the character "Frank Dux" or any and all portions of his "Life Story" and shall not otherwise infringe upon any of his published works which are listed in the attached schedule 1 to this agreement and any future books or publications about his life which occur prior to a "given" proposed "Bloodsport" sequel; provided, however, (a) any unintentional immaterial similarity between Dux's Life Story and any fictional character appearing in such other motion picture shall not be deemed to infringe upon the rights granted to Dux hereunder (it being acknowledged that F.M. shall have no right to utilize Dux name in connection with any such fictional character); (b) Dux acknowledges that Dux has no rights with respect to the "Kumite" full contact fighting contest portrayed in Bloodsport except the rights reserved in the June 1985 agreement (e.g. inclusion of the "Kumite" in any novelization written by Dux in exercise of Dux' reserved literary rights under clause 10 of such June 15, 1985 Agreement) and that F.M. and its successors and assigns may freely utilize such "Kumite" full contact fighting contest (and/or similar type contests) in any and all other motion pictures produced pursuant to this paragraph all without obligation to Dux.

FM 0359

127

Dux acknowledges that F.M. retains the exclusive rights to the title "Bloodsport" for all purposes and uses and Dux shall not have any right, title or interest in such title except ~~in the exploitation of the~~ "BLOODSPORT" NOVEL and  in ~~reference to  exploitation of the original and remakes of~~ "Bloodsport" as stated ~~herein~~.

3. F.M. hereby represents and warrants that F.M. is the sole owner of all rights herein granted to Dux to the full extent that such rights were granted to F.M. and its predecessors-in-interest by DiSalle and all entities affiliated with him and that F.M. has the full power and authority to grant said rights to Dux; that none of the rights granted to Dux hereunder (other than the Reserved Rights) have been granted, encumbered, or otherwise disposed of in any manner to any person, firm or other entity by F.M.; that F.M. has not done or omitted to do and will not do or omit to do any act or thing by license, grant or otherwise, which will or may impair or encumber any of the rights herein granted or interfere with the full enjoyment of said rights and that so far as F.M. is aware, in the exercise of reasonable prudence there are no claims or litigation pending or threatened which will or might adversely affect any of the rights herein granted to Dux.

(A).    F.M. specifically represents and warrants that, (i) Counsel for F.M. has reviewed DiSalle's chain of title in the "Agreements" and, (ii) insofar as F.M. is aware, in the exercise of reasonable prudence, F.M. owns all rights granted to DiSalle by Dux.

4.    F.M. will defend, indemnify, make good, save and hold harmless Dux and Dux's successors and assigns from and against any losses, damages, costs, charges, reasonable attorney's fees, recoveries, actions or judgments, penalties, expenses, and other loss whatsoever, which may be obtained against, imposed upon or suffered by Dux and/or Dux's successors and/or assigns by reason of the (i) the breach of any warranty, covenant, agreement or representation herein made by F.M. and/or (ii) any claim alleging facts which if true would constitute such a breach, if and to the extent such claim is of a type not ordinarily covered by a so-called errors and omissions policy.

5.    F.M. hereby grants to Dux all of F.M.'S right, title, and interest (to the full extent granted by DiSalle to F.M. or F.M.'s predecessors-in-interest) in and to any and all agreements, assignments, releases and other instruments in writing heretofore or hereafter executed in favor of DiSalle and F. M., or any predecessor of DiSalle and F. M., insofar as said documents grant or purport to grant to DiSalle and F. M., or any such predecessor, any of the rights, privileges and property herein granted to Dux, together with the full benefit of all representations, warranties and agreements made by any party in favor of DiSalle and F. M. or any such predecessor, insofar as the

same pertain to or affect any of the rights, privileges and property herein granted to Dux except for any rights expressly reserved to F.M. pursuant to paragraph 2 above only.

6.      Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of the this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof.

7.      Nothing contained in this agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this agreement and any material statute, law, ordinance, order or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provisions of this agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this agreement shall be affected thereby and such other provisions shall continue in full force and effect.

8.      Nothing in this letter agreement shall ever be construed to restrict, diminish or impair the rights of F.M., its predecessors and successors in interest as well as their respective assignees and licenses, or of Dux or Dux's assignees to utilize freely, in any work or media, any story idea, plot, theme, sequence, scene, episode, incident, name, characterization or dialogue which may be in the public domain, from whatever source derived.

9.      FM. hereby acknowledges that F.M.'s sole and exclusive remedy for any breach by Dux ( or Dux's successors or assigns), termination and /or cancellation of this agreement or any term hereof shall be an action for damages and F.M. irrevocably waives any right to seek and/or obtain equitable or injunctive relief except  for the use by Dux or his successors of the phrase "Bloodsport" and  or any derivation thereof in connection with the title of any motion picture, television series, mini-series, television movies and interactive product except in the exploitation of the "Bloodsport" novel or orginal film or remakes to his and F.M. common interest as defined herein. This paragraph shall not be deemed to give Dux a license to breach this agreement or any of the warranties herein.

10.     This letter agreement shall be governed by and construed in accordance with the laws of the State of California.

Please confirm the foregoing as accurately reflecting the Agreement and understanding of the parties by signing in the space provided below.

FM 0361

129

Very truly yours,

# RED LINE DRAFT

**Number FIVE**

Frank Dux

AGREED AND ACCEPTED:

F.M. Entertainment International (II), NV


By:

Its:

**FM 0362**

## ASSIGNMENT OF ALL RIGHTS

### "BLOODSPORT II"

This assignment is made with reference to the following:

(A)   On or about October 21, 1992 ComEnt Picture II Corp entered into a joint venture agreement (the "Joint Venture Agreement") with Transcontinental Cinema Group, Inc. (formerly known as Amazon Films, Inc.) ("Transcontinental") pursuant to which a joint venture (the "Joint Venture") was created for the purpose of developing, financing, producing and exploiting a proposed motion picture project based upon the previously produced motion picture "Bloodsport", tentatively entitled "Bloodsport II".

(B)   ComEnt Picture II Corp., as managing partner of such Joint Venture, and related companies such as ComEnt Picture Corp. I and Odyssey Distributors, Ltd. entered into various agreements on behalf of the Joint Venture (or on behalf of themselves, but with the intention to assign any rights acquired thereunder to such Joint Venture) in furtherance of the business of the Joint Venture.

(C)   A dispute has arisen among the parties to the Joint Venture and such parties have entered into an agreement resolving such dispute, which agreement is embodied in this Assignment of All Rights as well as in a separate Settlement Agreement and General Release of even date with this Assignment of All Rights (the "Settlement Agreement")

(D)   In furtherance thereof, the parties to the Joint Venture wish to terminate such Joint Venture, and the below described "Grantor", on behalf of itself and as a co-venturer party to such Joint Venture, wishes to confirm to transfer to F.M. Entertainment International (II) N.V. ("F.M."), which is the designated assignee of Transcontinental, of all right, title, and interest which Grantor has or may hereafter have in such Joint Venture, in the assets of the Joint Venture, and in any assets which Grantor may have acquired in furtherance of the Joint Venture and/or in connection with the motion picture project "Bloodsport II" and/or in connection with any other motion picture project(s) based upon "Bloodsport". Likewise, Transcontinental wishes to transfer to F.M., all right, title and interest which Transcontinental has or may hereafter have in such Joint Venture, in the assets of such Joint Venture, and in any assets which Transcontinental may have acquired in furtherance of the Joint Venture, and/or in connection with the motion picture project "Bloodsport II" and/or in

Blsprt/Com.Odys/Agmt.v10cln.

Exhibit 9

131

connection with any other motion picture projects(s) based upon
"Bloodsport II". Without limitation of the foregoing, such
transfer shall include, all right, title and interest,
whatsoever, in and to the below described "Rights" with the
intention to vest, solely and exclusively, in F.M., all right,
title and interest of Grantor and of Transcontinental in and to
such Joint Venture, and its assets, including, without limitation,
the below described "Picture" and all rights therein and any and
all sequel rights thereto.

Accordingly, for good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, effective as of the
date hereof, ComEnt Picture Corp. I, ComEnt Picture II Corp. and
Odyssey Distributors, Ltd., on behalf of themselves as well as on
behalf of all of their respective parent, subsidiary, related and
affiliated companies in their respective separate capacities as
principals of and/or agents for such Joint Venture, and in their
respective capacities as a co-venturer party to such Joint Venture
(individually and collectively referred to herein as "Grantor")
and Transcontinental, on behalf of itself as well as on behalf of
its parent, subsidiary, related and affiliated companies in their
respective separate capacities as principals of and/or agents for
such Joint Venture, and in its capacity as a co-venturer party to
such Joint Venture (the term "Transcontinental" as used herein
shall be deemed to refer to Transcontinental Cinema Group, Inc.
individually, and collectively to each and all of the foregoing in
such capacities), hereby irrevocably grant, sell, transfer, convey
and assign exclusively to F.M., in perpetuity and throughout the
universe all of the following:

1.   All of Grantor's and all of Transcontinental's right, title
     and interest, whatsoever, in and to the motion picture
     project currently entitled "BLOODSPORT II" and all rights
     therein whatsoever, (the "Picture"), and all other motion
     picture projects based upon the motion picture "Bloodsport"
     described in subparagraph 1(e) below, and/or the Picture, now
     held or hereafter acquired, including but not limited to:

     (a)  any and all rights acquired by Grantor and
          Transcontinental (or any of them) pursuant to that
          certain Option Agreement ("Option Agreement") dated as
          of December 9, 1992 between Pyramid Entertainment, Inc.
          and Metro-Goldwyn-Mayer, Inc. (as successor-in-interest
          to Pathe Entertainment, Inc.), including without
          limitation, all rights acquired by virtue of the
          exercise of the option contained in such Option
          Agreement;

     (b)  any and all rights which Grantor and by Transcontinental
          (or any of them) have in that certain screenplay
          presently entitled "Bloodsport II" written by Jeff

Blsprt/Com.Odys/Agmt.v10cln.

Schechter ("Screenplay") in connection with the Picture, any other screenplay, treatment or other literary work, whatsoever, relating to the Picture, all adaptions, dramatizations, translations, and future versions thereof whatsoever, and the copyright thereto, including, without limitation, the exclusive right to make derivative works based thereon;

(c) any and all rights which are the subject of that certain Agreement (the "Agreement") dated as of October 21, 1992 between Mark DiSalle and Pyramid Entertainment, Inc., on the one hand, and the Joint Venture (referred to therein as the "Bloodsport II Company"), including, without limitation, the following rights described therein: (i) the "MGM Rights"; (ii) all rights owned or controlled by Grantor and by Transcontinental (or any of them) pursuant to the "MGM Turnaround Agreement"; (iii) all of the so-called "DiSalle Turnaround Rights" as they relate to the Picture; and (iv) any and all rights in any "Property"; as each of the foregoing terms are defined in such Agreement;

(d) any and all results and proceeds of any services performed by Grantor and by Transcontinental (or any of them) or by any other person or entity performing services for or on behalf of Grantor and for or on behalf of Transcontinental (or any of them), whether as a work for hire or otherwise, in connection with the Picture and/or in connection with the development or production of any motion picture project based in whole or in part on the motion picture "Bloodsport";

(e) any and all Sequel and or other rights to develop, produce, distribute and exploit one or more derivative works based upon that certain motion picture entitled "Bloodsport" registered for copyright in the name of Cannon Films, Inc. and Cannon International, B.V. under entry number PA: 376-421 and that certain unpublished motion picture screenplay upon which such motion picture is based registered for copyright as an unpublished work in the name of Cannon Films, Inc. and Cannon International, B.V. under entry number PAU: 909-339, to the full extent of Grantor's and Transcontinental's (or any of their) rights therein; and

(f) any and all other rights, and proceeds, whatsoever, including, without limitation, contract rights, which Grantor and Transcontinental (or any of them) has or hereafter may have relating to the foregoing, including, without limitation, all rights of Grantor and Transcontinental (or any of them) in and to the Joint

Blcprt/Com.Odys/Agmt.v10cln.

Venture Agreement with respect to the Picture.

(g) any and all agreements with respect to the distribution and/or exploitation of the Picture including, without limitation, any and all distribution agreements entered into by Odyssey Distributors, Ltd. and/or by any constituent entity of Grantor and/or by Transcontinental (or any of them) relating to distribution and/or exploitation of the Picture, ("Distribution Agreements"), including, without limitation, all those Distribution Agreements listed on Schedule 1 attached hereto and incorporated by this reference, and all proceeds therefrom. The parties contemplate execution of further documents by Grantor (and/or by Transcontinental as required by F.M.) in order to give notice to each applicable distributor under such Distribution Agreements of the foregoing irrevocable assignment, including without limitation, formal Notices of Assignment and Irrevocable Payment Instructions directing each such distributor to pay all sums payable under such Distribution Agreements directly to F.M. and/or F.M.'s designee. Such Notices of Assignment and Irrevocable Payment Instructions shall be in a form set forth as Exhibit A with such modifications therein as may be approved by F.M.'s counsel and by the bank or other party financing the production cost of the Picture, and by the guarantor bonding completion and/or delivery of the Picture. In any event, if Grantor (or any of them) fail or refuse to execute such Notices of Assignment and Irrevocable Payment Instructions, this Assignment of All Rights and the Sales Agency Agreement shall constitute such Notice of Assignment and Irrevocable Payment Instructions. In such event, F.M. may insert the applicable information called for in Exhibit A and may execute the same on behalf of Grantor (or any of them) and deliver the same to each applicable distributor for counter-execution and such document shall be binding upon the applicable constituent entity of Grantor as if executed by such constituent entity of Grantor.

2. Any and all causes of action which Grantor and Transcontinental (or any of them has) have for any past, present or future infringement or interference with any of the foregoing rights granted to F.M. herein.

3. The foregoing shall be referred to collectively herein as the "Rights".

Grantor and Transcontinental, jointly and severally, hereby appoint F.M. (and its successors and assigns) as Grantor's and as

Blsprt/Com.Odys/Agmt.v10cln.

Transcontinental's irrevocable attorney-in-fact, with full power of substitution and delegation, in Grantor's name, in Transcontinental's name, in the name of the Joint Venture, and/or in F.M.'s name: to enforce and protect the Rights, including all rights, licenses, privileges and/or property granted hereunder under any and all copyrights thereof; to prevent or terminate any infringement or violation or threatened infringement or violation of said copyrights as respects any of said rights, licenses, privileges or property; and to litigate, collect and receive all damages of every kind or character for injury arising from any such defendant in any such suit or proceeding, in Transcontinental's sole discretion.

Grantor, jointly and severally, hereby warrants and represents to F.M. in respect of the Rights granted herein to F.M. by Grantor that: (i) Grantor (or any of them) has not previously assigned or encumbered any of the Rights herein granted or agreed to be granted to Transcontinental, other than solely those Rights previously assigned or granted to the Joint Venture (which are hereby granted to F.M.); (ii) to the best of Grantor's knowledge and belief, there are no claims or litigations threatened or pending in any way relating to the Rights; (iii) to the best of Grantor's knowledge and belief, each of the Distribution Agreements and other agreements comprising all or any part of Rights, remains in full force and effect (with the sole exception of the Distribution Agreement between the Bloodsport II Company and Dai Ichi Entertainment, Inc. dated October 31, 1992, for which Grantor makes no warranty or representation); (iv) Grantor (or any of them) has not committed any act or omission which constitutes a breach of any of the foregoing Distribution Agreements (with the sole exception of the Distribution Agreement between the Bloodsport II Company and Dai Ichi Entertainment, Inc. dated October 31, 1992, for which Grantor makes no warranty or representation) or of any of the other agreements comprising all or any part of the Rights; and (v) that each entity executing this Assignment on behalf of Grantor has the full power, right and authority to execute this Assignment on behalf of itself and each constituent entity and party comprising Grantor, it being the intention that this Assignment shall be binding upon each such constituent entity and party.

Transcontinental, jointly and severally, hereby warrants and represents to F.M. in respect of the Rights granted herein to F.M. by Transcontinental that: (i) Transcontinental (or any of them) has not previously assigned or encumbered any of the Rights herein granted or agreed to be granted to F.M., other than solely those Rights previously assigned or granted to the Joint Venture (which are hereby granted to F.M.); (ii) to the best of Transcontinental's knowledge and belief, there are no claims or litigations threatened or pending in any way relating to the Rights; (iii) to the best of Transcontinental's knowledge and

Blsprt/Com.Odys/Agmt.w10cln_

belief, each of the Distribution Agreements and other agreements comprising all or any part of Rights, remains in full force and effect; and (iv) Transcontinental (or any of them)) has not committed any act or omission which constitutes a breach of any of the foregoing Distribution Agreements or of any of the other agreements comprising all or any part of the Rights.

F.M. shall have the right at any time to assign or otherwise transfer the Rights, in whole or in part, to any person or entity whatsoever.

Grantor, jointly and severally, shall defend and hold Transcontinental and F.M., their successors, assigns and licensees, harmless from and against any claim, cost or expense, including, without limitation, reasonable attorneys fees, arising from a breach of any of the foregoing warranties and representations of Grantor.

Transcontinental, jointly and severally, shall defend and hold F.M., its successors, assigns and licensees, harmless from and against any claim, cost or expense, including, without limitation, reasonable attorneys fees, arising from a breach of any of the foregoing warranties and representations of Transcontinental.

Transcontinental and F.M. shall defend and hold Grantor harmless from any and all against claim, cost or expense, including, without limitation, reasonable attorneys fees, asserted against Grantor arising out of: (i) any agreement(s) between such Joint Venture on the one hand and any of Mark DiSalle and Pyramid Entertainment, Inc., Alexander Tabrizi, or the law firm of Gipson, Hoffman and Pancione in respect of the legal services of Ed Labowitz; and/or (ii) otherwise, arising out of the development, production and/or exploitation of the Picture, other than any claim arising from Grantor's breach of the foregoing warranties and representations.

Transcontinental and F.M. shall cause Grantor to be named as additional insureds under any producers errors and omissions insurance policy obtained with respect to the Picture.

    This Assignment shall be construed under and in accordance with the laws of the State of California.

This Assignment and the Settlement Agreement shall supersede and replace any and all agreements, written or oral, between or among any of Grantor, Transcontinental and F.M., including, without limitation, the Joint Venture Agreement, the December 1993 Agreement and any and all other agreements between the parties hereto, or any of them, whether written or oral, with respect to the Picture. Grantor, or any of them, shall have no right, title, interest, whatsoever, in and to the Picture, any sequels thereto, or in the proceeds thereof, except as expressly set forth in this

81aprt/Com.Odys/Agmt.v10cln.

Assignment and the Settlement Agreement; it being understood and acknowledged that henceforth, the rights and obligations of Grantor, of Transcontinental and each of their respective constituent entities, as well as of F.M. shall be governed solely by this Assignment and the Settlement Agreement.

IN WITNESS THEREOF, the parties thereto have executed this Assignment as of December 8, 1993.

FOR AND ON BEHALF OF GRANTOR, AND EACH OF THEM:

COMENT PICTURE CORP. I

By: _____
Its: _____

COMENT PICTURE II CORP.

By: _____
Its: _____

ODYSSEY DISTRIBUTORS, LTD.

By: _____
Its: _____

FOR TRANSCONTINENTAL AND F.M. AND EACH OF THEM:

TRANSCONTINENTAL CINEMA GROUP, INC.

By: _____
Its: _____

F.M. ENTERTAINMENT INTERNATIONAL (II), N.V.

By: _____
Its: _____

Blsprt/Com.Odys/Agmt.v10cln.

137

STATE OF _CALIFORNIA_ )
                          }
COUNTY OF _LOS ANGELES_ )

On _October 7 1994_, before me _JANET Ghio_ the undersigned
notary public in and for the State of _CALIFORNIA_ personally
appeared _SHANE O'NEIL_

personally known to me (~~or proved to me on the basis of~~
~~satisfactory evidence~~) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary's Signature


STATE OF _____ )
                          }
COUNTY OF _____ )

On _____, before me _____ the undersigned
notary public in and for the State of _____ personally
appeared _____

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

Witness my hand and official seal.


_____
Notary's Signature


Blsprt/Com.Odys/Agmt.v10cln.

Walt Disney Motion Pictures Group

Paige W. Wright

September 11, 1996

VIA MESSENGER

Frank Dux
c/o Michael Frankel, Esq.
12501 Chandler Boulevard, #104
North Hollywood, CA 91607

Re:   Spy Project/Frank Dux/Life Story Rights/Consulting

Gentlemen:

Reference is made to my correspondence to you dated August 29, 1996.

This letter shall confirm that HOLLYWOOD PICTURES COMPANY did not receive an
acceptable agreement between Frank Dux and FM Entertainment reasonably
necessary to satisfy chain of title as requested in the correspondence.  Accordingly, the
condition precedent set forth in Paragraph 1.d. of the Agreements (as referenced in my
correspondence) has been deemed unsatisfied as of September 5, 1996.  Neither party
has any obligation to the other party with respect to either Agreements or the project,
and you are free to convey such rights to other parties.

If you should have any questions, please do not hesitate to contact me.

Very truly yours,

Paige W. Wright

cc:   Steve Bardwil
      Doug Carter
      Mike Stenson
      Jerry Bruckheimer
      Chad Oman

DEFS EXHIBIT 53 FOR IDENTIFICATION
COLLEEN M. McGOVERN C.S.R. NO. 10360
DEPONENT: FRANKEL
DATE 8-4-98 PAGE 1 OF 1

Part of the Magic of The Walt Disney Company

**Exhibit 10**

FD 00203

139

**EVERGREEN AGENCY**
*17618 Collins Street, Encino, CA 91316*

Karin F. Pine, Agent
(818) 996-4576

March 17, 1993

Peter Elson, President
Odyssey Pictures
6500 Wilshire Boulevard
Suite 400
Los Angeles, CA 90048

        Re:   "Bloodsport:  The Sequel"

Dear Mr. Elson:

     My client, Frank Dux, and I are thrilled to learn that you
intend to produce and/or distribute "Bloodsport:  The Sequel",
which is clearly derived, by title, characters and/or story, from
the Cannon Pictures feature film, "Bloodsport".  As I am sure you
are aware, "Bloodsport" was based upon incidents from the life of
Mr. Dux.

     As a courtesy, we are advising you that we have advised
Jason Sloane, as attorney for Mark DiSalle, that compensation is
due to Mr. Dux for the sequel; however, we would expect that the
negotiations will be conducted in good faith from all sides, that
the spirit and intent of previous conversations and agreements
will be addressed, and that Mr. DiSalle's attorney and I will be
able to come to an amicable agreement.

     In anticipation of a successful negotiation, please accept
Mr. Dux' and my most sincere congratulations and best wishes for
a tremendously successful film.

     Kind regards.

                              Sincerely,


                              Karin F. Pine


KFP/pc
Encl.


DHX00001:tcr :01

Exhibit 11                                    FD 01693

```
 1        Q       Not that you can recall?

 2        A       Not that I can recall.

 3        Q       What happened with this document after you sent

 4   it?  Was it ever negotiated?

 5        A       No.

 6        Q       Why not?

 7        A       Because I proffered the agreement that was

 8   acceptable to Disney I believe shortly after this document in

 9   February of -- I believe it was February to Mr. Sloan of '94.

10        Q       Isn't it correct that Disney actually prepared

11   the document that was sent to Mr. Sloan in place of this

12   Accord and Satisfaction?

13        A       Larry Simpson prepared it I previously stated.

14        Q       Larry Simpson, as you understood, was --

15        A       For the same --

16                MR. KRAMER:  Wait for the question to be

17   completed, please.

18   BY MR. GABRIEL:

19        Q       Larry Simpson, as you understood it, was an

20   attorney representing Simpson-Bruckheimer; is that correct?

21        A       Yes.

22        Q       And after you prepared this you had a

23   discussion with representatives of either Simpson-Bruckheimer

24   or Disney regarding the sufficiency of this document?

25        A       Yes.
```

                                                              38

**Exhibit 12**

1   subsequent letter in September that he had not as of yet

2   reviewed, but he kept assuring me at all times between April

3   and this letter that there was no problem in reconveying

4   Frank's rights to him and that there are other matters dealt

5   with in this letter for which the letter speaks for itself.

6       Q       Yeah, I'm not getting into the other matters in

7   the letter for which the letter speaks for itself.

8       A       But I remember --

9               MR. KRAMER:  Mr. Frankel, for the fourth time

10  wait for a question.

11  FBY MR. GABRIEL:

12      Q       What I want to know is what precipitated

13  sending a status report on discussions with the Perez family,

14  or the Merez family?

15      A       I believe that was at the request of Joel

16  Gotler.

17      Q       Joel Gotler suggested to you that you update

18  Lucas Foster?

19      A       I believe so.

20      Q       At that point you hadn't received comments yet

21  from Mr. Plotkin?

22      A       Yes.  From the 24th?

23      Q       Yes.

24      A       Yes.  Apparently I misspoke before.  He had

25  mentioned that Mr. Abrams, as of August, was going to be

56

**142**

1    documents?

2          A     From Mr. Abrams' office, no.

3          Q     Did Mr. Sloan or anyone from his office refuse

4    to provide you with any documents?

5          A     Yes.

6          Q     Who at Mr. Sloan's office refused?

7          A     While I was on the phone with Mr. Sloan,

8    Mr. DiSalle was on the other line and basically said -- I'm

9    trying to be polite.

10               MR. KRAMER:  What date are we on at this point?

11               THE WITNESS:  This would be I believe spring

12   of --

13   BY MR. GABRIEL:

14         Q     '95?

15         A     '95.

16               -- said, "I sold everything I own, FM, don't

17   bother me.  Leave me alone.  And that was the end of the

18   conversation.  And Mr. Sloan forwarded that, Mr. DiSalle's

19   comments to him.

20         Q     What had you requested from Mr. Sloan that was

21   not provided to you?

22         A     I'd have to refresh myself with documents.  I

23   believe there was a missing quit claim or reconveyance.

24   There was some documents that were mentioned and other

25   documents that were not present.

1        Q        When did you have a discussion with Chad Oman?

2        A        I had a series of them.  I don't recall the

3    actual dates.  He took over for Lucas Foster.

4        Q        Lucas Foster left?

5        A        Simpson-Bruckheimer.

6        Q        In April of '95; correct?

7        A.       I don't know the date.  Sometime in '95.

8        Q        Did Chad Oman tell you -- withdraw that.

9                 Did you ever see a written agreement between

10   Disney and Simpson-Bruckheimer with regard to the Frank Dux

11   Life Story Rights project?

12       A        Not that I recall.

13       Q        Did you ever see a written agreement under

14   which Jerry Bruckheimer agreed to be a producer on a motion

15   picture based on Frank Dux's life story?

16       A        Not that I recall.

17       Q        On the first page of this agreement which is

18   the second page of Exhibit 28, there are a number of

19   conditions precedent.  One of them is Hollywood Pictures,

20   that is, Disney's receipt of a signed publisher's release.

21   Do you see that in B?

22       A        Yes.

23       Q        Did you ever see a written release by the

24   publisher of -- I understand this to be The Secret Man?

25       A        Not that I recall.

```
 1    end of the month.

 2          Q       The month of May, that is?

 3          A       The month of May.

 4          Q       Exhibit 39, this a fax that you sent to

 5    Ms. Woolfork approximately May 9, 1996?

 6          A       Yes, this is a fax in response to this letter.

 7                  (Defendant's Exhibit 39 was subsequently marked

 8                  for identification by the deposition officer

 9                  and is attached hereto.)

10    BY MR. GABRIEL:

11          Q       The second paragraph of this letter makes

12    reference to "outside council" spelled "c-o-u-n-c-i-l."  You

13    meant outside "counsel," "c-o-u-n-s-e-l"?

14          A       I believe so.

15          Q       Who was that outside counsel?

16          A       There was never one hired to my knowledge.

17          Q       Is this Exhibit 40 on May 28, 1996, a letter

18    that you sent to Tamara Woolfork?

19          A       Yes.

20                  (Defendant's Exhibit 40 was subsequently marked

21                  for identification by the deposition officer

22                  and is attached hereto.)

23    BY MR. GABRIEL:

24          Q       Did you ever receive a response to each of the

25    points that you made in this?
```

```
 1    Dux.

 2    BY MR. GABRIEL:

 3         Q       Did Ms. Woolfork ever tell you that the Jerry

 4    Bruckheimer condition precedent was already taken care of by

 5    Disney?

 6         A       Not that I recall.

 7         Q       Did anybody from Disney say that that condition

 8    precedent had been taken care of by Disney?

 9         A       Not that I recall.

10         Q       Did anybody from Disney ever represent in

11    writing that Disney would take care of the Jerry Bruckheimer

12    condition precedent?

13         A       Not that I recall.

14         Q       Attached to this May 28 letter is a document

15    entitled "Addition Notes on Dux Life Rights Agreement."  Do

16    you see that?

17         A       Be there in a minute.

18                 Yes.

19         Q       That was written by you?

20         A       Yes.

21         Q       And that was based on comments that you

22    received from Karen Pine and Joel Gotler?

23         A       No.  This was based on my comments and Joe

24    Gotler's.

25         Q       Any of Karen Pine's comments made in here?
```

1          Q      On the bottom of Page 2 of Mr. Abrams' letter

2    under point 4, the last sentence reads, "Disney is demanding

3    indemnity so long as the underlying complaint alleges facts

4    which, if proven, would constitute such a breach and the

5    claim is not covered by insurance.  Anyone can allege

6    anything, but proving is another matter."

7          Did you believe Mr. Abrams' comment here was

8    well taken?

9          A      That anybody can allege something?

10          MR. KRAMER:  The whole comment?

11          THE WITNESS:  Yes.

12   BY MR. GABRIEL:

13          Q      Yes, you did?

14          A      I believe that it's a valid point.

15          Q      On the next page second to the last paragraph,

16   there is a reference to a waiver of the first negotiation

17   first refusal rights as an alternative to a grant of rights

18   agreement.  I think you mentioned this earlier today in your

19   testimony.  Did you agree with Mr. Abrams at this time,

20   August 1996, that a waiver of the first negotiation first

21   refusal right was an acceptable alternative to a grant of

22   rights agreement?

23          A      I reviewed his suggestion and passed it on.  I

24   don't know at what time it was incorporated into the

25   agreement or was modified as a possible solution.

1    it, I don't recall having read it because I may have

2    said, "Oh, well, this seems like" -- so let me retract

3    that other statement.

4                    I don't believe that I had read the

5    underlying agreement because I may have at that point

6    -- may have had a position, but I do not have a

7    position on it, which means I never read it.

8            Q       So I'm clear, you don't recall ever

9    reading --

10           A       I don't recall.  I don't recall ever

11   reading it.  But it was a while ago.

12           Q       And you don't recall ever having your

13   own opinion as to whether Disney's chain of title

14   concerns were --

15           A       No.

16           Q       -- a legitimate problem?

17           A       No.  I don't recall.

18       MR. GABRIEL:  Why don't we take that break

19   now.

20       MR. KRAMER:  Fine.

21               (Recess taken.)

22       MR. GABRIEL:  Back on the record.

23           Q       Before I forget, can you give me a

24   brief description of your professional career as an

25   agent.

Exhibit 13                    148                              35

1          A        I started at the William Morris Agency

2    in I believe it was 1972.  I spent approximately three,

3    three and a half years there.

4                   I moved to California in 1975 and went

5    to work for Universal Studios.

6                   On June 9, 1976, I went to work for a

7    literary agency, H.N. Swanson.  I had that affiliation

8    for 10 years.

9                   And I had my own agency in 1979 and

10   I've basically had my own agency since then in

11   Hollywood, dealing primarily with books, the rights to

12   books, with books to movies and television and books to

13   publishers here and abroad.  Manuscripts, publishing

14   rights.

15          Q        You represent WGA member writers?

16          A        Yes.

17          Q        And --

18          A        Signatory too.

19          Q        Your specialty is that of a literary

20   agent?

21          A        Yes.  Because we own the two oldest

22   literary agencies in Hollywood, being Swifty Lazar and

23   Jim Swanson.

24          Q        Let me show you a document that was

25   previously marked as Exhibit 35.  This was marked at

                                                        36

                             149

1    the deposition of Michael Frankel.  Here is another

2    copy of that.

3                    Is this a copy of a letter that you

4    sent out to Michael Frankel on February 28, 1996?

5         A       I guess so.  I signed it.

6         Q       Does this look familiar to you?

7         A       Yes.

8         Q       And as I understand it, this is a

9    summary of comments that you had to two agreements that

10   Disney sent to Mr. Frankel and to you.

11        A       Right.

12        Q       One agreement had to do with the

13   acquisition of life rights and film rights based on

14   "The Secret Man" and the other had to do with a

15   consulting --

16        A       Consulting, right.

17        Q       -- services agreement.

18                Was it Mr. Frankel's role to

19   communicate the comments that he and you had to these

20   agreements to Disney?

21        A       Yes.

22        Q       It wasn't your role to communicate

23   those comments?

24        A       No.

25        Q       Your role was to negotiate the material

1      Q          -- that Simpson-Bruckheimer was

2   attached?

3      A          That Lucas said, "We want to make this

4   movie."

5      Q          It wasn't based on any agreements or

6   any documents that you saw?

7      A          No.  Not to my knowledge.

8      Q          And you never saw any agreements under

9   which Mr. Bruckheimer or Simpson-Bruckheimer agreed to

10  act as a producer on the Frank Dux film project?

11     A          No.  I didn't see the agreement.

12             The only thing I saw or I heard was

13  that the Creative Artists Agency in the development

14  reports at Hollywood Pictures was "The Secret Man" was

15  being developed by Bruckheimer-Simpson, and it was on

16  those reports for a long time.

17     Q          But you never saw an agreement?

18     A          I never saw the agreement, an

19  agreement.

20     Q          Did it ever come to your understanding

21  that an agreement existed?

22     A          I was never asked, so I don't know.

23  It's not -- I assume it fell under Jerry's deal at

24  Disney.  Whether it was a separate contract or not, I

25  don't know.

48

151

1          A          I don't think it came about that way.

2          Q          Let me withdraw that question then.

3                      How did the idea of acquiring the life

4     story rights from Mr. Dux come about?

5          A          What happened was I started to talk to

6     Frank Dux about something entirely different, which was

7     studying martial arts with him, and I really had no

8     interest at that point, at the very beginning, in his

9     experiences.  I didn't even know he had experiences.

10                     When he was presented to me, I thought

11    he was a martial arts expert and I had no idea that he

12    had military affiliations of any kind.

13                     I invited him to lunch one day at the

14    studio and Jerry joined me for lunch.  At lunch Frank

15    started telling stories about his past, because Jerry

16    was interested, and some of the things that he told us

17    were so amazing that they seemed like a movie.

18                     So at some point someone said -- and I

19    don't remember who -- "There's probably a book in

20    this."

21                     And Judith Regan, who is someone we

22    talk to fairly often, who had sold "Rogue Warrior" to

23    Don and Jerry as a book proposal -- you know, she was

24    sort of a famous or infamous editor -- and I think in

25    one of our conversations with her, we said, "Hey, we

35

Exhibit 14          152

Richard
Marenko or guys
Like him

1    met this guy and he reminds us of Mark Sinko (phonetic)

2    and you should do a book on him or you should talk to

3    him anyway."

4                So she called him up, and the next

5    thing we knew, He had a book deal.  So what happened in

6    typical producer fashion, we said, "If you're going to

7    do a book we want to buy the rights to the book.  What

8    is the book going to be about?"

9                So basically the conversation was what

10   were Frank's experiences beyond the martial arts

11   experiences.  We had -- I don't know if we had a

12   meeting with him or I talked to him on the phone, but

13   Jerry and I got a better idea of what the story was,

14   and a new project emerged like out of nowhere.

15               So while the book deal or maybe after

16   the book deal was done -- I don't exactly remember --

17   we basically had first shot at the movie rights because

18   we had sort of created it by accident.

19               So that's the genesis of my business

20   relationship with Frank Dux, our company's relation-

21   ship.

22        Q       At the time that you met Frank Dux down

23   in San Diego, you were with Simpson-Bruckheimer; is

24   that right?

25        A       Working For Them . Correct.
                  Right.  (Nodding head )

36

153

1          Q          At the time that you had this lunch

2     with Jerry Bruckheimer and Frank Dux, was Frank Dux

3     already providing services on "Rogue Warrior"?

4          A          No.  Like I said, he was just my

5     martial arts teacher or not even yet my martial arts

6     teacher.  He was going to be.

7          Q          So you met him in San Diego at this

8     convention and the next contact was you wanted to talk

9     to him about being your martial arts instructor.

10         A          Yes.  He was -- yes.

11         Q          Can you tell me, what point in time did

12    you have this lunch with Jerry Bruckheimer and Frank

13    Dux?

14         A          I have no way of remembering that.  I

15    don't know.

16         Q          If I told you that Frank Dux entered

17    into his agreement to perform consulting services on

18    "Rogue Warrior" in November 1993, do you remember how

19    long before November 1993 you had this lunch?

20         A          I'm sure it was within a few months.

21    It wouldn't be a long time.

22         Q          I'm sorry.  What was the name of that

23    convention?

24         A          Spec War Convention, short for "Special

25    Warfare."

37

```
1              A        Correct.

2              Q        -- to work out a deal with Frank Dux's

3    representatives?

4              A        Correct.

5              Q        After you were told that there was a

6    potential problem in acquiring the life story rights

7    because of the earlier transfer of a portion of those

8    rights to another company, what happened next, to your

9    recollection, with regard to the acquisition?

10             A        I think we tried to get paperwork,

11   clearing up whether there really was a problem or there

12   wasn't a problem.

13             Q        Paperwork in order to review or to

14   determine whether there was a problem?

15             A        Whether he had the right to sell his

16   rights.

17             Q        So it was a process of reviewing, as

18   one might put it, the chain of title documents?

19             A        Correct.

20             Q        Whose responsibility was it to analyze

21   the chain of title documents?

22             A        Disney.  Disney business affairs and

23   legal affairs.

24             Q        Your involvement would be with respect

25   to facilitating the documents getting over to them?
```

45

155

1    producer.

2                    So it was to our interest, once a book

3    was being created, to acquire the rights to the book as

4    opposed to broadly acquiring the life rights.

5                    I don't think he was free to sell the

6    life rights.  He was only free, as it was represented

7    to me, to discuss or sell a portion of his life rights

8    because the martial arts life rights had already been

9    acquired by another company and a film had been made

10   about his life.

11          Q       That film is called BLOODSPORT; right?

12          A       Yes.

13          Q       When did it first come to your

14   attention that some other producer or company had owned

15   the life rights to the military exploits of Mr. Dux?

16          A       Well, here is -- it wasn't brought to

17   my attention in the way that you described, okay.

18                  What I was told was the following --

19   and I don't remember exactly when this was.  But at

20   some point we were trying to make a deal with him.

21                  Somebody said, "There's an agreement

22   that he has with this other company that made the film

23   BLOODSPORT," that -- I remember some business affairs

24   guy saying to me, "There's a problem.  This guy isn't

25   free to sell his rights."

39

1    I said, "It's my understanding that he

2  only sold the rights relating to his martial arts

3  experiences, and the movie has been made and we have no

4  interest in making a martial arts film.  We have an

5  interest in the military stuff that he did, which is

6  apparently, according to him, excluded from his

7  agreement."

8    And so there was some document which

9  passed through my consciousness, which had some

10  language in it that was supposedly his experiences as a

11  military person were excluded.

12    And I passed that document on and it

13  was given to the business affairs guy.  We had a

14  tremendous amount of trouble closing the deal because

15  Disney could never be assured that the rights were

16  clear, but nevertheless we wanted to proceed and they

17  were wary, so we were trying to find a way to proceed.

18    Q    Okay.  I have to go kind of back in

19  time to what you were talking about.

20    Do you know the identity or the

21  capacity of the person who told you "There's a problem

22  because apparently a portion of Mr. Dux's life rights

23  were sold to another company"?

24    A    It was, I thought, Frank's lawyer.  I

25  don't know if that's the same as Steve Kramer or a

40

157

1   Joel essentially after that on that project.

2          Q        When you were leaving Simpson-

3   Bruckheimer, did you have a conversation with Jerry

4   Bruckheimer or Don Simpson in which you discussed the

5   status of the Frank Dux project?

6          A        No.

7          Q        Do you know whether Jerry Bruckheimer

8   was still interested in the Frank Dux project at the

9   time that you left?

10         A        I don't know.

11         Q        After you left Simpson-Bruckheimer, do

12  you know if Jerry Bruckheimer had any interest in

13  continuing on with the development of the motion

14  picture based on incidents from Frank Dux's life?

15         A        I have no way of knowing.

16         Q        Did anybody ever tell you that there

17  was a Los Angeles Times article about Frank Dux which

18  appeared around the time the motion picture BLOODSPORT

19  was released?

20         A        Yes.

21         Q        Who did you discuss that with?

22         A        I think Frank told me about it.

23         Q        What did he tell you about it?

24         A        That he was unhappy with it.

25         Q        Did he tell you what the article said

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the City and County of Los Angeles.  I am over the age of eighteen years and am not a party to this action.  My business address is 9601 Wilshire Boulevard, Fourth Floor, Beverly Hills, California 90210-5288.

On October 26, 1998, I served the foregoing document described as:  **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF ALAN MEHREZ, MARK DISALLE AND JOSEPH M. GABRIEL IN SUPPORT THEREOF** by:

__X__      placing _____ the original __X__ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

Steven M. Kramer
Steven M. Kramer & Associates
468 No. Camden Drive, 2nd floor
Beverly Hills  CA  90210

__X__      BY MESSENGER SERVICE:  I personally delivered by hand to the office of the addressee(s).

_____      BY MAIL:

_____   I deposited such envelope(s) in the mail at Beverly Hills, California.  The envelope(s) was(were) mailed with postage thereon fully paid.

_____   I caused such envelope(s) to be deposited in the mail at Beverly Hills, California and be mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  The within correspondence is deposited with the U.S. Postal Service on the same day shown above, in the ordinary course of business.  I am the person who sealed and placed for collection and mailing the within correspondence on this date.

Executed on October 26, 1998, at Beverly Hills, California.

__X__      (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_Betty Chevillat_
Betty Chevillat

LAW OFFICES
**ROSENFELD,
MEYER &
SUSMAN**