STEVEN KRAMER & ASSOCIATES
468 N. CAMDEN DR.
SECOND FLOOR
BEVERLY HILLS, CA 90210
(310) 859-5222
(California Bar Member No. 159719)

ATTORNEYS FOR PLAINTIFF, Frank Dux

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FRANK DUX, | ) | **Case No.** CV97-8409 JSL |
| | ) | (VAPX) |
| Plaintiff, | ) | |
| ALAN MEHREZ | ) | **DECLARATION OF FRANK DUX** |
| | ) | **IN OPPOSITION TO MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |

HEARING DATE: 11/16/98
TIME: 10AM
CTRM: Hon.J.Spencer Letts

Frank Dux declares under penalty of perjury this 10th day of November,

1998 that:

    1. I have organized this declaration in a manner that corresponds to the

points raised by the defendants. The first section addresses their argument

on the Consulting Obligation in the June 15,1985 agreement [PX 7]. The

second section addresses their argument on the issue of consideration. The

third section addresses the Disney offer and proof of damage.

## SECTION ONE:THE CONSULTING OBLIGATION

2.   The Bloodsport II, III and IV fall under the consulting obligation, paragraph 15 of the June 15,1985 agreement [PX 7] for a number of reasons. First, they were marketed as 'sequels'[ PX 1C p.2, para. 7]. Defendants' business attorney, Alan Abrams, so testified in my presence [PX 4]. Second, Bloodsport II is in fact a sequel. It has a similar story line. It involves a Kumite Championship and a protagonist who is mentored by an Asian martial arts instructor. The protagonist (played by Daniel Bernhardt) bears a striking resemblance to the protagonist (Jean Claude Van Damme) in the original Bloodsport, who in turn looked almost exactly like I looked in 1975, the year that I won the  Kumite Championship. In both, the prize was a Japanese Katana sword. Both included a character called 'Ray', who was played in both movies by the same actor, Don Gibb. In addition, both producers of Bloodsport II, Mike Corcione and Satish Patel, told me that Bloodsport II was a sequel to the original film.

3.   In addition, FMNV relied on information provided by me. Corcione asked me about information concerning the Kumite. That information was the basis for Bloodsport II.

4.   FMNV argues that the reason it acquired the Bloodsport rights was 'because of the value it saw in marketing films which contained Bloodsport in the title—FMNV had no interest in producing motion pictures which involved plaintiff's life story.' Def. Mem. At 4. But the only reason why the title

'Bloodsport' had value was because of the goodwill generated from the original 'Bloodsport'.  Why else use look-alike protagonists?

4A. At no time did FMNV ever afford me the opportunity to exercise my right [see PX3] to require that FMNV use my name for the protagonist in Bloodsport II-IV.

4B. FMNV never retained or paid me as a consultant under para.15,PX7.

## SECTION TWO: CONSIDERATION

5.  In 1993, DiSalle told me that he had been unsuccessful in generating interest to do a Bloodsport film without Van Damme. He was fearful that Van Damme and myself would do a sequel so he said that if I promised not to do a fictionalized Bloodsport/Kumite type film with Van Damme or anyone else, he would grant back all of my rights, except for a remake because MGM owned that right, and that I would not look to be compensated for a Bloodsport II. He told me that he wanted this so that he could do a sequel on a low budget basis or sell of the rights to make money. I agreed that I would not look to be compensated for the right to do a Bloodsport sequel except as a consultant under paragraph 15 of the 6/15/85 agreement between myself and him.

**SECTION THREE: THE DISNEY OFFER**

6. The Disney Company offer did not require as a prerequisite that Bruckheimer sign an agreement. See PX 2.

7. Had FMNV signed the grant back agreement on a timely basis, rather than stalling for more than two years, Disney and Bruckheimer would have made a deal with me, whereby I would have received at least $125,000 for an option against $500,000 for the purchase of my rights.

EXECUTED THIS 10TH DAY OF NOVEMBER 1998 AT LOS ANGELES, CA.

FRANK DUX.



LAW OFFICE of
# ALAN ABRAMS

August 13, 1996

Via Facsimile:  (818) 752-9006

Michael B. Frankel
12501 Chandler Blvd.
Suite 104
No. Hollywood, CA  91607

Re:  "Bloodsport"-- Frank Dux Life Story Rights

Dear Michael:

I have the comments made by Disney to my notes to the Redline
Draft No. 5 of the above agreement between FM Entertainment
International II NV and Frank Dux, which I received last Thursday.

As you know, we learned last week that your "hypothetical" major
was, in fact, not hypothetical and was, in fact, the Walt Disney
Company or an affiliate, which had been directing these
negotiations for some time.

Without prejudice to my client's position regarding this, I am
indicating in this letter what my recommendations will be when I
discuss this matter with my client on Thursday.  My client's
representative has been out of town for several weeks, and I have
arranged a meeting on Thursday to discuss these matters and
events.  I understand that Disney and Mr. Dux have attempted to
impose deadlines for responses from us under threat of litigation.
I trust that Mr. Dux and Disney can wait a few more days for the
final definitive response, notwithstanding their "deadlines".

2B.  I have no problem from a legal standpoint as to Disney's
proposed addition to paragraph 2B.  From a business standpoint, I
do not see Disney's reasons for objecting to a "miniseries" remake
involving so much of Frank Dux' life story as appears in the
original film, and no more, but I will discuss this point with my
client, along with the other business points raised by this
paragraph.

270 N. Cañon Drive, 3rd Floor
Beverly Hills, California 90210

Michael B. Frankel
August 13, 1996
Page 2

Finally, with respect to the language deleted from my suggested insert to paragraph 2B, I would like to know what Disney's position is on this matter and why Disney believes my client's rights should be so limited.

2C.  My client has <u>unlimited</u> rights with regard to use of the title "Bloodsport" and to portrayal of the "Kumite" and that Frank Dux' rights therein are limited, as I noted in my mark-up. Disney's apparent attempt to limit my client's rights to exploit productions and products using the title "Bloodsport" to exploitation emanating from a sequel motion picture, is contrary to the existing agreement.

Our understanding was that my client's rights would be unlimited so long as Frank Dux name and life story were not used and there was no infringement of Mr. Dux' published works.

Disney is attempting to force an alteration of our agreement on "sequels" and this is unacceptable.

The June 15, 1985 Agreement is quite clear that Dux has no ownership in the resulting motion pictures, and all elements thereof, including titles and you have confirmed to me that our agreement in principle confirms my client's unlimited and exclusive right to use of the title "Bloodsport" so long as Dux' character, life story and published works are not involved.

We must insist that the language reflect the original understanding and the original language that I suggested must remain in place.

Please note, as we discussed, the term "Sequel" may be a misnomer in a technical sense.  Although Bloodsport II and III were sold as "sequels," the leading character was not the Dux character from the original "Bloodsport."

4.    Disney has chosen to hide behind Frank Dux and conceal its involvement and direction of negotiations, but at the same time Disney has demanded that my client indemnify Disney for claims which may be frivolous and do not amount to a breach of my client's warranties and representations.  Disney is demanding indemnity so long as the underlying complaint alleges facts which, if proven, would constitute such a breach and the claim is not covered by insurance.  Anyone can allege anything, but proving it is another matter.

Disney has demanded that my client "accept" indemnification of
Disney for claims not constituting a breach of warranty, on the
grounds that it is "Disney Policy" and has apparently pressured
you and Dux to threaten my client with litigation if we don't
agree.

As I pointed out to you, my client is not in direct privity with
Disney.  In fact, Disney asked that their involvement be concealed
to avoid having a direct negotiation which may result in Disney
being requested to pay compensation for the rights demanded of my
client.

As my client will receive no consideration whatsoever for this
accommodation to Mr. Dux, it is inappropriate that Disney insist
that my client indemnify Disney for claims which are not, in fact,
a breach of my client's representations and warranties.

Disney has had the chain of title which we provided for some time.
They can make their own determination and evaluate the risk of
going forward.  There is no reason why my client should be coerced
in this manner.

As I indicated to you, Mr. Dux, as Disney's direct grantor, will
be receiving compensation for the rights he granting to Disney and
he may make any indemnification of Disney he wishes, including an
indemnity for claims which only allege a breach of his
representations or warranties.  Disney's policy should be
applicable to parties who choose to do business with Disney, and
should not be imposed, unilaterally, by Disney on third parties
without direct dealings.  However, as I understand it, Disney has
taken the position that our failure to cede to their demands on
this point is a "deal breaker".

I have a solution which will break the impasse and avoid
confrontation, as a result of Disney's attempted modification of
our "agreement in principle".

You have represented that Disney is interested in acquiring rights
in literary materials created by Dux and/or life story rights, not
pertaining to the rights incorporated in the original "Bloodsport"
motion picture.

All Disney really needs is a simple waiver of the first
negotiation first refusal right under paragraph 9 of the June 15,
1985 Agreement permitting Disney to negotiate and acquire rights
in Dux' published material and remaining life story.

If all my client is required to do is waive the first negotiation
right and first refusal right, then there should be no need for a
grant and corresponding warranties, representations or
indemnities.  If this is the case, Disney need not worry about

DATE:    As of January 3, 1996
SUBJECT: "SPY PROJECT"
         FRANK DUX/RIGHTS

MEMORANDUM OF AGREEMENT

The following are the terms of the agreement (the "Agreement") dated as of January 3, 1996, between HOLLYWOOD PICTURES COMPANY ("HPC") and Frank Dux ("Owner") for the acquisition of (i) exclusive motion picture, television and all allied rights of every kind and nature throughout the universe (all as more fully set forth in Paragraph 6 below) in and to the unpublished book written by Owner entitled "THE SECRET MAN" (the "Book") in connection with a possible motion picture based thereon currently known as "SPY PROJECT" (the "Picture"), and (ii) all right title and interest in and to Owner's life story (the "Life Story") (all as more fully set forth in Paragraph 6 below).  The Life Story and the Book and all versions and adaptations of the Book previously or hereafter written are collectively referred to herein as the "Property".

1.    CONDITIONS PRECEDENT:  HPC shall have no obligation hereunder unless and until:

    a.    HPC receives a fully signed agreement (in form and substance acceptable to HPC) for the producing services of Jerry Bruckheimer in connection with the Picture;

    b.    HPC's receipt of a fully signed publisher's release (in form and substance acceptable to HPC) of all rights other than publication rights for the Book; and

    c.    HPC's receipt of a fully signed agreement between Hollywood Pictures Company ("HPC") and Frank Ninjitsu-Ninja Studios ("Lender") for the consulting services of Frank Dux ("Consultant") on an independent contractor basis in connection with the Picture.

    d. HPC approves the chain of title with respect to the Picture, approves all agreements with respect thereto and receives all assignments and releases which HPC requires in connection therewith.

2.    OPTION/RIGHTS GRANTED:  Owner hereby grants to HPC the exclusive and irrevocable option ("the Option") to acquire all rights including without limitation the motion picture, television and allied rights and rights of every kind and nature now known and unknown in perpetuity throughout the universe in and to the Property (collectively, the "Rights"), as more fully defined in Paragraph 6 below.

3.    EXERCISE OF OPTION:  The Option may be exercised by written notice thereof given at any time commencing as of the date of this Agreement and ending two (2) years after the later to occur

SPY02AA

-1-

of: (i) the execution and delivery to HPC of this Agreement and (ii) satisfaction of the Conditions Precedent set forth in Paragraph 1 above (the "Initial Option Period"); provided, however, that the Initial Option Period may be extended for an additional period (the "First Extended Option Period") of one (1) year by written notice to Owner during the Initial Option Period and by payment as provided in Paragraph 4.b below; provided, further, that the Option shall be deemed exercised upon the commencement of principal photography of the Picture; and provided, further, that the Initial Option Period, and/or the First Extended Option Period may be further extended for any period during which a claim based upon, or for breach by the Owner of, any representation or warranty hereunder with respect to the Property has been asserted and remains unresolved, and for any period during which HPC's development and/or production activities based upon the Property are interrupted or postponed due to any occurrence of an event of force majeure, including, without limitation, any labor dispute (or threat thereof). The Initial Option Period as extended by the First Extended Option Period is hereinafter referred to as the "Total Option Period".

4.   OPTION CONSIDERATION:

     a.   Initial Option Period.   In consideration of Owner's grant to HPC of the Option, HPC shall pay Owner the sum of $125,000 upon the later to occur of the satisfaction of the conditions precedent set forth in Paragraph 1 above or the execution of this Agreement, which $125,000 sum shall be fully applicable against the Purchase Price set forth in Paragraph 5 below.

     b.   Extended Option Period.   If HPC extends the Option Period as set forth in Paragraph 3 above for the Extended Option Period, then HPC shall pay Owner the additional sum of $50,000 upon the commencement of the Extended Option Period, which sum shall not be applicable against the Purchase Price set forth in Paragraph 5 below.

5.   PURCHASE PRICE:   If HPC exercises the Option, HPC will own all of the Rights, and as payment in full for Owner's grant of the Rights to HPC and for all of the promises, representations, warranties and agreements made by Owner hereunder, HPC will pay Owner as follows:

     a.   Cash Consideration.   The sum ("Purchase Price") of $500,000, less any applicable sums set forth in Paragraph 4.a. above and 5.b. below, payable upon the earlier to occur of the exercise of the Option or the commencement of principal photography of the Picture; and

     b.   If the Picture is produced as a theatrical motion picture, a bonus in the amount of:  (A) $10,000 for each week that the Book appears, if ever, on the New York Times Sunday Review of Books hard-cover fiction best seller list (the "Best Seller List") in position one (1) during the Book's initial release; (B) $5,000 for each week that the

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| FRANK DUX | ) | Case No.   CV 97-8409 JSL (VAPx) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | DECLARATION OF |
|  | ) | MICHAEL B. FRANKEL |
| ALAN MEHREZ, FM ENTERTAINMENT | ) | In Opposition to Motion for |
| CO., DIANE MEHREZ | ) | Summary Judgement |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |
|  | ) |  |

I , Michael B. Frankel Declare:

1.      I am an attorney licenced to practice law in the state of California and was Frank Dux's

Attorney in the negotiation of the June 15, 1985 Letter Agreement between Mark DiSalle and

Frank Dux ( Plaintiff's Exhibits 7 hereinafter PX 7) , and Exhibits "A" and "C" of the March 25,

1986 Cannon Acquisition Agreement ( PX8) between Mark DiSalle, Frank Dux and Cannon

Pictures and the July 10, 1986 Letter Agreement (PX9) between Mark DiSalle and Frank Dux

(the "Bloodsport Agreements" )

2    In Defendants' Statement of Uncontroverted Facts page 3 paragraph 5, Defendants state that

DiSalle retained the Consulting Obligation when he transferred the film rights to Cannon Films.

However, in Exhibit "A" of the Cannon Acquisition Agreement paragraph 2B ( PX8), Cannon
as well as DiSalle specifically agree to all the protection of Paragraph 15, of the June 15, 1985
Letter Agreement between Mark DiSalle and Frank Dux.

3.    Further, (PX8) counters paragraph six of page 3 of Defendants' Statement of Facts
wherein they say:

> "The "Remakes, Sequels" provision in the Cannon Agreement
> demonstrates that DiSalle retained the Consulting Obligation and that
> Plaintiff was entitled to compensation only if DiSalle himself produced
> the sequel..."

But Cannon had also granted Dux the protection of the choice of who would be the lead
character in the sequel or remake. The second full paragraph of (PX8) "C" page 2 states that
"...Also the portrayal of the lead character in "Bloodsport" shall be portrayed under my name if I
so choose prior to the start of production, I shall notify Mr .DiSalle of the decision". This
obligation as with the Consulting Obligation was both Cannon's and DiSalle's. The July 10,
1986 Letter Agreement (PX 9) between Mark DiSalle and Frank Dux on page two states "Mr.
Dux shall receive no less protection on the sequel or remake than given him in the original June
15, 1985 Agreement and the other agreement and Exhibits referred to herein."This included
paragraph 15 (the Consulting Obligation) of the June 15, 1985 agreement as to any sequels made
by DiSalle or his successors in interest, (i.e. FM) and paragraph 2B of Exhibit "A" of the Cannon
Acquisition Agreement and the second paragraph which allowed Dux to determine the lead
character in the "Bloodsport" sequel.

2

4.     Defendants on page 3 paragraphs 7 and 8 claim that "Bloodsport II, III and IV ' are not based on any true incidents, events, experiences or involvements of Mr. Dux and are therefore not sequels.   One of the main elements of a sequel or prequel is the title of the preceding film that has already been a success and gained market share and good will in the public's mind. Further, the forum or event in a plot such as a race or an athletic competition is as valuable as a lead character in some types of films ( e.g. in the Police Academy type films the forum is the star).  The fight that Mr. Dux was in , his experiences of other fighting arts and fighters and the event itself were based on Mr. Dux's involvements and experiences remade with a new character name and new label for the setting but the same forum, "the KUMITE".   "Bloodsport II" used the Kumite (the forum from 'Bloodsport'), the title and all the good will of a very popular film based on Dux's life experiences and co-starred Donald Gibb, Dux's side kick (Ray) from the original "Bloodsport" as a main character in "Bloodsport II". By using the title "Bloodsport II" as a title the film "Bloodsport II" was positioned as a sequel to the public and marketed as such by FM.  FM represented to the public it was a sequel by the title.(PX1 at page 2, paragraph 7)(see video tapes covers  previously lodged with the court)

5.     FM received its rights to the title "Bloodsport" , "The Kumite" (the event or forum)  made a subsequent film entitled "Bloodsport II", marketed it as a sequel to the public on rights obtained from DiSalle and are successors in interest to Cannon and DiSalle's sequel rights and their promises in the agreements. (PX7,PX8,PX9)

3

6.    In negotiating with FM over a two and one half year period from on or about April 1994 to September of 1996, when Disney with drew its offer to purchase Dux's life rights because he could not deliver clear title, through the rest of 1996 and into January 1997 FM received concessions on the obligations already owed Dux if a remake was made (PX14).   They did not want to just reconvey Mr. Dux's rights. They wanted consideration in return and still did not sign the agreement as of January 1997 as shown in the fact that there were seven red line agreements between myself and FM. Between January 1995 and November 1996.

7.    On page 5 at paragraph 3 of Defendant's Statement of Uncontroverted Facts, Defendants state that DiSalle had no intention of making "Bloodsport" films after 1988 involving the Frank Dux Character.  However in 1989 during negotiations with Jean Claud Van Damme for a multi picture deal, I was told by Steve Katlowitz that ICM was representing Mr. DiSalle in trying to put together a sequel starring Mr. Van Damme with MGM which had taken over from Cannon Films the "Bloodsport" rights.  This was confirmed by Mr. DiSalle's attorney Jack Dwosh.(see PX13) {This is contra to Mr. DiSalle's Decl, Request for Judicial Notice,  and Exhibit 1, thereto}.  Steve Katlowitz and Mr. Dwosh advised me that Mr. DiSalle would have been happy to make the sequel using the Dux character if he and Mr. Van Damme and Mr. Dux could come to an agreement.(PX13).

9.  The terms  Disney wanted with regard to "injunctive relief" protection and warranty against "breach or alleged breach" was standard language and was included in the first draft of the agreement that I sent to FM in 1994 (PX10).  Contra to Defendant's assertions at paragraph 13

4

page 7 of their Statement of Uncontroverted Facts  Mr. Bruckeimer's  representatives and

Disney kept calling and checking on progress of the reconveyance from FM after my notes on

the Disney January 3, 1996 agreement (DX7) were sent to Disney for review.  In fact Disney's

Tamara Woolfort told me that she had reviewed my notes and sent them to her supervisors with

recommendations to grant some of my requests. Contra to paragraph 14 page 7 of Defendants

Statement of Uncontroverted Facts  Disney did respond to my notes by requesting that I clear

title with FM as soon as possible so they could move on with the project..


9.    The only reason that Disney gave me for terminating the offer for Dux's life rights was that

we were unable to complete the reconveyance and clear title to Dux's life rights from FM

(PX11).


10.    I recall at no time in over the three year period that Mr. Abrams ( FM's Attorney) or Mr.

Sloan (Mr. DiSalle's Attorney)  and I negotiated did the subject of the veracity of Mr. Dux's life

come up, contrary to Defendant's assertions at page 5 paragraph 4 of their Statement of

Uncontroverted Facts.


12.    Lucas Foster, in his first conversation with me, said that he did not care about true life

issues but wanted to deal with stories that involved Dux's life and to work with Frank as did Don

Simpson and Jerry Bruckheimer.  In my notes to Disney on their January 3, 1996 Agreement

(DX7) I expressed in the opening of my letter that my client wanted to work with Bruckheimer

and that we needed to make it work.   There was never a deal breaker comment in my request for

better terms, in fact quite the contrary (PX12).   Both Disney and Bruckheimer stated that the

only reason for not going any further on the negotiations was that FM had not reconveyed after

almost three years (PX11).

13.     The language Disney requested, including the use of "alleged breach", was a standard

term in the industry including other majors studios.  For example, Cannon required the same

language in the 1986 Acquisition Agreement, page 3 paragraph 6g (PX6).


I declare under penalty of perjury under the laws of the United States of America and the State

of California that the foregoing is true and correct.

Executed November 10th, 1998 at Los Angeles California.

Michael B. Frankel

ALAN ABRAMS, 9/23/98

1    "Bloodsport II," which is I guess the movie we're

2    talking about, was not really technically a sequel

3    within the commonly understood parlance of what a sequel

4    is.

5          Q     But you viewed it as a sequel.  You used

6    that term.

7          A     I used that term loosely.  But it's not a

8    sequel.

9          Q     Mr. Abrams, true or false:  You've written

10   at least one letter that specifically referred to

11   "Bloodsport II" as, quote, a sequel, unquote.  True?

12         A     Probably.  I probably did it, but --

13         Q     True or false?

14         A     True.

15         Q     There you go.  That's not difficult.

16               Okay.  And were you lying when you said that?

17         A     No.  I --

18         Q     Yes or no?

19         A     I was being sloppy.

20         Q     Were you lying?

21         A     No.

22         Q     And when you write letters to people, as

23   the experienced, skilled professional that you are,

24   specializing in entertainment, you try to write letters

25   carefully, don't you, by and large?

                                                        82

1        A        I don't remember.  I remember a

2   conversation about it and that's all.  Maybe there is.

3   Maybe there isn't.  I don't know.

4        Q        Do you remember one conversation or a

5   series of conversations?

6        A        There were multiple conversations in

7   every direction as we were trying to figure out can we

8   do this or couldn't we?  We really wanted to.

9        Q        Do you remember if this was an ongoing

10  issue that was discussed over a period of several

11  months or a couple of weeks?

12       A        I can't remember the timetable but it

13  was an ongoing issue for sure.

14       Q        With regard to the actual time when

15  this conversation that you recall took place, I note

16  that on Exhibit 2 the date is December of 1993.

17       A        Right.

18       Q        Does that jog your recollection these

19  conversations took place around this time?  Does that

20  help you at all in determining it?

21       A        You know, I've been involved in so many

22  negotiations that to pin them to a given date is not

23  information that's necessary to my functioning as an

24  executive or a producer.

25                I remember broadly what the issues were

1          A          No.

2          Q          -- after you received this letter?

3          A          No.

4          Q          Do you recall whether you found these

5    terms in the ballpark, outrageous, or any reaction like

6    that?

7          A          I remember they were like on the high

8    side of the ballpark, slightly.

9          Q          If you communicated anything you may

10   have communicated that, that you thought that what they

11   were asking for was too much here?

12         A          Relative to the option period.

13   (Nodding head.)

14         Q          You mean the $75,000 option?

15         A          Yes.  $75,000 for 18 months typically

16   would be more than I want to pay for that amount of

17   time.

18         Q          How about purchase price of 500,000?

19         A          That's perfectly reasonable.

20         Q          It makes reference to the book entitled

21   "Echo of Justice."

22         A          The "Secret Man" title is actually a

23   title that came later from another project of mine, and

24   I kind of borrowed it, and the project was going

25   nowhere so I suggested that we use it.

## ACQUISITION AGREEMENT

This Agreement dated as of March 25, 1986 shall constitute the basic terms and conditions of the agreement between MARK DISALLE ("Owner") and CANNON FILMS, INC. ("Purchaser") relating to the life story of Frank Dux ("Dux").

1. <u>The Property</u>:  Reference is made herein to (a) that certain executed letter agreement dated As of June 15, 1985 (the "Dux Agreement") between Owner and Dux regarding certain rights to Dux's life story (that portion of Dux's life story generally consisting of Dux's training as a Ninja beginning as a child and cluminating with Dux's victory of the 1975 Kumite Championship and Dux's military experiences)(the "Life Story"), and (b) that certain executed letter agreement dated June 15, 1985 (the "Lettich Agreement") between Owner and Sheldon Lettich ("Lettich") wherein Owner employed Lettich to write a screenplay (the "Screenplay") based upon the Life Story.  The Dux Agreement and the Lettich Agreement are the "Underlying Rights Agreements".  The Life Story and the Screenplay are the "Property".

2. <u>Grant of Rights</u>.  Owner hereby irrevocably sells, grants and assigns to Purchaser, absolutely and outright, in perpetuity and throughout the universe, a license to produce one motion picture based upon the Property or any part thereof (the "Picture") and customary ancillary, subsidiary and incidental rights related thereto.  With respect to the Picture, and without limiting the generality of the foregoing, the rights herein granted include:

(a)  all silent and sound (including all musical) motion picture rights, televised motion picture rights, television rights (whether free, pay, cable, subscription, pay-per-view, live or otherwise), and audio-visual rights (including, without limitation, videocassette and videodisc rights in all formats), in all languages in any and all media and by any means whatsoever (whether now known or hereafter developed), for the entire universe, and all ancillary and subsidiary rights therein (including, without limitation, merchandising, commercial tie-up, by-product and music publishing and recording rights);

(b)  the right to freely change, adapt, translate and add to or subtract from the Property, and to engage writers to render writing services in connection with the Property;

(c)  the right to distribute, exhibit, advertise, publicize, exploit and otherwise turn to account the Picture by any and all manner and media (whether now known or later devised).

3.   Reserved Rights.  Notwithstanding the foregoing, Owner hereby reserves only (a) certain remake, sequel and television program rights in the Life Story (subject to the terms of Paragraph 22 below), and (b) the right to publish the Life Story in printed form; provided, however, that Purchaser may publish or reproduce up to 5000 words from the Life Story for the purpose of advertising, publicizing and promoting the Picture.

4.   Assumption of Obligations:  It is expressly acknowledged and agreed by Owner and Purchaser that although the rights granted herein to Purchaser are controlled by Owner by virtue of the Underlying Property Agreements, Purchaser is not assuming any obligations pursuant to the Underlying Property Agreements, except only (a) the obligation to accord writing credit to Lettich if so determined by the WGA, and (b) the merchandising payment obligations pursuant to Paragraphs 12, 13 and 14 of the Dux Agreement.

5.   Consideration.

(a)   In consideration for all the rights granted to Purchaser by Owner hereunder and all of Owner's representations and warranties and agreements made herein, and subject to Paragraph 23 hereinbelow, Purchaser shall pay to Owner the sum of $75,000.00, payable upon execution hereof by the parties and execution and delivery of releases in the form of Exhibits "A", "B" and "C" attached hereto.

(b)   Additionally, with respect to merchandising for the Picture (other than on the cover of publications, home video device jackets and/or soundtrack albums and the like, which shall not be considered merchandising for purposes of this Paragraph and for which there will be no royalty), then Purchaser shall be entitled to a royalty of 5% of Purchaser's "net receipts" actually received (gross receipts less all costs of manufacture and distribution, a 25% distribution fee/ sales commission and all third party agent fees, if any) directly derived from such merchandising, prorated among all parties entitled to a royalty in connection with such merchandising but in no event less than 2-1/2% of such net receipts.  Merchandising royalties payable hereunder shall be accounted for and paid in accordance with generally accepted motion picture industry practice.

6.   Warranties and Indemnities.  Owner hereby represents, warrants and agrees that:

(a)   Lettich is the sole author of the Screenplay and Owner is the sole and exclusive owner of all rights in the Screenplay and such rights in and to the Life Story as are required to convey to Purchaser the rights herein granted to Purchaser.

(b)   Owner has the full and sole right and authority to enter into this Agreement and to convey the all the rights herein conveyed to Purchaser as herein set forth.

(c)   The Screenplay is wholly original with Lettich in all respects (except with respect to public domain material relating to the Life Story).

(d)   Owner has exercised his option respecting the Life Story pursuant to the Dux Agreement.

(e)   No part of the rights herein conveyed to Purchaser has in any way been encumbered, conveyed, granted or otherwise disposed of and the same are free of any liens or claims whatsoever and to the best of Owner's knowledge there are no claims or litigation pending, outstanding or threatened which might in any way prejudice, interrupt or interfere with Purchaser's use of said rights.

(f)   The exercise or use by Purchaser of any of said rights will not in any way infringe upon or violate the copyright, common law right or literary, dramatic or motion picture rights or constitute a libel, defamation or invasion of the rights of privacy or publicity of any person, firm or corporation whomsoever.

(g)   Owner has not consented to allow Dux to authorize the production of a film based upon portions of Dux's life story which are not exclusive to Owner as set forth in Paragraph 2 of the Dux Agreement, and Owner agrees that he will not in the future so consent during the period of time in which his consent is required pursuant to said Paragraph 2.

Additionally, Owner hereby assignes to Purchaser the benefit of any representations, warranties and indemnities of Dux and Lettich made pursuant to the Underlying Property Agreements.

The foregoing warranties and representations are made by Owner to induce Purchaser to execute this Agreement and Owner acknowledges that Purchaser has executed this Agreement in reliance thereon.  Owner hereby agrees to indemnify, defend and hold Purchaser and his successors, licensees and assigns, harmless from and against any claim, demand, loss, obligation, liability, cost or expense (including reasonable attorney's fees, whether or not litigation is actually commenced) arising out of a breach or alleged breach by Owner of any warranties, representations or agreements contained in this Agreement.  In the event that Owner's aforesaid indemnity shall be required by Purchaser, Purchaser may offset and/or deduct the amount covered by Owner's indemnity from monies due to Owner pursuant to this agreement or any other agreement of the parties.

**Mark DiSalle**
**10100 Santa Monica Boulevard**
**Suite 2600**
**Los Angeles, California**
**90067**

As of June 15, 1985

Mr. Frank Dux
12504 Magnolia Boulevard
North Hollywood, California   91364

      Re:   Life Story of Frank Dux
              Dramatization Option Agreement

Dear Mr. Dux:

The following when signed by you shall constitute our agreement regarding your true-life story as the basis of a feature length theatrical motion pictures tentatively entitled "BLOODSPORT".

## OPTION

1.     For good and valuable consideration, receipt of which you hereby acknowledge, you nereby grant to me, or my designee, an irrevocable, exclusive option to acquire the right to produce, distribute and commercially exploit one feature length motion picture (or television film, as provided hereunder, collectively, the "Film") based upon those certain true incidents, events, experiences and involvements of yours which we have previously identified as a portion of the story of your life generally consisting of your training as a Ninja beginning as a child and culminating with your victory at the 1975 Kumite Championship and your military experiences (collectively the "Story").

2.     Notwithstanding the foregoing, you may freely continue to write or have written, stories, screenplays or similar adaptations based upon other of your life experiences which may include your Ninja training as a child and/or your military experiences but **may not** include your victory at the 1975 Kumite Championship **PROVIDED** that during the Option Period (as it may be extended), the production of the Film and nine months following release of the Film you shall not grant to others any right in or to such other stories or experiences without my prior written permission in each instance.

Mr. Frank Dux
Life Story Option and Agreement
Page 2.

3.     I shall have the right to acquire the Story and all rights incident thereto, upon the terms and conditions set forth hereinafter for a period of two (2) years following the date hereof ("Option Period").   I shall be entitled to extend the Option Period for an additional period of one year by the additional payment to you of $1000.00, and/or, if prior to the expiration of the Option Period I shall have commenced negotiations in respect of the Film which are incomplete upon expiration of the Option Period, the Option Period shall be automatically extended, without additional payment, for a period reasonably necessary for the completion of such negotiations.

4.     I may exercise my option and acquire the rights to the Story as provided hereunder by giving written notice thereof to you within the Option Period, as the same may be extended, and paying to you the sum of $15,000.00.

### TERMS OF AGREEMENT

Upon exercise of the option, our agreement shall be as follows:

### Grant of Rights

5.     Upon exercise of the option you shall grant to me, and I shall acquire all right, title and interest in and to the Story as provided herein and I shall have the right to add to, subtract from, and otherwise to dramatize and portray all aspects of the Story in a manner suitable for entertainment purposes but not in any way which would not be flattering to you or which would degrade you or cause you to be ridiculed.

6.     I shall have the right to engage writer(s) who shall be entitled to create original literary works based upon the Story for purposes of producing the Film hereunder which I shall be entitled to own and exploit in perpetuity throughout the world by all and every means now known or hereafter devised.

7.     I shall be entitled to produce, distribute and commercially exploit by any and all means now known or hereafter devised one (1) feature length theatrical motion picture, or, in my sole and exclusive discretion, one motion picture made for television, based upon the Story and/or any literary property based upon the Story, except literary properties created by or for you for purposes of publishing, the rights to which are reserved to you.

Mr. Frank Dux
Life Story Option and Agreement
Page 3.

8.    I shall not be entitled to novelize any literary property, including teleplays or screenplays, created for the production of the Film without your prior written consent in each instance.

## Remakes, Sequels and Series

9.    Provided that I shall actually produce and release the Film, then I shall thereafter have the right, in perpetuity, in my sole and exclusive discretion, to remake the Film or to produce one (1) sequel to the Film.  In addition, you hereby grant to me the irrevocable, perpetual right of first negotiation and first refusal for the rights to: produce television programs based upon the Film or the Story; produce a second or subsequent sequel or remake of the Film; and/or, produce any other film or program based upon your true-life experience other than the Story.

## Literary Rights Reserved

10.    I shall not be entitled, and you shall retain all rights to novelize the Story and publish the same in book form **provided** that you shall not grant to others or make any use of the publishing rights reserved to you hereunder which diminish or abridge the rights granted to me hereunder.

## Materials

11.    You agree to provide me you with the details of your personal experiences and in connection therewith to give me reasonable access to all recorded materials (written works, memos, letters, books, articles, reviews and audio or audio-visual recordings) relating, describing or portraying any aspect of the Story.

## Merchandising

12.    You grant to me all merchandising rights in or in connection with the Film and in connection therewith I shall have the right to use your name, likeness, voice and biographical information.

13.    As full and complete compensation for the merchandising rights granted hereunder, I agree to pay to you, and you agree to accept, in addition to any other payment hereunder, a sum equal to five percent (5%) of my gross receipts from direct merchandising and/or a sum equal to twenty-five percent (25%) of my gross receipts

Mr. Frank Dux
Life Story Option and Agreement
Page 4.

from merchandising licensed by me and conducted by others hereunder. Merchandising proceeds shall not be considered as gross receipts derived from the Film.

14.    I acknowledge that you have previously granted merchandising or similar to rights to third parties pursuant to presently valid written agreements.   Therefore, I agree that, even if depicted in the Film, I shall not have the right to exploit merchandizing rights in connection with your studio logo, your personal logo, the "Ninja knife" designed by you or the book written by you on the history of the Ninja. Merchandizing hereunder must be associated with the Film and shall not include any direct endorsement by you.

### Consultants Services

15.    During production of the Film, or any subsequent Film under this agreement or based upon your true-life experiences, you shall be engaged as a consultant for the duration of principal photography and you shall be paid therefor a consultants fee to be negotiated in good faith.

### Courtesy Screenplay Consultation

16.    I shall not be required to obtain your approval of any screenplay or teleplay in connection with the Film but I agree to consult with you and consider your suggestions in connection with the preparation of any screenplay or teleplay.

### Releases and Authorizations

17.    You will use your best efforts to obtain and deliver to me all releases or authorizations reasonably necessary to use the actual names and portray on the screen real people and actual locations in the Story.  You have advised me, and I acknowledge that in some instances national security or similar governmental interests may prevent you from obtaining some releases or authorizations.

### Profit Participation

18.    If I actually produce the Film and complete production thereof, then, in addition to other payments hereunder, I shall pay you a sum equal to two and one-half percent (2 1/2%) of the producer's net profits, as that term is defined herein.

Mr. Frank Dux
Life Story Option and Agreement
Page 5.

19.   As used herein, the term producer's net profits shall mean all sums or items of value received from all sources and means of exploitation of the Film or other rights granted herein, **but not** revenues from merchandising, less all costs and expenses thereof, including, without limitation, third-party fixed dollar deferments and actual expenses of any type paid or incurred in the production or distribution of the Film. The profit participation payable to you hereunder shall be computed, accounted for and paid in the same manner as for all other profit participants in producer's net profits.

20.   You shall have the right to inspect my books and records relating to the Film, upon reasonable notice and during normal business hours at your offices in Los Angeles, California, but in no event more often than once every six months.

## Ownership; Reversion

21.   I shall own, solely and exclusively, all of the rights in and to all literary material created hereunder, and all of the elements of the Film, including the copyright in and to the same and all renewals and extensions thereof, throughout the world.

22.   Notwithstanding my continuing right to own all literary materials created hereunder and based upon the Story, if I have not commenced principal photography of the Film within six (6) years following the date hereof, or if I have not actually completed and released the Film within seven (7) years following the date hereof, upon your written request I shall reconvey to you all rights granted hereunder.

## Use of Name

23.   I and each entity commercializing or exploiting the Film, and the entity's advertising agency, and each network station over which the same may be broadcast, shall have the right to reproduce, print and disseminate in any medium, your name, likeness, voice and biographical information for purposes of advertising and promoting such picture, program or series, and in connection therewith, the product or services of any sponsor, provided that no direct or indirect endorsement of any such product of service by you shall be used without you's prior written consent.

Mr. Frank Dux
Life Story Option and Agreement
Page 6.

## Publicity

24.    I shall have the sole and exclusive right to issue publicity concerning the Film and concerning your services with respect thereto.   You shall not, directly or indirectly, issue or permit the issuance of any publicity, grant any interviews, or make any statements concerning your services hereunder without our prior written consent in each instance.

## Promotional Services

25.    You agree to render reasonable services and to make personal appearances in all media to the extent permitted by your other activities for the purpose of promoting and advertising the Film.   You shall not be entitled to any compensation therefor **provided** no other personality in or in connection with the Film receives any compensation for similar appearances.

## Notices

26.    Notices desired or required to be given hereunder shall be in writing and may be given by personal delivery or by United States mail, postage prepaid, and addressed to the respective addresses indicated for each party herein, unless and until either of us gives the other written notice of a different address.

## Warranties

27.    You represent and warrant that you have not and you shall not enter into any agreement which abridges or diminishes any right granted to me hereunder nor granted similar rights to any other person nor authorized any other person to create an audio-visual work based on the Story.   You shall indemnify me and hold me harmless from any claim, loss, action, damage, judgment, cost or expense paid or incurred in connection therewith.

28.    At your request, the Film shall contain a disclaimer announcing the fact that it is based upon a true story but that no particular person or event is portrayed therein.

Mr. Frank Dux
Life Story Option and Agreement
Page 7.

## Miscellaneous Provisions

29.   This agreement sets forth the entire understanding between the parties relative to the subject matter hereof, and any and all prior or contemporaneous negotiations, understandings, agreements, representations, warranties, inducements or similar communications are superceded and replaced by and/or incorporated into this agreement.

30.   This agreement shall inure to the benefit of, and be binding upon all of the parties hereto and each of their respective successors, permitted assigns, heirs, executors, administrators and/or legal representatives.

31.   The parties hereto agree to promptly execute and deliver to the other such other and further documents as are reasonably necessary to effectuate or carry out the provisions of this agreement.

32.   No modification, amendment, waiver, termination, discharge or replacement of this agreement or any of its terms or provisions shall be effective for any purpose unless and until confirmed in a writing executed by the duly authorized representative of the parties hereto.

33.   No waiver by any party hereto of any term or provision of this agreement shall abridge such parties right thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

34.   In the event of an action at law or in equity, or before any adjudicatory body having jurisdiction thereover, to enforce or construe any provision hereof or any right or obligation directly or indirectly created hereunder, the prevailing party shall be entitled to receive, as an element of damages, all costs and expenses paid or incurred in connection therewith, including reasonable attorney fees.

35.   This agreement is entered into in the State of California and shall be enforced and construed in accordance with the laws of said state applicable to agreements entered into and to be wholly performed therein.

Mr. Frank Dux
Life Story Option and Agreement
Page 8.


If the foregoing accurately reflects our understanding, please so indicate by signing below and this shall become a binding agreement between us.

Very truly yours,

Mark DiSalle

**AGREED AND ACCEPTED:**

Frank Dux

(3.104/c/bsrights)



Mr. Frank Dux
Life Story Option and Agreement
Page 8.


If the foregoing accurately reflects our understanding, please so indicate by signing below and this shall become a binding agreement between us.

Very truly yours,

Mark DiSalle

AGREED AND ACCEPTED:

Frank Dux

(3.104/c/bsrights)

REVISION


EXHIBIT "A"


References made herein to (a) that certain letter agreement dated June 15, 1985 (the letter agreement) between Mark DiSalle (DiSalle) and Frank Dux (Dux) with respect to the life story of Frank Dux, as limited by Paragraphs 1 and 2 of that agreement (the life story) and (b) that certain agreement dated as of March 25, 1986 (the Cannon agreement) between DiSalle and Cannon Films, Inc. (Cannon) regarding the production of one motion picture based upon the life story (the picture), as limited by the June 15th letter agreement.

As a material condition to Cannon's entering into the Cannon agreement (which Dux acknowledges will be of direct benefit to Dux), Dux hereby agrees as follows:

1.  Dux has read the Cannon agreement and fully understands same.

2.  Dux agrees that DiSalle has fully, timely, and correctly exercised the option in the letter agreement.  Notwithstanding anything to the contrary which may be contained in the letter agreement, Dux agrees that said letter agreement conveys to DiSalle sufficient rights for DiSalle to enter into the Cannon agreement and grant to Cannon all the rights therein granted and to make all the representations, warranties, and agreements therein made with respect to the life story.  To the extent the letter agreement does not convey such sufficient rights, Dux hereby grants same directly to Cannon.

2A.  To that degree that Cannon is granted further sufficient rights, Cannon will indemnify  Dux for all changes to the existing screenplay and it is further agreed by Cannon that Dux's liabilities under all warranties shall be limited to the dollar compensation he was paid by owner for the underlying rights granted in Paragraphs 1 and 2 of the letter agreement, specifically, $15,000 for any and all liabilities which may arise from the above-mentioned warranties, except with respect to the warranty that he has not previously sold the property.

2B.  Further, Cannon and DiSalle specifically agree that any further grant of rights will in no way limit Dux's rights to use incidents and facts from his life as retained in Paragraphs 1 and 2 of the letter agreement.  Neither will such grant of rights afford Dux any less protection than he is

afforded under Paragraph 5,7,15,21,22, and 28 of the letter
agreement.

2C.  All exercise of rights to the exploitation of Dux's
unique life beyond one theatrical motion picture must be
negotiated in good faith with Dux as per the above-mentioned
agreements.

2D.  Both DiSalle and Cannon specifically warrant that
they shall in no way interfere or attempt to control or construe
these contracts to grant rights in Dux's martial arts business,
training films, novelization rights to his life story, non-
fiction writing, and fiction writing on any subjects; they shall
only have interest in those stories specifically defined and
limited in Paragraphs 1 and 2 of the letter agreement and those
other "life story" related stories subject to the letter agreement.

3.  Cannon shall have the benefit of all representations,
warranties, agreements, and indemnities made by Dux to DiSalle
pursuant to the letter agreement and may proceed directly against
Dux to enforce same.  To that extent which Cannon has obtained
sufficient rights mentioned above and specifically with regard
to the "story based on the life of Frank Dux" credit, the
inclusion of the disclaimer as per Paragraph 28 of the letter
agreement, all commercial aspects, dealings, and payments under
Paragraphs 12,13, and 14 of the letter agreement as assigned
to Cannon by Paragraph 4 of the Acquisition Agreement, Dux may
enforce directly against Cannon.

4.  Dux shall look solely to DiSalle and not in any
manner to Cannon for all payments and other compensation which
may become due to Dux in connection with the picture and/or
the exercise by Cannon of its rights pursuant to the Cannon
agreement, except as outlined above and with regard to matters
under the direct control of Cannon and not under the control
of DiSalle, in which case Dux may look directly to Cannon for
relief.

5.  Dux has not and hereafter will not authorize or
permit the production of any motion picture based upon any
part of Dux's life story until nine months after release of the
picture (and subject to Paragraph 9 of the letter agreement).
However, if Cannon has not produced and released one theatrical
motion picture based on the life of Frank Dux within twenty-
four months of the signing of this agreement, subject to
extension for force majeure, then Dux may submit a second story
pursuant to Paragraph 9 of the letter agreement on other events
or subjects which are not wholly owned by DiSalle as per
Paragraphs 1 and 2 of the letter agreement.  At such time as
story is presented, DiSalle and Cannon will have a thirty day
period (as per the Acquisition Agreement) to accept or reject
said project and in the event they do not choose to exercise
their rights under the Acquisition Agreement and DiSalle does

-2-

not choose to exercise his rights under Paragraphs 1,2, and 9 of the letter agreement, Dux may go to third parties and may permit the production of a separate motion picture based on the other incidents in his life as per Paragraphs 1 and 2 of the letter agreement, subject only to allowing Cannon or DiSalle to match third party offers to produce said film and to negotiate in good faith on all terms offered by third party with regard to the above-mentioned film.

      6.   Notwithstanding any breach of the letter agreement by DiSalle nor any breach of the Cannon agreement by Cannon, Dux shall have no right to and shall not seek to in any manner interfere with the production, development, distribution, advertising, publicizing, exhibition, exploitation or other turning to account of the picture.  Further, Dux shall make no claim for damages against Cannon for any reason connected with the picture, except as contained herein.

      7.   The agreement of Dux herein contained are expressly for the benefit of Cannon who shall have the right to enforce same directly against Dux and Dux against Cannon as per the above agreement.

_Frank W. Dux_
_____
FRANK DUX


CANNON FILMS, INC.


By: _____


Its: _____



REVISION


EXHIBIT "C"


Dated as of March 25, 1986

Cannon Films, Inc.
640 San Vicente Blvd.
Los Angeles, CA 90048

Dear Sirs:

                    RE:   Frank Dux Life Story
                          as defined by June 15, 1985
                          Letter Agreement

        You have informed me that you are developing a motion
picture (the picture) which may be based upon, adapted from,
suggested by or include events in my life (as limited by
Paragraphs 1 and 2 of the June 15th agreement).

        For good and valuable consideration, the receipt and
sufficiency of which I hereby acknowledge, I hereby irrevocably
consent and agree that you (and your successors, licensees,
and assigns) shall have the irrevocable and exclusive right to
use my name, likeness, and/or biography (in whole or in part),
and to portray, represent, and impersonate me or a person
resembling me under my name only (i) in the one motion picture
(and in any remakes and sequels thereof and pilots and/or
series, all of which are hereafter referred to as motion pictures,
to the extent you separately acquire the right to make such
remake and sequel, each in good faith and by separate contract),
and (ii) in connection with the advertising, publicizing, and
exploitation of motion pictures.  The motion pictures may be
produced, distributed, exhibited, advertised, promoted, and/or
exploited in any manner and in any media (whether now known or
hereafter devised) throughout the universe and forever, including
without limitation theatrically, on television, and on video
devices.  I understand that such motion picture may contain
dialogue, incidents, characters, and written or visual material
which may or may not be based upon or suggested by actual events.
But each such picture other than the "one" picture shall be
limited by those specific clauses negotiated and contained in
each separate contract on each specifically named project as
the above clause refers to the one motion picture (currently
titled BLOODSPORT).

        I hereby agree that I will not assert or maintain against

you (or your successors, assigns, licensees or directors, shareholders, employees or agents of you and each of them) any claim, action, suit or demand of any kind or nature whatsoever, including but not limited to those grounded upon invasion of privacy, violation of the right of publicity, defamation, liable or slander, or for any other reason in connection with your use of the rights herein granted to you.  As between you and me, you shall own all right, title, and interest in and to the one motion picture and all rights therein and elements thereof and you shall have no obligation to me in connection therewith except as outlined in the other Exhibits and contracts relating to the acquisition of the currently titled project BLOODSPORT.

It is further agreed and understood that Cannon will portray the story of my life in a positive light as per Paragraph 5 of the June 15th letter agreement.  Also, the portrayal of the lead character in BLOODSPORT shall be portrayed under my name if I so choose prior to the start of production,  I shall notify Mr. DiSalle of that decision.

Cannon acknowledges a disclaimer as stated in Paragraph 28 is necessary due to the highly fictionalized telling of my story and my warranties and liabilities are conditioned on such a disclaimer appearing on the film or Cannon obtaining a writer's liability insurance policy to protect me from loss.

I hereby release you (and your agents, successors, assigns, licensees and each of them) from and against any and all claims, liabilities, demands, actions, causes of action, costs and expenses, whatsoever, at law or in equity, known or unknown, anticipated or unanticipated, suspected or unsuspected, which I have ever had, now have or may, shall or hereafter have by the rights herein granted to you or otherwise in connection with such motion pictures.  I hereby specifically waive the provisions of California Civil Code Section 1542 which provides:  "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor.

This agreement shall be construed, interpreted and enforced in accordance with, and governed by, the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California, and cannot be modified and/or revoked without your written consent.

I grant you the foregoing rights with the knowledge and understanding that you will incur expenses and/or undertake commitments in reliance thereon and that in the granting of the foregoing consent and rights I have not been induced to so do

-2-

by any representation or assurance by you or on your behalf relative to the manner in which any of the rights or licenses granted hereunder may be exercised; and I agree that you are under no obligation to exercise any of the rights or licenses granted hereunder.

The terms hereof shall be binding upon me and my heirs and legal representatives.

Very truly yours,

*Frank W. Dux*

FRANK DUX

Address: 5105 KELVIN AVE.

WoodLAnd Hills CA 91364

Telephone: (818) 888.9800

Social Security # 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

STATE OF CALIFORNIA    )
COUNTY OF LOS ANGELES  )

On this the 16th day of June, 1986, before me, the undersigned, a Notary Public in and for said County and State, personally appeared FRANK DUX, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledge that he executed the same.

IT WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written

Notary Public for said County and State



OFFICIAL SEAL
H ARTHUR LADIN
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My comm. expires APR 11, 1987

ACKNOWLEDGED AND ACCEPTED CANNON FILMS, INC.

-3-

**Mark DiSalle**
**10100 Santa Monica Boulevard**
**Suite 2600**
**Los Angeles, California**
**90067**
**(213) 553-3888**

July 10, 1986

Frank Dux and Sheldon Lettich
c/o Mike Frankel, Esq.
4444 Riverside Drive
Suite 105
Toluca Lake, California 91505

Re:    "Bloodsport"

Dear Mr. Dux and Mr. Lettich:

The following, when mutually executed, shall memorialize our representations and warranties and the modifications to the terms of those two separate written agreements each dated June 15, 1985, (the "Agreements"), regarding the rights to certain aspects of the life of Mr. Dux ("Rights") and a first draft screenplay based thereupon ("Script") all of which we have identified by the working title "Bloodsport".

Notwithstanding the terms and conditions of the Agreements, I have advised each of you that, in order to enter into an agreement with Cannon Films for the production of a motion picture based upon the Rights and Script (the "Picture"), I have agreed to receive no portion of net profits (as understood in the industry) derived from the exploitation of the Picture.  You each acknowledge, therefore, you are receiving no net profits from this production only.

In addition, to accommodate the agreement with Cannon Films, you each are making certain concessions and are agreeing to reduce the sums which would otherwise be payable to you under the Agreements.  Specifically, Mr. Lettich has agreed to accept the sum of $37,500.00 as full compensation, of which $2,500.00 has been previously paid by me.

We three agree to make such changes and concessions, and each of you authorizes me to enter into said agreement with Cannon Films, subject to the terms and conditions therein and in the exhibits attached thereto, in order to maximize the probability that a motion picture based on the Rights and Script will actually be produced and exploited.

Each of you understands that I will not have ultimate control over the production or exploitation of the Picture and that such final control will remain with Cannon Films.

In the event of the production of a sequel or remake of the Picture, I agree to negotiate in good faith with Mr. Dux for his compensation for rights and/or services granted and/or performed by him in connection therewith, which shall be reasonable

Frank Dux and Sheldon Lettich
July 10, 1986
Page 2.

taking into consideration the results of my 'GOOD FAITH' negotiations
with others for the production of the sequel or remake.  Not withstanding
the above it is understood Mr. Dux shall receive no less protection on
the sequel or remake than given him on the original June 15, 1985
Agreement and the other agreements and exhibits referred herein.

Nothing in this agreement, or in the Agreements, is intended to or
shall in any way abridge or diminish my absolute rights in and to the
sequel and remake of the Picture and Mr. Dux and I specifically agree
that our negotiations shall be limited solely to the compensation therefor.
Under no circumstances shall Mr. Dux be entitled to deny my right to produce,
or permit others to produce such a sequel or remake (subject to the
June 15, 1985 Agreement).

In the event Mr. Dux and I are unable to agree upon such reasonable compen-
sation, upon demand by either of us the matter shall be resolved through
binding arbitration before the American Arbitration Association in Los
Angeles, California pursuant to the then existing rules and procedures
established by the American Arbitration Association for arbitrations of
this type.

In the event that Mr. Lettich is engaged to render writing services in
connection with a remake or sequel of the Picture, his compensation shall
be negotiated in good faith with his agent as per the WGA basic agreement.

Except as specifically set forth herein, the Agreements continue in full
force and effect.

If the foregoing accurately reflects our understanding, please so indicate
by signing below.

Very truly yours,

Mark DiSalle

AGREED AND ACCEPTED:

Frank Dux

Sheldon Lettich

(3.125.c.mdsalle)

As of January 31, 1994

Mark DiSalle


Re:  **Frank W. Dux's Life Story Rights**

Dear Mark:

    Reference is made to (i) the letter agreement ("Option Agreement") dated June 15, 1985 between you ("DiSalle") and Frank W. Dux ("Dux"), (ii) the Production/Acquisition Agreement ("Production Agreement") dated June 16, 1986 between DiSalle and Cannon Picture Corporation (including Exhibits A and C thereof), and (iii) the letter agreement ("Letter Agreement") dated as of July 10, 1986 between _____ and _____ in connection with the life story rights of Dux.  The Option Agreement, Production Agreement and Letter Agreement are hereinafter collectively referred to as the "Agreements".

    1.  **Granted Rights**.  Subject only to Paragraph 2. below, this letter shall confirm that notwithstanding anything to the contrary contained in the Agreements, and for good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by DiSalle), DiSalle hereby grants, assigns and/or reconveys, as applicable, to Dux all of the motion picture, television and allied rights of every kind and nature, known and unknown, in perpetuity, throughout the universe, in and to Dux's "Life Story".  As used herein, Dux's Life Story shall include, but not be limited to, the unconditional and exclusive right throughout the universe to use, simulate and portray, factually and/or fictionally, Dux's name, likeness, voice, personality, personal identification and personal experiences, incidents, situations and events which heretofore occurred or hereafter occur (in whole or in part) based upon or taken from Dux's life and otherwise.

2.  _Reserved Rights_.   Notwithstanding any rights
previously granted to DiSalle (and/or his successors or
assigns) under the Agreements (including but not
limited to any first negotiation and/or first refusal
rights), it is hereby agreed that only the following
rights to Dux's Life Story are reserved to DiSalle for
DiSalle's use and disposition on a non-exclusive basis:

> (A)  The right to distribute, broadcast, license,
> exhibit and copyright the existing motion picture
> entitled "Bloodsport" ("Bloodsport") starring
> Jean-Claude Van Damme and directed by Mark Arnold.

> (B)  The remake rights to "Bloodsport," which
> remake rights shall include only that part of
> Dux's Life Story which was actually portrayed in
> the original "Bloodsport" (the "Bloodsport Remake
> Rights").

> (C)  The right to utilize the title "Bloodsport"
> in connection with the right reserved in Paragraph
> 2.(B) above.

3.  DiSalle hereby represents and warrants that
DiSalle is the sole owner of all rights herein granted
to Dux and has full power and authority to grant said
rights to Dux; that none of the rights granted to Dux
hereunder (other than the Bloodsport Remake Rights)
have been granted, encumbered, or otherwise disposed of
in any manner to any person, firm or other entity; that
DiSalle has not done or omitted to do and will not do
or omit to do any act or thing by license, grant, or
otherwise, which will or may impair or encumber any of
the rights herein granted or interfere with the full
enjoyment of said rights; and that so far as DiSalle is
aware, there are no claims or litigation pending or
threatened which will or might adversely affect any of
the rights herein granted to Dux.

4.  DiSalle will defend, indemnify, make good, save
and hold harmless Dux and Dux's successors and assigns
from and against any losses, damages, costs, charges,
reasonable attorney's fees, recoveries, actions or
judgments, penalties, expenses and other loss
whatsoever which may be obtained against, imposed upon
or suffered by Dux and/or Dux's successors and/or
assigns, by reason of the breach or alleged breach of

any warranty, covenant, agreement or representation herein made by DiSalle.

5.   DiSalle hereby grants to Dux all of DiSalle's right, title, and interest in and to any and all agreements, assignments, releases and other instruments in writing heretofore or hereafter executed in favor of DiSalle, or any predecessor of DiSalle, insofar as said documents grant or purport to grant to DiSalle, or any such predecessor, any of the rights, privileges and property herein granted to Dux, together with the full benefit of all representations, warranties and agreements made by any party in favor of DiSalle or any such predecessor, insofar as the same pertain to or affect any of the rights, privileges and property herein granted to Dux.

DiSalle represents and warrants that any such instruments (if any exist) have not been amended, modified or cancelled in any way, and are in full force and effect as originally signed; that DiSalle has not granted or assigned any right, title or interest heretofore acquired by DiSalle in, to or under said instruments in a manner inconsistent herewith; and that there has been paid to the party or parties entitled thereto all sums which have heretofore become payable under any of said instruments, and, except as herein specifically provided, DiSalle will hereafter pay or cause to be paid, to the party or parties entitled thereto, all sums which may hereafter accrue under said instruments.

6.   Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other.  Neither party shall hold itself out contrary to the terms of this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof.

7.   Nothing contained in this agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this agreement and any material statute, law, ordinance, order or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provisions of this agreement so affected shall be

curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this agreement shall be affected thereby and such other provisions shall continue in full force and effect.

8.    Nothing in this letter agreement shall ever be construed to restrict, diminish or impair the rights of Dux or Dux's assignees to utilize freely, in any work or media, any story, idea, plot, theme, sequence, scene, episode, incident, name, characterization or dialogue which may be in the public domain, from whatever source derived.

9.    DiSalle's sole and exclusive remedy for Dux's breach, termination, or cancellation of this Agreement or any term hereof shall be an action for damages and DiSalle irrevocably waives any rights to seek and/or obtain equatable and injunctive relief.

10.   This letter agreement shall be governed by and construed in accordance with the laws of the State of California.

Please confirm the foregoing as accurately reflecting the agreement and understanding of the parties by signing in the space provided below.

Very truly yours,


_____
Frank Dux


ACCEPTED AND AGREED:


_____
Mark DiSalle

 **Walt Disney** Motion Pictures Group

Paige W. Wright
Attorney

September 11, 1996

**VIA MESSENGER**

Frank Dux
c/o Michael Frankel, Esq.
12501 Chandler Boulevard, #104
North Hollywood, CA  91607

Re:    Spy Project/Frank Dux/Life Story Rights/Consulting

Gentlemen:

Reference is made to my correspondence to you dated August 29, 1996.

This letter shall confirm that HOLLYWOOD PICTURES COMPANY did not receive an acceptable agreement between Frank Dux and FM Entertainment reasonably necessary to satisfy chain of title as requested in the correspondence.  Accordingly, the condition precedent set forth in Paragraph 1.d. of the Agreements (as referenced in my correspondence) has been deemed unsatisfied as of September 5, 1996.  Neither party has any obligation to the other party with respect to either Agreements or the project, and you are free to convey such rights to other parties.

If you should have any questions, please do not hesitate to contact me.

Very truly yours,

Paige W. Wright

cc:   Steve Bardwil
      Doug Carter
      Mike Stenson
      Jerry Bruckheimer
      Chad Oman

LAW OFFICE OF
MICHAEL B. FRANKEL
12501 Chandler Boulevard, Suite 104
North Hollywood, California 91607
(818) 761-4841

May 23, 1996

Tamara Woolfork, Esq.
HOLLYWOOD PICTURES COMOPANY
500 South Buena Vista Street
Burbank, California 91521

RE: NOTES SPY PROJECT

Dear Tamara:

As we discussed over the last two months, the following are my general concerns on the current draft of the agreement. **The bottom line as I understand it from Joel is that Jerry wants to work with Frank and Frank wants to work with Jerry.** It is up to us to pull from that vast store of Disney boilerplate the language that will fairly protect my client and compensate him while following Disney policy and Jerry's needs in making these films.

Frank would like to do the first draft screenplay for the "Spy" project at minimal compensation forward, with any significant payment to be made if he gets sole or shared screenplay credit in the produced film. Frank would like to discuss this matter with Jerry given the success of "The Quest" and get his reactions on this point. As we discussed last week, it is my understanding that Frank's duties under the Technical Advisor agreement excludes services that would be covered under the WGAw minimum basic agreement.

I explained to you that Frank is already working on a project called, "Legacy" which encompasses the life of his father, his grandfather and himself as spies. Since there is some reference to his father and grandfather in "The Secret Man," we will need to add a paragraph to the reservation of rights stating that Frank has a right to do a novel about his father and grandfather and using some incidents from his own life and that novel may be used as the basis for a feature, movie-of-the-week, miniseries, etc. We would, of course, be giving HPC a right of first refusal on such film rights

February 24, 1989


Jack Dwosh
Covey and Covey
10000 Santa Monica Blvd.   3rd Floor
Century City, CA 90069

Dear Mr. Dwosh:

     RE:   <u>BLOODSPORT Sequel</u>

This will confirm our conversation of February 7, 1989,
wherein you assured me that all of the clauses and
protections of the June 15, 1985 contract would be adhered to
by Mark DiSalle and I promised that I would call Bill Weiner
at Cannon Films and confirm that you had a right to negotiate
the sequel pursuant to that contract and other addendums and
amendments thereto without myself or Frank being present.
Toward this end I contacted Bill Weiner on February 13th and
made the following statement:  Mark DiSalle has an absolute
right to negotiate with Cannon and to do a sequel limited
only by the June 15, 1985 agreement, Exhibit A of the Cannon
Agreement, Exhibit C of the Cannon Agreement, and those other
addendums attached thereto without myself or Frank Dux being
directly involved with those negotiations.  However, I have
been assured by Jack Dwosh that Mark DiSalle will live up to
all of the clauses and protections of the June 15, 1985
agreement.

However, before totally dismissing these negotiations, Jack,
I believe we should clear up some rumours and other questions
that are unclear to me as of yet:


1.  Is Mark claiming that he has paid Frank in cash or other
kind an amount of money giving him a right to any of Frank's
individual stories or missions without the limitations of
Paragraph 1 and 2 of the June 15, 1985 agreement which would
be contra to the assurances you made me on February 7, 1989;

2.  Is it your contention that any addendum to the June 15,
1985 agreement in any way gives Mark an unlimited right to a
sequel without the limitations of Paragraph 1 and 2 of the
June 15, 1985 agreement.  If so, please send me a redline

copy immediately since I am unaware of any agreement that did
not incorporate by reference the June 15, 1985 agreement and
in fact state redundantly as does Exhibit A and C of the
Cannon Agreements that it was the intention of the June 15,
1985 agreement, particularly as stated in Paragraph 2, that
Frank would treat each of his missions except the Kumite 1975
Championship story as a separate story subject to submission
to Mark DiSalle under the original June 15, 1985 agreement
and Exhibit A, Paragraph 5 of the revision to the Cannon
Agreement.  Further, since you and I worked so hard to
separate these individual missions out I find it distressing
that Mark or anyone else should believe they have a right to
any of the separate stories discussed but not purchased by
mark which Frank believed from the promises made by Mark
during the last few years that he would be involved in both a
writing and/or production capacity, e.g., Frank's rescue
mission, Frank Dux in Thailand, Frank Dux in South America,
Tiny's rescue, and other various stories that we discussed in
early 1985 prior to the June 15, 1985 agreement which were to
be protected as per your wording in Paragraph 2 of the June
15, 1985 agreement and as reinforced and agreed to by Cannon
and DiSalle in Exhibits A and C of the Cannon Agreement.  It
was never contemplated that Mark would write or expand on any
story without consulting Frank as per Paragraph 16 of the
June 15, 1985 agreement and Paragraph 15 of the June 15, 1985
agreement.

     As you may know, there were several months of negotiating
with Larry Kopeikin and Cannon with regard to the content of
the screenplay BLOODSPORT and the fear that the
fictionalization done by DiSalle left Frank unprotected with
regard to Paragraph 5 of the original agreement and the
various exhibits.  In fact, upon the release of BLOODSPORT
there was some negative publicity which should be avoided by
involving Frank in the story from the earliest possible
conception when a subject for the sequel is agreed upon;

3.  It has been rumoured that Mark is intending to use a
story designated as the mission about Frank's rescue of
children from the Phillipinnes.  I think it important to
point out that Frank pitched this as his separate story and
wrote up a treatment in Hong Kong during the filming of
BLOODSPORT (I) in that this story and treatment were rejected
by Mark (...we already have a sequel that will take place in
San Francisco...).  Specifically this story and treatment
come under Paragraph 5 of Exhibit A of the Cannon Agreement
and currently Mark has no right except to match third party
offers to this particular story.  Any representation that
this is not Frank's original story in which he was the writer

of said story would be in direct conflict with our position
and must be resolved before involvement of any third parties;

4. I cannot stress strongly enough my concern that Frank be
involved in consultation on the story from the earliest
possible conception so that we do not get into the problems
with the story as we did last time wherein Cannon felt it
necessary to extort Frank's acceptance of the shooting script
by threatening not to allow him to go over and exercise his
rights as technical advisor on the film;

5. It is also our concern that Frank's compensation for
technical advisor on ethe sequel not be included in the
compensation package for the underlying rights. YOU MUST
REMEMBER THAT MARK'S INDUCEMENT IN GETTING DUX TO SIGN WITH
CANNON IN REGARD TO REVISIONS A AND C AND THE ADDENDUM TO THE
JUNE 15, 1985 AGREEMENT WAS THE SPECIFIC AND NUMEROUS
PROMISES THAT "I'LL MAKE IT UP TO YOU ON THE SEQUEL...WE'LL
GET WELL ON THE SEQUEL...WE'LL MAKE OUR REAL MONEY ON THE
SEQUEL, ETC. These promises were made not only to Frank, but
to me and Sheldon during the negotiation for the diminishing
of compensation and equity interest in the first BLOODSPORT
film with the expectation that we would get all the money we
would have made; if the film did well and a sequel was made
on that sequel. This was the major inducement from our point
of view into entering into the modification of the
agreements. Therefore we expect significant increases in
compensation, not only proportionate with the increase in
budget but also in accordance with the make up and get well
promises made by DiSalle inducing us to enter into the
modifications;

6. I also feel it important to point out that I was highly
disappointed with Cannon and Mark's performance with regard
to any exploitation of merchandising and/or ancillary rights
and I wish to point out that Frank was not significantly
included in the publicity campaigns so no benefits from the
exploitation of these contracts was experienced by my client
on the first film and your assurances in negotiation that you
had protected his rights with regard to merchandising, et
cetera, proved of no economic benefit nor did the purported
publicity to be garnered by the exploitation of Frank's life
story;

7. A further concern of mine is the interpretation in
Paragraph 1 of the June 15, 1985 agreement to in any way
diminish the retained story rights of Paragraph 2 and point
out that Mark's rights are limited only to the Kumit,

Championship and those military experiences that don't
infringe on individual missions retained in Paragraph 2 and I
wish to again point out that the Phillipine rescue story does
not qualify as a military experience either denotatively nor
connotatively within the context and understanding of the
June 15, 1985 agreement or any succeeding modification
thereto;

8.  I think we need to be very clear, given whatever the
story content may be, of the type of disclaimer to be used as
per Paragraph 28 and Paragraph 5 of the June 15, 1985
agreement.

In conclusion, I want to be very clear that we will cooperate
in every way, in any manner to help Mark make a deal for a
sequel.  However, we have no intention of waiving or giving
up any rights retained by any of the above-mentioned
agreements.  HOWEVER, IF NECESSARY TO MODIFY AND GIVE WIDER
LATITUDE TO MARK OR CANNON, WE ARE MORE THAN WILLING TO MAKE
NECESSARY MODIFICATIONS TO MAKE THE DEAL AS LONG AS WE ARE
REASONABLY COMPENSATED.  Such figures I have already
mentioned to you, but we have no intention of having some
unfair bad faith agreement imposed upon us.

                        Sincerely,



                        Michael B. Frankel

cc  Bill Weiner

     Cannon Films

LAW OFFICES OF
**MICHAEL B. FRANKEL**
12501 CHANDLER BOULEVARD, SUITE 104
NORTH HOLLYWOOD, CALIFORNIA 91607
TELEPHONE: (818) 841-8742

August 2, 1996

Delivered by Hand          Urgent

ALAN ABRAMS, ESQ.
Law Offices of Alan Abrams
270 Canon Drive, 3rd Floor
Beverly Hills, CA 90210

    RE:  "Bloodsport" Dux Character Rights

Dear Alan:

    Enclosed please find the revised Redline number 5 contract with execution copies.  It is imperative that we execute these contracts by no later than noon Monday (August 5).

    As you know, based upon my February letter and your reply, we have been dealing with third parties who have relied upon the fact that we have an agreement in principle as of redline number 3, subject only to some language changes.

    With reference to the changes you requested attached to your February 1996 letter wherein you had agreed to execute said contracts based on these changes, I have given you all I can with regard to remake rights which are consistent with all of your drafts of the agreement.  I am willing to give up any payment due Frank under 2(b) under remake rights except his merchandising rights if we can execute this agreement by Monday.  Also, please be aware that I have gotten you what I believe to be the injunctive relief changes you wanted against Frank.

    I am available to you at all hours through this weekend by voicemail beeper at (818) 545-4423.  Let us do everything necessary to get this contract executed.

Sincerely,

Michael B. Frankel

MBF/dcs
Encl.

STEVEN KRAMER
BAR NO.159719
468 N. CAMDEN DRIVE
SUITE 200
BEVERLY HILLS, CA 90210
310-859-5222

IN THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

FRANK DUX                                    CASE NO.
     PLAINTIFF

V

SOLDIER OF FORTUNE, INC.         JURY TRIAL DEMANDED
LARRY BAILEY
AND ROBERT K. BROWN
     DEFENDANTS

**COMPLAINT
FOR DAMAGES: LIBEL**

1.      Plaintiff is a martial arts champion, former government covert operative, teaches covert operations and planning to police agencies worldwide, including the Narcotics Enforcement Officers Association and as an adjunct faculty member to the Multi-Jurisdictional Counter-Drug Task Force based in St. Petersburg, FL.. [Exhibit 9] .He is also a Knight Chevalier member of the Police Hall of Fame [Exhibit 8] and is a member of the Martial Arts Hall of Fame. He is also a recognized grand master in martial arts. As recently as last month, he was inducted as a Living Legend in one of the major martial arts organizations in the world, World Head of Family Sokeship Council International Hall of Fame. Ex.7.

2.      His covert operative service to this country is corroborated by the attached Declaration of Lt. Commander[US Navy retired] Alexander Martin [Exhibit 1]:

> 'During my intelligence career, I have met with and been introduced to many covert operatives, whose existence has often been officially denied by the government agencies that these parties have been associated with.
>
> 'One of these covert operatives was one Frank Dux.
>
> 'I was introduced to Mr. Dux, whom was using an alias at that time. We met in Tegucigalpal, Honduras, in the summer of 1985, where I was being briefed by Dux and other intelligence

operatives on military targets within Nicaragua. These targets

included the planned mining of a Nicaragua port  and the

planned sabotage of certain Nicaraguan  installations

including power stations and weapons depots, code named

'OPERATION CORDOBA HARBOR'.

'OPERATION CORDOBA HARBOR' as then envisioned by

DCI William Casey and Lt Colonel Oliver L. North… called

for the placing of underwater mines in said harbor in order to

disrupt Soviet and other East Bloc [nations] shipping then

transporting weapons and military supplies to the Sandinista

regime.

' Peripherally to these mining operations, there was to be

targeted for destruction port facilities in surrounding power

generating plants, in which Frank Dux was to play a role.'


3. Mr. Dux' service to this country as a covert operative is also corroborated

by the attached  Declaration of John Padgett [ Exhibit 2]:

"In May 1996, I began producing a documentary on biological

weapons of mass destruction…Amongst the individuals interviewed were a

[Ukranian] Special Forces Colonel whom identified for me on film, Frank

Dux as being a former covert operative sent by the United States to take part

in a secret joint American Soviet mission to recover stolen biological

3

weapons of mass destruction... Frank Dux was identified to me as being

conferrred the rank of a military colonel in the Ukranian anti terror unit,

bERKYT, by its commanding officer. .. I was able to document Frank Dux

on film in uniform at their headquarters. He was there actively training their

elite response team, and those charged with their training and tactics.


4. It is also corroborated by the attached  Declaration of retired USSR

General A. Kornienko [Exhibit 3]:


    "In early 1983, I received an order from the Military Command to

provide necessary assistance and cooperation to joint Soviet American

military group known then as 'Officer Duchovny's Group' which operated on

the territory of the Soviet Union in areas under my command where military

operations were conducted....


    "Officer Duchovny's Group' was led by Frank Dux, an American

military officer with special branch of the military which was involved in

searching for ways by which leaks of biological weapons were occuring.

Frank Dux, dubbed 'The Hunter' and his group were in the Soviet Union for

just a few weeks, but our intelligence already had information about

exceptional talents of The Hunter and his unique ability to investigate

extremely dangerous and complicated matters."

5. Mr. Dux  is named as a contributing fighting course personnel in the U.S. Navy Handbook for Naval Special Warfare Combat Fighting Course [Navy Seal manual]. Exhibits 5 and 10.

6. Defendant Soldier of Fortune Magazine is a publisher of extremist right wing views linked to the CIA.. In 1996, it competed against Dux in attempting to secure a feature film or television series deal with Jerry Bruckheimer. In 1996, plaintiff's book The Secret Man [Harper/Collins] exposed unlawful activities of the CIA, including Operation Phoenix  which involved war crimes [the assassination of 21,000-40,000 Vietnamese civilians]. Soldier of Fortune Magazine Editor and Publisher Robert K. Brown was a member of Operation Phoenix . In addition, plaintiff's book exposed  General [retired] John K. Singlaub,  who was a member of the board of the defendant corporation, as the head of Operation Phoenix, a fact he denied in 1996. Singlaub also  attempted to have Dux' book pulled from circulation by making threats of litigation to Dux' publisher, Harper Collins. Defendant Bailey is the writer of the subject article.

7.          In the November 1998 issue of Soldier of Fortune, the defendants libelled the plaintiff. In a prominent article, defendants called plaintiff a 'fraud' and part of a group of  'phony vets' who travel on a 'circuit' and obtain money on false pretenses. Defendants also called plaintiff a fraud

5

with regard to his standing as a martial artist expert and champion.

Exhibit 4.

8.      This was not the first time that the defendant has libelled the

plaintiff. In 1996, defendant published an issue that made similar

allegations against the plaintiff. Exhibit 6. Plaintiff promptly sent a

demand for retraction. The envelope containing the demand was sent

back by the defendants unopened. In addition, plaintiff told defendant

during a telephone conversation that there was no basis to their

allegations but defendant ignored him.

9.      The libelous statements were made knowing that they were false

in an effort to destroy plaintiff's reputation and to weaken his status as a

competitor of the defendant.

10.      As a result, plaintiff has suffered damage to his reputation, pain

and suffering, embarrassment, humiliation and other losses.

WHEREFORE PLAINTIFF DEMANDS JUDGMENT AGAINST THE

DEFENDANTS TOGETHER WITH ACTUAL AND COMPENSATORY

DAMAGES, PUNITIVE DAMAGES AND SUCH OTHER AND FURTHER

RELIEF AS THIS COURT MAY DEEM JUST.


JURY TRIAL DEMANDED.


_____

STEVEN KRAMER

Dated: October 9,1998

April 8, 1994

Ms. Gabrielle Klatsky                    <u>Via Facsimile</u>
Disney                                   (818)562-6921
500 S. Buena Vista Street
Burbank, CA 91521-0519

      Re:  "Jungle Book"

Dear Gabrielle:

      Enclosed please find the Exhibits "A" and "B" to the November 1st, "Jungle Book" Agreement.

      Because my office was to be compensated on a flat fee basis, there were no regular monthly itemized statements showing work performed.  However, I was involved with this Picture in a very substantial way since November, 1992 until the date I was asked to step aside to allow Disney's attorneys to take over the production legal work.  Because pursuant to my settlement, further fees were to be based on an hourly basis as opposed to a flat fee, my office began sending out regular itemized monthly statements.

      The work was performed, and at prevailing hourly rates, the fees for the work performed would greatly exceed the amounts Disney approved in its budget for "1993 fees".

      With regard to your comment that the budget contained only a $15,000.00 item for my fees, please note that the draft budget which my client saw in early March, 1993 provided for "1993 fees" ($37,235.00) as well as the $15,000.00 you spoke of.  On March 9, 1994 my client asked me to prepare a letter for him to correct a number of budgetary discrepancies including the two discrepancies noted in account 8875.  Since my client sent this letter on his own letterhead from his office I don't have a copy of the letter which he sent.  I do have a copy of my draft of it which I prepared for him to place on his letterhead which I have enclosed.

      As I mentioned to you, when Disney took over, the monthly payments which I had been receiving for the "1993 fees" simply terminated.  This has caused a serious cashflow problem for my small office and the likely result is that I may be unable to fund a number of year end tax driven investments.  I would therefore greatly appreciate it if you could resolve any problems which you have quickly so that I can have my check by mid week next week.

      As I indicated it was my understanding that Disney would honor Vegahom's agreements with me with regard to "Jungle Book" and for this reason I did not object when I was asked to step

Ms. Gabrielle Klatsky
April 8, 1994
Pasge 2

aside.  I am therefore a little troubled by the suggestion that
Disney now may not wish to honor those fee agreements.
Nevertheless, I am hopeful that this matter can be resolved
quickly so that I may receive these past due fees next week.

    Thank you.

                               Sincerely,

                               Alan Abrams

AA:cb
enc.

cc:  Raju Patel
     Larry Mortorff

November 8, 1994

Bob Debitetto                          <u>Via Facsimile</u>
DISNEY                                 818-843-7109
500 Buena Vista
Team Disney 406D
Burbank, CA  91521

        Re  "The Jungle Book" - Accounting Issues

Dear Bob:

        Despite our efforts over the past several weeks we have
unable to speak or come to a resolution regarding the open
accounting issues on "Jungle Book".

        We ask that you reach a decision as soon as possible.

        In the interim, Vegahom would like to pay one of its
attorneys, Alan Abrams, from the proceeds of the Ziffren,
Brittenham & Branca trust account.  Gabrielle Klatsky has
confirmed to us that approximately thirty seven thousand dollars
($37,000.00) of the Escrowed Amount held by Ziffren, Brittenham &
Branca is no longer disputed by Disney.

        We, therefore, request that you sign the enclosed
authorization allowing Ziffren, Brittenham & Branca to transfer
the sum of thirty four thousand dollars ($34,000.00) to the Law
Office of Alan Abrams in satisfaction of Vegahom's obligations to
his office in respect of his legal fees for this Picture.

        Since Alan's bills have been outstanding since March 1994, we
ask that you attend to this without further delay.

        Thank you for your immediate attention.


                                Very truly yours,



                                Lawrence Mortorff


LM:cs
enc.
cc:  Sharad Patel
     Viju Patel
     Raju Patel
     Alan Abrams
     Mohammed Yusef

# EXECUTED

DATE:    November 30, 1993
SUBJECT:  "ROGUE WARRIOR"
             FRANK DUX / Consultant

## MEMORANDUM OF AGREEMENT

Agreement between Hollywood Pictures Company ("HPC") and Dux Ninjitsu-Ninja Studios ("Lender") for the consulting services of Frank Dux ("Consultant") on an independent contractor basis in connection with the proposed theatrical motion picture currently entitled "ROGUE WARRIOR" (the "Picture").

1. ## DEVELOPMENT SERVICES/COMPENSATION

   1.1 <u>Services</u>.  Consultant shall render consulting services hereunder on a non-exclusive basis from time-to-time as required by HPC in connection with the development of the Picture.

   1.2 <u>Compensation</u>.  In consideration of and as full compensation for the development services to be performed hereunder and in consideration of all the rights granted by Consultant to HPC hereunder and subject to Consultant's full performance of all development services and obligations by Consultant hereunder, Lender shall be entitled to receive the amount of $3,500, which sum shall be fully applicable against the cash compensation set forth in Paragraph 2.2 below.  The payment under this Paragraph 1.2 shall accrue and become payable upon Consultant's execution and delivery of this Agreement to HPC.

2. ## PRODUCTION SERVICES/COMPENSATION

   2.1  If HPC elects to proceed with production of the Picture, Consultant shall render consulting services hereunder on a non-exclusive, first priority basis to HPC as required by HPC in connection with the pre-production, production, distribution, exploitation and/or publicity of the Picture.

   2.2  In consideration of and as full compensation for the services to be performed hereunder and in consideration of all the rights granted by Consultant to HPC hereunder and subject to Consultant's full performance of all services and obligations by Consultant hereunder, and if the Picture is produced, Lender shall be entitled to receive the sum of $30,000 (less the amount received by Lender under Paragraph 1.2 above), which sum shall accrue and become payable as follows:

1

a.   50% (less the amount received by Lender under
Paragraph 1.2 above) upon the start of principal
photography;

c.   50% on delivery of the completed Picture to HPC
(including television coverage).

     Said compensation is an all inclusive flat fee and
no additional compensation shall be payable by reason
of overtime, weekend work, holidays, etc.

3.   OPTION FOR EXCLUSIVE SERVICES

     HPC is hereby granted an exclusive and irrevocable option,
exercisable at any time prior to delivery to HPC of the completed
Picture, to engage Consultant to render exclusive services as a
consultant (and/or action and fight coordinator) for the period
commencing eight (8) weeks prior to the commencement of principal
photography of the Picture and continuing until completion of
principal photography of the Picture, subject only to
Consultant's prior contractual professional engagements, provided
that Consultant shall use best efforts to be available to render
such exclusive services.  If said option is exercised, then
subject to Consultant's full performance of all services and
obligations by Consultant hereunder, Lender shall be entitled to
the amount of $20,000, which sum shall accrue and become payable
as follows: (i) one-half (1/2) upon HPC's exercise of the option
and Consultant's commencement of exclusive services in connection
therewith; and (ii) one-half (1/2) upon Consultant's completion
of exclusive services hereunder.

4.   TRANSPORTATION AND EXPENSES

     If HPC requires Consultant to travel more than fifty (50)
miles from Consultant's then principal place of residence
(presently Los Angeles County, California) for the purposes of
rendering services hereunder, Lender shall be entitled to receive
a weekly allowance (proratable at 1/7 thereof per day), in lieu
of all living or other expenses of $1,000 per week, plus one
first-class (if available) round trip transportation.  HPC shall
not be responsible for any other expenses or perquisites of
Consultant.  All travel arrangements, including but not limited
to the acquisition of airline tickets, booking of accommodations,
etc., shall be made though HPC's location or travel department,
unless prior written approval is obtained from a business affairs
executive of HPC.

5.   OWNERSHIP OF RIGHTS

     The results and proceeds of Consultant's services hereunder
(the "Work") in connection with the Picture shall be deemed a
work-made-for-hire specially ordered or commissioned by HPC.  HPC
shall exclusively own all now known or hereafter existing rights
of every kind throughout the universe, in perpetuity and in all

11/10/98   12:19   ☎818 752 8⁻⁴⁹      BARRY E. POSNER                    ☎003

languages, pertaining to such results and proceeds, the Picture, any part thereof and all elements therein for all now known or hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, digital television, video and computer games, video cassette and video or laser disc, any computer-assisted media (including, but not limited to CD-Rom, CD-I and similar disc systems, interactive media and multi-media and any other devices or methods now existing or hereinafter devised), character, sequel, remake, and allied rights therein, and the foregoing is inclusive of a full assignment to HPC thereof.

6.  ## WARRANTIES AND INDEMNIFICATION

6.1  Consultant warrants and agrees that the Work shall not infringe upon or violate any copyright of or the right of privacy of any person, shall not constitute a libel or slander of any person, and shall not infringe upon or violate any other right of any person, but said warranty and agreement is not made with respect to any material assigned to Consultant by HPC.

6.2  Consultant agrees to indemnify HPC, HPC's parent, subsidiaries, affiliates, licensees, subsidiaries of HPC's parent, and their respective directors, officers, employees and agents against and hold each harmless for all damage, liability or expense, including reasonable attorneys' fees, resulting from any breach and/or alleged breach under this warranty and Agreement.

6.3  HPC warrants and agrees that any material assigned to Consultant by HPC shall not infringe upon or violate any copyright of, or the right of privacy of any person and shall not infringe upon or violate any other right of any person other than material created and/or written by Consultant.  HPC shall indemnify Consultant against, and hold him harmless from all damage, liability or expense, including reasonable attorneys' fees resulting from any breach by HPC of the aforesaid warranty and agreement.

6.4  Errors and Omissions Insurance.  Consultant shall be covered as an additional insured on HPC's errors and omissions insurance policy in connection with the Picture during customary periods of production and distribution of the Picture, subject to the limitations and restrictions of said policy.  The provisions of this Paragraph 6.4. shall not be construed so as to limit or otherwise affect any obligation, representation or agreement by Consultant.

## NO OBLIGATION TO USE

Subject only to payment of compensation earned and accrued by Consultant hereunder, HPC is not obligated to use the services

of Consultant, the Work, or to develop, produce, distribute, or
exploit any motion picture that Consultant renders services with
respect to, or if commenced, to continue the development,
production, distribution, or exploitation of any such motion
picture.  HPC may (in its sole discretion) terminate this
Agreement at any time.

8.    ASSIGNMENT

    HPC may sell, grant, license, assign, or otherwise transfer
HPC's rights under this Agreement, and this Agreement shall inure
to the benefit of HPC's successors, licensees, or assigns.  No
obligation of Consultant hereunder may be assigned or delegated
to any third party.

9.    SERVICES UNIQUE

    Consultant acknowledges that Consultant's services are of a
unique, extraordinary, and intellectual character, the loss of
which cannot be adequately compensated in damages in an action at
law, and therefore Consultant acknowledges that HPC shall be
entitled to seek injunctive and other equitable relief to prevent
or curtail any breach of this Agreement by Consultant.

10.   PROMOTIONAL FILMS

    HPC contemplates filming and exploiting films, including
without limitation, "behind-the-scenes" or "making-of"
productions (jointly and severally "Promotional Rights") about
the development and production of each Picture produced
hereunder.  Consultant hereby agrees and consents to such filming
and exploitation (including without limitation use of any film
clip footage from such Picture and behind-the-scenes photography
and filmed interviews with Consultant) and hereby grants to HPC
the right to use Consultant's name, voice and likeness in
connection with such Promotional Rights for no additional
consideration inasmuch as the compensation payable to Consultant
under this Agreement for each such Picture shall be deemed to
include compensation for all rights granted pursuant to this
Paragraph 10.

11.   INDEPENDENT CONTRACTOR:

    It is understood and agreed that Consultant is acting as an
independent contractor in the performance of New Wave's
obligations hereunder.  Nothing herein contained shall be
construed as creating the relationship of joint venturers,
principal and agent or employer and employee between HPC and
Lender and/or Consultant.

12.   APPROVALS AND CONTROLS

    HPC shall retain all approvals and controls, including
without limitation, the right to designate the production

manager, estimator and location auditor, and the right to
initiate action at any time and in any respect in connection with
the Picture.

13.  PUBLICITY

        Lender and Consultant hereby acknowledge and agree that
neither Lender nor Consultant shall directly or indirectly issue
or permit the issuance of any publicity or disclose any
information concerning the Agreement, Consultant's services under
the Agreement, the Picture, the Work (as defined in Paragraph 5.
hereof), HPC, Simpson/Bruckheimer Productions (or its principals
or employees) or HPC's or Simpson/Bruckheimer Productions'
business or production methods; provided, however, that
Consultant shall not be deemed in breach of this Paragraph 13. if
Consultant makes incidental and non-disparaging reference solely
to said matters during an interview concerned primarily with
Consultant rather than any of said matters.  Lender and
Consultant hereby acknowledge that unauthorized disclosure of any
information related to the above could cause irreparable harm and
significant injury which may be difficult to ascertain.
Accordingly, Lender and Consultant agree that HPC (without
limiting its rights pursuant to Paragraph 15. below) and
Simpson/Bruckheimer Productions shall have the right to obtain
immediate injunctive relief from any breach of this Paragraph
13., in addition to any other rights and remedies they may have,
including without limitation, HPC's right to terminate this
Agreement.

14.  NOTICES

        Any notice pertaining hereto shall be in writing.  Any such
notice and any payment due hereunder shall be served by
delivering said notice or payment personally or by sending it by
mail, cable, or telex (postage or applicable fee prepaid),
addressed as follows (or as subsequently designated in writing):

        To Lender and          Mike Frankel
        Consultant:            12501 Chandler Boulevard, # 104
                               North Hollywood, California 91607

        To HPC:                Hollywood Pictures Company
                               500 South Buena Vista Street
                               Burbank, CA 91521
                               Attention: Senior Vice President
                                          Business & Legal Affairs

15.  GENERAL

        This Agreement constitutes the entire agreement between the
parties and supersedes all prior and contemporaneous written or
oral agreements pertaining hereto and can only be modified by a
signed writing.  Lender's and Consultant's sole and exclusive
remedy for HPC's breach, termination, or cancellation of the

Agreement or any term hereof shall be an action for damages and Lender and Consultant irrevocably waive any right to seek and/or obtain equitable or injunctive relief.

    In witness hereof and in full understanding of the foregoing, the parties have executed and delivered this Memorandum of Agreement as of the date and year first written above.

HOLLYWOOD PICTURES COMPANY

By: _Phillip Mull_

Its: _Vice President_

AGREED TO AND ACCEPTED:

Dux Ninjitsu-Ninja Studios

By: _Frank Dux_          Date: _20 Dec 93_

Its: _OWNER_

_Frank Dux_
Frank Dux

"Question:  Did you tell
Mr. Plotkin that in your opinion, that FM
could not produce a movie depicting the
'Kumite' competition without first
entering into this agreement that you were
negotiating?

"Answer:  I told Mr. Plotkin it was
my opinion that if they did not do a
release for Frank Dux and did not

negotiate with him with regard to his
rights in any sequel as per the agreement,
they would be breached and owing money.

"Question:  And what did
Mr. Plotkin respond, if at all?

"Answer:  He said something to the
effect, 'Okay.  You can sue us on that
issue, or we can reconvey it.'  We had
some discussion, but there again he ended
with why there's no problem in reconveying
the rights to Frank."